No. 25-3048

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

LIFESTYLE COMMUNITIES, LTD. *et al.*,
*Plaintiffs-Appellants*,

v.

THE CITY OF WORTHINGTON, OHIO,
*Defendant-Appellee*,
_____

On appeal from the United States District Court for the
Southern District of Ohio, Case No. 2:22-cv-01775

---

**BRIEF OF APPELLANTS LIFESTYLE COMMUNITIES, LTD.
AND WORTHINGTON CAMPUS, LLC**

---

Michael R. Gladman
Yvette McGee Brown
Dustin M. Koenig
Timothy D. Lanzendorfer
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215
(614) 469-3939

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

## CORPORATE DISCLOSURE

Per Federal Rule of Appellate Procedure 26.1, Lifestyle Communities, Ltd. and Worthington Campus, LLC declare the following:

1.    Lifestyle Communities, Ltd. is not a subsidiary or affiliate of a publicly owned corporation.

2.    Worthington Campus, LLC is not a subsidiary or affiliate of a publicly owned corporation.

3.    No publicly owned corporation not a party to the appeal has a financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure ............................................................ i

Statement in Support of Oral Argument ........................................ xii

Statement of Jurisdiction ..................................................... xiii

Statement of Issues ........................................................... xiv

Statement of the Case ......................................................... 1

    A.    Worthington updates its comprehensive plan to spur development of the United Methodist property. ........................ 3

    B.    Lifestyle Communities seeks to develop the United Methodist property consistent with the 2014 Plan. ..................... 9

    C.    Robinson schemes behind the scenes to convert the United Methodist property into a public park. ......................... 11

    D.    Lifestyle Communities submits an application to redevelop the property consistent with the 2014 Plan. ............. 14

    E.    Worthington's municipal planning commission stonewalls Lifestyle Communities' applications. ..................... 16

    F.    City council denies LC's application and scraps the 2014 Plan without notice to the public. ....................... 19

    G.    Lifestyle Communities sues to vindicate its property rights. ................................................ 24

Summary of Argument ......................................................... 26

## TABLE OF CONTENTS
(continued)

Page

Argument .................................................................................28

I.    There is a genuine dispute of material fact as to whether the
      City committed a partial regulatory taking of the property. ..............28

      A.    Lifestyle Communities suffered severe economic loss to
            the United Methodist property's fair market value. .................33

      B.    The City interfered with Lifestyle Communities'
            reasonable investment-backed expectations. ...............39

      C.    Worthington's actions have the character of a taking. ..............46

II.   Lifestyle Communities plausibly alleged its due process claims. .......54

      A.    The district court erred by ignoring Lifestyle
            Communities' protected interests in the United Methodist
            property itself. ...................................................56

      B.    Lifestyle Communities also had a protected interest in the
            benefit of rezoning consistent with the 2014 Plan. ....................58

III.  The district court erred in granting summary judgment on the
      declaratory judgment claim without analysis. ......................61

Conclusion .................................................................................64

Certificate of Compliance ..................................................66

Certificate of Service ..........................................................67

Addendum ...............................................................................68

# TABLE OF AUTHORITIES

**CASES**                                                      **Page**

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ......................................................................40

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................32, 36, 51

*Armstrong v. United States*,
364 U.S. 40 (1960) ..........................................................................................51

*Bannister v. Knox Cnty. Bd. of Educ.*,
49 F.4th 1000 (6th Cir. 2022) ....................................................................36, 56

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ..................................................................................54, 58

*Braun v. Ann Arbor Charter Township*,
519 F.3d 564 (6th Cir. 2008) ..........................................................................58

*C. Miller Chevrolet, Inc. v. City of Willoughby Hills*,
313 N.E.2d 400 (Ohio 1974) ..........................................................................63

*Canal Appraisers of the State of N.Y. v. People ex rel. Tibbits*,
17 Wend. 571 (N.Y. 1836) ..............................................................................30

*CCA Assocs. v. United States*,
667 F.3d 1239 (Fed. Cir. 2011) ..................................................................34, 38

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ..............................................................................28, 29, 30

# TABLE OF AUTHORITIES

(continued)

Page

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003).......................................................34, 38, 40, 51

*Cincinnati v. Banks*,
  757 N.E.2d 1205 (Ohio Ct. App. 2001)...........................................................33

*City of Akron v. Chapman*,
  116 N.E.2d 697 (Ohio 1953)..........................................................................56

*City of Norwood v. Horney*,
  853 N.E.2d 1115 (Ohio 2006).................................................................28, 56

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*,
  365 F.3d 435 (6th Cir. 2004)..........................................................................33

*Colony Cove Props., LLC v. City of Carson*,
  888 F.3d 445 (9th Cir. 2018)..........................................................................34

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*
  *for S. Cal.*,
  508 U.S. 602 (1993).......................................................................................37

*Dimare Fresh, Inc. v. United States*,
  808 F.3d 1301 (Fed. Cir. 2015).................................................................30, 31

*Dolan v. City of Tigard*,
  512 U.S. 374 (1994).................................................................................47, 49

*Dyke v. City of Shaker Heights*,
  2004 WL 231792 (Ohio Ct. App. Feb. 5. 2004)...............................................60

# TABLE OF AUTHORITIES
## (continued)

**Page**

*E. Enters. v. Apfel*,
  524 U.S. 498 (1998)..................................................................53

*EJS Props., LLC v. City of Toledo*,
  698 F.3d 845 (6th Cir. 2012).....................................................58

*F.P. Dev., LLC v. Charter Township of Canton*,
  456 F. Supp. 3d 879 (E.D. Mich. 2020)..............................44, 45, 49

*F.P. Dev., LLC v. Charter Township of Canton, Michigan*,
  16 F.4th 198 (6th Cir. 2021).......................................44, 49

*FBT Everett Realty, LLC v. Mass. Gaming Comm'n*,
  187 N.E.3d 373 (Mass. 2022) .................................................51

*Fla. Rock Indus., Inc. v. United States*,
  18 F.3d 1560 (Fed. Cir. 1994)...........................................53, 54

*Formanek v. United States*,
  26 Cl. Ct. 332 (Fed. Cl. 1992) ...........................................39, 44

*Gillis v. Miller*,
  845 F.3d 677 (6th Cir. 2017)...................................................46

*Goldberg Cos., Inc. v. Richmond Hts. City Council*,
  690 N.E.2d 510 (Ohio 1998)...........................................57, 61

*Haw. Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984)................................................................29

*Ingram v. Wayne Cnty., Michigan*,
  81 F.4th 603 (6th Cir. 2023)...................................................28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Jaylin Invs., Inc. v. Moreland Hills,*
839 N.E.2d 903 (Ohio 2006)................................................................61, 62, 63

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979)....................................................................................28, 47

*Karches v. City of Cincinnati,*
526 N.E.2d 1350 (Ohio 1988)...........................................................................61

*Kelo v. City of New London,*
545 U.S. 469 (2005)...........................................................................................29

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
480 U.S. 470 (1987)....................................................................................46, 53

*Koontz v. St. Johns River Water Mgmt. Dist.,*
570 U.S. 595 (2013)...........................................................................................47

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005)..............................................................................31, 34, 46

*Loveladies Harbor, Inc. v. United States,*
15 Cl. Ct. 381 (Fed. Cl. 1988) .............................................................38, 39, 44

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003 (1992).........................................................................................29

*Masheter v. Kebe,*
359 N.E.2d 74 (Ohio 1976)....................................................................33, 36, 39

*Mayfield-Dorsh, Inc. v. City of S. Euclid,*
429 N.E.2d 159 (Ohio 1981).............................................................................57

# TABLE OF AUTHORITIES
(continued)

**Page**

*Murr v. Wisconsin*,
  582 U.S. 383 (2017)................................................................31, 43

*Musial Offs., Ltd. v. County of Cuyahoga*,
  163 N.E.3d 84 (Ohio Ct. App. 2020)...............................................58

*Nollan v. Cal. Coastal Comm'n*,
  483 U.S. 825 (1987)........................................................................47

*Pa. Coal Co. v. Mahon*,
  260 U.S. 393 (1922)................................................................31, 53

*Paterek v. Village of Armada, Michigan*,
  801 F.3d 630 (6th Cir. 2015)...........................................................54

*Penn Cent. Transp. Co. v. New York City*,
  438 U.S. 104 (1978)................................................................ passim

*Raceway Park, Inc. v. Ohio*,
  356 F.3d 677 (6th Cir. 2004)...........................................................37

*Rindge Co. v. Los Angeles County*,
  262 U.S. 700 (1923)........................................................................46

*Rispo Realty & Dev. Co. v. City of Parma*,
  564 N.E.2d 425 (Ohio 1990)...........................................................61

*Rose Acre Farms, Inc. v. United States*,
  559 F.3d 1260 (Fed. Cir. 2009).......................................................33

*Ross v. City of Toledo*,
  2009 WL 806903 (Ohio Ct. App. Mar. 20, 2009)......................61, 63

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Ruckelshaus v. Monsanto Co.,*
  467 U.S. 986 (1984) ........................................................................40

*Rudd v. City of Norton Shores, Michigan,*
  977 F.3d 503 (6th Cir. 2020) ..........................................................55

*Sansotta v. Town of Nags Head,*
  97 F. Supp. 3d 713 (E.D.N.C. 2014) ...................................51, 52, 53

*Sherman v. Town of Chester,*
  752 F.3d 554 (2d Cir. 2014) .......................................................51, 53

*State ex rel. Gordon v. Taylor,*
  149 Ohio St. 427 (1948) ..............................................................59, 60

*Store Safe Redlands Assocs. v. United States,*
  35 Fed. Cl. 726 (1996) ....................................................................43

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
  535 U.S. 302 (2002) ........................................................................30

*Troche v. Crabtree,*
  814 F.3d 795 (6th Cir. 2016) ..........................................................32

*United States v. Craft,*
  535 U.S. 274 (2002) ........................................................................28

*United States v. Pewee Coal Co.,*
  341 U.S. 114 (1951) ........................................................................30

*Wensmann Realty, Inc. v. City of Eagan,*
  734 N.W.2d 623 (Minn. 2007) ........................................................52

# TABLE OF AUTHORITIES
(continued)

**Page**

*Wray v. Mussig*,
 1996 WL 586755 (Ohio Ct. App. Sept. 20, 1996) ....................................34, 36

**STATUTES**

28 U.S.C. § 1291 ............................................................................................. xiii

28 U.S.C. § 1331 ............................................................................................. xiii

28 U.S.C. § 1367 ............................................................................................. xiii

42 U.S.C. § 1983 ............................................................................................. xiii

Ohio Rev. Code § 2721.03 .................................................................................61

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8 ...............................................................................................55

Fed. R. Civ. P. 56 .............................................................................................32

Ohio Const. art. I, § 19 .....................................................................................29

Ohio Const. art. XVIII, § 3 ...............................................................................61

U.S. Const. amend. V ........................................................................................29

U.S. Const. amend. XIV ..............................................................................29, 54

Worthington Charter § 6.03 .............................................................................3, 4

Worthington Ord. 1123.22 ..................................................................................4

Worthington Ord. 1141.02 ..................................................................................4

# TABLE OF AUTHORITIES
(continued)

**Page**

Worthington Ord. 1141.03 ................................................................4

Worthington Ord. 1145.01 ................................................................4

Worthington Ord. 1174.08 ................................................................4

Worthington Res. 04-2022 ..............................................................22

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants Lifestyle Communities, Ltd. and Worthington Campus, LLC respectfully request argument. This appeal raises thorny constitutional questions involving government interference with private property rights. These questions implicate issues that go beyond the facts of this case. Oral argument would aid the Court in its analysis.

## STATEMENT OF JURISDICTION

The district court had federal question and supplemental jurisdiction over Lifestyle Communities, Ltd. and Worthington Campus, LLC's claims under 28 U.S.C. §§ 1331 and 1367 and 42 U.S.C. § 1983. On December 27, 2024, the court granted the City of Worthington's motion for summary judgment and denied Lifestyle Communities, Ltd. and Worthington Campus, LLC's motion for summary judgment in a final judgment that resolved all remaining issues. Op., R. 89, PageID #5655; Judgment, R. 90, PageID #5656. Lifestyle Communities, Ltd. and Worthington Campus, LLC filed a timely notice of appeal on January 24, 2025. Notice, R. 91, PageID #5657. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the district court erred in awarding summary judgment to the City of Worthington on appellants' regulatory takings claim under the United States and Ohio Constitutions, when the City's newfound desire to turn Lifestyle Communities' property into a privately sponsored public park decimated the property's value and interfered with LC's reasonable reliance on the City's own past guidance for developing the property into a mixed-use campus.

2.      Whether the district court erred in dismissing at the pleading stage appellants' due process claims under the United States and Ohio Constitutions, when the complaint plausibly alleged property interests in both the property itself and in the benefit of future rezoning.

3.      Whether the district court erred in awarding summary judgment to the City of Worthington on appellants' Ohio law declaratory judgment claim, where the court assumed the claim duplicated Lifestyle Communities' other claims despite the fact that LC's briefing made clear it was a standalone claim under Ohio law and not merely a requested remedy.

## STATEMENT OF THE CASE

This is a case about government overreach. Worthington, Ohio is a northside suburb of the City of Columbus. Although central Ohio has seen explosive growth in recent years, nearly forty acres of prime real estate sit vacant just north of downtown Worthington. For decades, the United Methodist Children's Home ran a facility for troubled youth there, and the property's specialized, restrictive zoning reflects that unique use. But that zoning posed a problem once the home shuttered. The land sat unused, which served no one—least of all the City of Worthington.

Hoping to spur interest from investors, Worthington embarked on an ambitious project to develop a blueprint for future development on the site. The result was a comprehensive plan that envisioned a mix of residential, retail, and green space. Lifestyle Communities, a Columbus-based real estate developer, liked what it saw and thought it could deliver on the City's vision for the site. And so it signed a development rights deal for the property and reached out to the City about its plans.

From the start, however, Lifestyle Communities' efforts were dogged by elements within the City, championed by citizen-turned-city councilman David Robinson, who preferred to see the land dedicated to park space. But they had a problem—Worthington couldn't afford to buy the land. And so Robinson, from his perch on the Worthington city council, worked behind the scenes to influence the City to extract from Lifestyle Communities that which it couldn't afford—a public park on private land.

Along the way, Worthington reneged on its commitments, broke its own rules, and trampled on Lifestyle Communities' rights under the United States and Ohio Constitutions. After years of stonewalling by the City, Lifestyle Communities brought this case to vindicate those rights.

To be sure, this case raises thorny constitutional questions that resist easy answers. But the district court took a number of missteps when wading into that constitutional thicket. At the pleading stage, it dismissed Lifestyle Communities' due process claims only by missing and misconstruing the complaint's well-pleaded facts. That was error. And at summary judgment, the district court usurped the jury's role and made factual calls on Lifestyle

Communities' regulatory takings claim while eliding its declaratory judgment claim altogether. That too was error. Lifestyle Communities thus respectfully asks this Court to correct course and remand this case so Lifestyle Communities can have the day in court it deserves.

**A.    Worthington updates its comprehensive plan to spur development of the United Methodist property.**

Worthington has relied on a comprehensive plan to shape the City's zoning strategy since 1964. 2005 Comprehensive Plan, at AP_000010.[1] The plan, as amended from time to time, reflects Worthington's official policy for land use and development, as required by the City's charter. Worthington Charter § 6.03. In addition, Worthington has a formal zoning code that reflects the City's implementation of that land use and development policy. Applications for rezoning first go to the municipal planning commission, which evaluates proposals based on the comprehensive plan and makes a

---

[1] The 2005 comprehensive plan was not filed electronically below. However, the plan is publicly available on Worthington's website, and the district court took judicial notice of it. Op., R. 89, PageID #5621; City of Worthington, Ohio, Comprehensive Plan Update & 2005 Strategic Plan for Worthington (2005). Lifestyle Communities has provided this plan in an appendix.

recommendation to the city council. *Id.* They then go to the council for review and approval. Worthington Ords. 1145.01, 1174.08.

The property at the center of this case is mostly flat, save for a ravine and a wooded area at the southern end of the lot called the Tucker Creek. 2014 Plan, R. 65-4, PageID #2021. For decades, it housed a facility for troubled youth run by the United Methodist Children's Home. Meeting Min., R. 60-1, PageID #703. Historically, Worthington zoned the vast majority of the parcel as "special," or S-1, which is used for "large public or semipublic land holdings" that are "suitable for noncommercial recreation" and "highway interchanges." Worthington Ord. 1141.02(b); *see* 2014 Plan, R. 65-4, PageID #2021; Op., R. 89, PageID #5624. Worthington zoned smaller portions C-2 (Community Commercial) and C-3 (Institutions and Offices) close to the main thoroughfare of High Street and a tiny sliver R-10 (Low Density Residential) at the northern tip. 2014 Plan, R. 65-4, PageID #2021; *see* Op., R. 89, PageID #5624; Worthington Ords. 1123.22(b) (C-2 zoning), 1123.22(c) (C-3 zoning), 1141.03(b) (R-10 zoning).



Worthington has periodically updated its comprehensive plan, and the United Methodist lot has often drawn special attention given its prominent location. When the City revised the plan in 2005, Worthington noted that the "site offers the opportunity to develop some of the urban village living that is lacking in the City" with "higher density residential development." 2005 Comprehensive Plan, at AP_000098. The 2005 plan concluded that the

– 5 –

United Methodist property "is an ideal site for a mixed use, planned development." *Id.*

The youth facility shuttered in 2010 and the land sat idle, leading the City to redouble its efforts to make productive use of the space. Brown Memo., R. 65-3, PageID #1888. Worthington hired a consultant to develop a revised comprehensive plan specifically for the United Methodist property. *Id.* The City wanted the "public planning process" to "build community consensus on how the [] property develops in the future." *Id.* Worthington also hoped that the updated plan would "provid[e] a potential new developer some confidence that their proposal would fit with the community, city, and landowner desires for the site as they go through the development process." *Id.* To achieve this consensus, the City pursued a robust process that included multiple rounds of stakeholder interviews, walking tours of the site, and an online dialogue on the City's website. *Id.*, PageID #1889.

In September 2014, Worthington's city council officially adopted a new comprehensive plan for the United Methodist property "to guide future

development of the site" (hereafter the 2014 Plan or the Plan). Res., R. 73-5, PageID #4122. By its own terms, the Plan's "goal" was "to provide guidance" to "future developer[s]" who seek to "rezon[e] the property" and "to assist the City with its review and evaluation of any proposal." 2014 Plan, R. 65-4, PageID #2020. The 2014 Plan "provide[d] a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site." *Id.*, PageID #2021. The Plan also acknowledged that, given the strictures of the lot's dominant "special" zoning, "any proposed redevelopment" would "include rezoning of the entire site to a Planned Unit Development as an early step." *Id.*, PageID #2022.

The 2014 Plan called for a mix of residential, retail, and green space. *Id.* Within the "Neighborhood Core," Worthington expected developers to erect a "higher density neighborhood." *Id.*, PageID #2024. The Plan called for single family homes around the north and west perimeter, with mixed use commercial/residential along the main drag of High Street. *Id.*, PageID #2022–23.



Worthington also wanted to see "park space for community and public enjoyment"—not just for the site's residents but also to "address the community's desire for park space and amenities here," including a preserve around the Tucker Creek. *Id.*, PageID #2026.

### B.    Lifestyle Communities seeks to develop the United Methodist property consistent with the 2014 Plan.

Lifestyle Communities is a real estate developer based in Columbus, Ohio. Compl., R. 1, PageID #6; Answ., R. 43, PageID #563.[2] After reviewing the 2014 Plan, LC liked what it saw and thought it could deliver on the City's vision for the United Methodist site. So in 2015, Lifestyle Communities signed a deal with the United Methodist Children's Home that granted LC exclusive rights to develop the property. *See* Agreement, R. 65-1, PageID #1700.

Lifestyle Communities then presented a "preliminary concept" for the United Methodist property at a public meeting of Worthington's municipal planning commission. Meeting Min., R. 60-1, PageID #702. LC's concept embodied the 2014 Plan, with a mix of apartments, single-family homes, office space, and retail. Meeting Min, R. 72-1, PageID #3420. The concept also featured green spaces such as a shelter house, a trail along the Tucker Creek,

---

[2] This brief refers to Appellants Lifestyle Communities, Ltd. and Worthington Campus LLC together as simply Lifestyle Communities or "LC."

a formal village green, a community park, and scattered open space around the development. *Id.*

Although not a full-fledged proposal, Lifestyle Communities hoped its concept would generate feedback and promote a "dialogue" with the City and public. Meeting Min., R. 60-1, PageID #703. It did. One resident reported feeling "grateful and thrilled that there was someone out there that had the same vision for what the property could be that we the city itself had." *Id.*, PageID #712. Others offered support alongside constructive feedback. *See id.*, PageID #713–17 ("this is a good first step"; "I looked at this plan before I came to the meeting tonight, and I am excited about it").

Enter David Robinson. Then just a private citizen, Robinson disliked any proposal that included apartments. Robinson Letter, R. 72-6, PageID #3722. He instead wanted to see the City pursue the "acquisition of greenspace at" the site. Robinson Email, R. 72-6, PageID #3726. And a Robinson-aligned citizens group calling itself the Worthington Alliance for Responsible Development similarly complained about a perceived lack of green space in Lifestyle Communities' concept. Meeting Min., R. 60-1,

PageID #707. But even Robinson admitted that the City had "explicitly state[d]" that the 2014 Plan "is, and ought to be, the defining authority regarding the future of the" property. Robinson Letter, R. 72-6, PageID #3724. Not to be deterred, Robinson set out to wage a multi-year campaign against Lifestyle Communities in hopes of instead turning the United Methodist lot into parkland.

### C.    Robinson schemes behind the scenes to convert the United Methodist property into a public park.

Robinson's next step in his crusade was to get elected to city council in November 2017. Robinson Dep., R. 62-1, PageID #1115. A month later, before even taking office, Robinson privately emailed city manager Matt Greeson about his goal to rescind the 2014 Plan, explaining that he was "intent on moving on this at the very outset of the new year." Robinson Email, R. 72-7, PageID #3787.

His marching orders in place, Greeson began to consider whether, and how, to convert the property into a new park. Greeson Email, R. 65-3, PageID #1894, 1903. Years prior, Worthington officials had considered whether to "[p]ursue fee simple acquisition of the land" but found it would be too

"financially costly." *Id.*, PageID #1903. Not willing to take no for an answer, Robinson directed city officials to revisit the financial prospects to acquire the property. Robinson Email, R. 65-3, PageID #1907. He enlisted outside counsel to prepare a proposal in November 2018 to buy the land and turn it into a public park—a proposal he later sent to a fellow councilmember from his personal email address with a "confidential" label. *See* Florey Memo., R. 72-5, PageID #3678–81; Robinson Email, R. 72-10, PageID #3820. Because the price for an outright purchase remained out of reach, Robinson and the City settled on a much cheaper strategy: "[n]egotiate land set aside as part of development." Greeson Email, R. 65-3, PageID #1903.

In February 2019, the city council and city officials held a retreat where they discussed the United Methodist property. Ballard Memo., R. 72-9, PageID #3795. Robinson accused LC of lying to the City. *Id.* He hoped that "once the City Council denied" LC's rezoning application—which it would not submit until more than a year later—Lifestyle Communities "will buckle and realize the only option remaining is to sell the land to the City." *Id.*

Councilman Doug Foust was even more explicit, agreeing that "[a]nything" that Lifestyle Communities proposes "will be denied." *Id.*

For its part, Lifestyle Communities had entered a purchase contract with the United Methodist Children's Home in April 2017—long before Robinson's election to council. Contract, R. 65-1, PageID #1719. While the contract originally included a standard zoning contingency, LC later agreed to drop the contingency because it expected the City would abide by the 2014 Plan it had spent so much time and money to develop. DeAscentis Decl., R. 80-1, PageID #4550.

Robinson, however, feared that the City *would* abide by its commitments in the 2014 Plan. So, he took his first public shot at the Plan in September 2020. The day before a council meeting, he informed his fellow councilmembers of his plan to move to "temporarily suspend" the Plan. Robinson Email, R. 72-5, PageID #3683. He hoped to "avoid" the City being placed in a "vulnerable" position if Lifestyle Communities were to submit a new proposal that "conforms in general with the [2014 Plan] and yet is rejected." *Id.* He feared that, if LC submitted a redevelopment plan,

Worthington "cannot legally update the [2014 Plan] since they would have a 'vested interest.'" Robinson Email, R. 72-6, PageID #3768.

Robinson's proposed moratorium fizzled at the meeting. Councilman Scott Myers worried that "[i]f Council or [the municipal planning commission] were to contradict the [2014 Plan], that could give [Lifestyle Communities] an argument on appeal." Meeting Min., R. 72-10, PageID #3817. Myers also explained that "[o]ther than a desire for a park, and the opposition to rental properties, he ha[d] not heard specific objections to the [2014 Plan]," and he expressed concern at the prospect of "set[ting] aside a document that was literally years in the making on a non-agenda item, at the end of the meeting, without input from the public or staff, or any advance notification." *Id.*, PageID #3816–17. So council punted on the measure. *Id.*, PageID #3817. At least publicly, then, Worthington remained behind the 2014 Plan.

**D.     Lifestyle Communities submits an application to redevelop the property consistent with the 2014 Plan.**

A month later, in October 2020, Lifestyle Communities submitted its first application for a planned unit development on the United Methodist

property. DeAscentis Decl., R. 80-1, PageID #4550. Lifestyle Communities based its proposal on 2014 Plan, but LC had not received any pre-submission feedback because the city council had "discouraged staff from proactively working with LC." Greeson Memo., R. 65-3, PageID #1975. Even staff conceded that this broke with the City's standard procedure of having staff "help steer developments towards" mutually beneficial outcomes with "clearly discernable" goals. *Id.* Rather, City officials had told Lifestyle Communities it could only receive feedback and guidance through the City's formal procedures. Meeting Min., R. 60-5, PageID #890; *see* Brown Dep., R. 69-1, PageID #2765; Meeting Min., R. 72-3, PageID #3570–71. In private, though, the City bared its teeth, with the planning commission chairman remarking to the planning director whether "LC was aware of the buzz saw they are running into." Coulter Email, R. 72-12, PageID #3838.

With its application submitted, Lifestyle Communities formally closed on the property. DeAscentis Decl., R. 80-1, PageID #4550. It paid $5.2 million dollars. *Id.* Lifestyle Communities finalized the sale "in reliance upon the

[2014 Plan] and with the expectation that [LC] would be permitted to develop the Property pursuant to the Applications." *Id.*

### E. Worthington's municipal planning commission stonewalls Lifestyle Communities' applications.

The City's municipal planning commission reviewed LC's application on January 14, 2021. Meeting Min., R. 72-1, PageID #3415. City staff had already evaluated the proposal and—unsurprisingly given Robinson's handiwork behind the scenes—recommended denial. *Id.*, PageID #3416. Staff purportedly had concerns about the application's population density, housing mix, stormwater management, and supposed lack of community green space. *See id.*, PageID #3416–48. Consistent with Robinson's scheme to turn the space into a public park, commission members told Lifestyle Communities they wanted "more contiguous green space that can be utilized by anyone." *Id.*, PageID #3469; *see also id.*, PageID #3471. Lifestyle Communities' representative reiterated LC's desire to collaborate with the City and the community. *Id.*, PageID #3471. Because Worthington had directed staff to not talk to LC outside of public meetings, LC hoped this commission meeting could provide that guidance. *See id.*; *see also* Brownlee

– 16 –

Dep., R. 61-1, PageID #984. After receiving the City's views, LC requested the commission table the application to give it time to incorporate the feedback. Meeting Min., R. 72-1, PageID #3471–72. The commission agreed. *Id.*, PageID #3472.

Lifestyle Communities submitted a revised application in September. Revised Application, R. 69-1, PageID #2967–81. LC strove to incorporate the January feedback regarding the "mix and location of uses" and the "[c]onfiguration of open space and open space amenities." *Id.*, PageID #2981. For example, the revised plan reduced the population density significantly and dedicated 25% of the property to open spaces. Meeting Min., R. 60-5, PageID #852, 883, 894. The revised application conformed with the 2014 Plan in all relevant respects. *See* Sudy Rep., R. 72-14, PageID #3856.

The planning commission scheduled to discuss the revised application on October 14, 2021. Meeting Min., R. 60-5, PageID #846. The morning of the meeting, however, Robinson again put his thumb on the scale. Robinson Email, R. 72-5, PageID #3686. In an email to the planning commission, he pressured them to deny the application rather than collaborate with LC,

writing that while he "recognize[d] the sensibility and fairness of the [commission's] standard practice of giving applicants a chance to change course … [he] would suggest that this approach does not apply to the proposal on hand from Lifestyle Communities." *Id.*, PageID #3686–87. Robinson's "inappropriate" email represented a "shock[ing]" breach of Worthington's standard process to councilmembers and staff alike. Brown Dep., R. 69-1, PageID #2779; Coulter Dep., R. 81-1, PageID #4639, 4641 (admitting Robinson's email caught her "offguard" because it was "not normal for what—how we do business").

Still, Robinson's whisper campaign worked. While LC sought feedback—which it could get only through public meetings since the council had muzzled city staff—and a chance to further perfect its proposal, the planning commission instead recommended outright denial per Robinson's instructions. Meeting Min., R. 60-5, PageID #901. While staff conceded that the revised application showed a "positive improvement" with better open spaces, they still reported that "the community" demands "additional park

space with amenities within the [] site" and the revised application did not "meet[] the need for usable contiguous open space." *Id.*, PageID #875–76.

Even the fact that Lifestyle Communities had dedicated a full quarter of the property to open space did not sate the commission. *See id.*, PageID #888, 896–97. Worse still, the commission did not allow LC to amend its initial rezoning application to the updated September plan, meaning the application that actually went to the city council didn't reflect LC's efforts to incorporate the limited feedback from January. *Id.*, PageID #901; *see* Meeting Min., R. 72-3, PageID #3571.

### F.   City council denies LC's application and scraps the 2014 Plan without notice to the public.

Against Lifestyle Communities' wishes, its initial application went before the city council in December 2021. Meeting Min., R. 72-3, PageID #3568. At the meeting, LC representatives reiterated that they "remain[ed] committed to a path forward that satisfies mutual goals" but explained that the City's consistent stonewalling had left LC "guessing about what type of plan would get [planning commission] and Council support." *Id.*, PageID #3570. Indeed, Lifestyle Communities did not even ask the city council to

*approve* its application at that meeting; rather, LC asked that the city council: (*i*) refer the application back to the planning commission with instructions to provide genuine and collaborative effort with respect to the proposal; (*ii*) empower city staff to communicate with LC and work directly on the development plan as a liaison to the commission and the city council; and (*iii*) afford LC an opportunity to amend its initial rezoning application with a revised site plan and a full hearing before the planning commission to work through that revised application. *Id.*

These requests were consistent with the planning commission's "standard practice," as even Robinson himself admitted. Robinson Email, R. 72-5, PageID #3686–87. But the fix was in. As engineered by Robinson and his allies, the council denied the application. Meeting Min., R. 72-3, PageID #3579; *see* Ballard Memo., R. 72-9, PageID #3795 ("[a]nything" that Lifestyle Communities proposes "will be denied"). The denial meant that LC would have to wait at least six months to submit another application. Meeting Min., R. 72-3, PageID #3578.

But Robinson was not done. During the December council meeting, LC representatives had observed that the calls to turn the United Methodist lot into a public park themselves contradicted the 2014 Plan. *Id.*, PageID #3575. And so at the next city council meeting, Robinson—now president of the council—covertly renewed his plot to scrap the 2014 Plan. Meeting Min., R. 72-5, PageID #3654–55. At the close of regular business, Robinson introduced an emergency moratorium on any rezoning applications, certificates of appropriateness, development plan approvals, conditional uses, or permits for the United Methodist property. *Id.*

While the measure expressly targeted LC, Robinson did not notify Lifestyle Communities (let alone the public) before raising it. *See id.* In fact, a fellow councilmember complained about Robinson's bully tactics leading up to the meeting, which included "in essence being told not to talk to anybody but City staff or council members, which in essence is a gag order which all the years she has been around, unless it was executive session or it was attorney-client privilege, she has never been told to not talk to other people." *Id.*, PageID #3664. Robinson admitted he kept his intentions under

wraps specifically in order to deny Lifestyle Communities an opportunity to act to defend its rights as the owner of the United Methodist property. *Id.*, PageID #3665 ("Why didn't we just broadcast it to the world? Our concern, and it was not merely hypothetical, our concern was that by publicly announcing a moratorium or a … resolution to amend the comprehensive plan, either one of those actions could have prompted Lifestyle[] Communities to submit a proposal that would have thwarted and made impossible the action that we are proposing tonight."). Intense debate ensued, with one citizen calling the gambit "anti-democratic" and linking the sparse public attendance that night to the fact that Robinson had hidden the matter from the agenda. *Id.*, PageID #3656–69.

The moratorium failed because it didn't get the supermajority required for an emergency measure, but Robinson had a backup plan ready—something he literally called "Plan B." *Id.*, PageID #3670–72. Robinson introduced a resolution (also unannounced) to replace the detailed 2014 Plan with a one-and-a-half-page policy statement. *Id.*, PageID #3672; *see* Worthington Res. 04-2022. Robinson had privately circulated this resolution

to the council just two hours before the meeting. Meeting Min., R. 72-5, PageID #3672. His tactics "appalled" the audience, including some councilmembers. *Id.*, PageID #3672–75. Unmoved, a simple majority passed the resolution around midnight (hereafter the Midnight Resolution or the Resolution). *Id.*, PageID #3676; *see id.*, PageID #3674 (noting the late hour).

The Midnight Resolution set a new framework for a large community park across the United Methodist property. Res., R. 72-5, PageID #3636–38. Per the Resolution, the City found it "important" and "highly desirable" for the United Methodist property to include "a large continuous green space, central to the property and inclusive of the Tucker Creek" at the south end of the property. *Id.*, PageID #3637–38. Worthington expected this "central" space to be "[c]ompatible with current S-1 zoning." *Id.* The Resolution also called for "[c]ommercial development" for the City's "revenue generation" and "select service-oriented retail" along High Street "roughly in conformity with the existing C-2 and C-3 zoned areas." *Id.*, PageID #3638. The Resolution *only* contemplated rezoning for low-density housing around the edge of the property—whether free-standing or embedded within the commercial strip.

*Id.* The Midnight Resolution thus sharply departed from the 2014 Plan by calling for (*i*) community green space over the bulk of the property and (*ii*) the existing zoning to remain largely intact.

These actions decimated the United Methodist property's value. If rezoned consisted with the 2014 Plan, the undeveloped property would have a market value of $55,500,000. Gardner Rep., R. 73-2, PageID #4048. Under the Midnight Resolution's framework, however, the property could only fetch between $3,338,000 (LC's assessment) and $6,623,000 (Worthington's assessment). *Id.*, PageID #4054; Horner Rep., R. 73-1, PageID #3983.

### G.    Lifestyle Communities sues to vindicate its property rights.

Lifestyle Communities filed its complaint against Worthington in May 2022. Compl. R. 1, PageID #1. As relevant to this appeal, LC pleaded five different due process claims, a regulatory takings claim under both the United States and Ohio Constitutions, and an Ohio law declaratory judgment claim. *Id.*, PageID #29–37, 39–42. LC alleged that City "officials committed to [LC] that, if it would develop the Property in accordance with the [2014 Plan], the City would provide the necessary approvals in

accordance with the City's Charter." *Id.*, PageID #12. And Lifestyle Communities alleged that "[b]ased on the assurances from the City and upon the [2014 Plan], Lifestyle entered into an agreement to purchase the Property" in 2017. *Id.*

Worthington moved to dismiss. Mot., R. 20, PageID #114. The district court granted in part and denied in part. Op., R. 37, PageID #507. As relevant here, the court concluded that Lifestyle Communities' due process claims all failed to state a claim because LC had not alleged that it held a protected property or liberty interest. *Id.*, PageID #513–21. Yet the court analyzed only whether Lifestyle Communities had a protected interest in the future benefit of rezoning, failing to consider LC's rights in the United Methodist property itself. *See id.* The court allowed the regulatory takings and declaratory judgment claims to proceed. *Id.*, PageID #531–32. Lifestyle Communities moved for reconsideration, but the court denied the motion as to the due process claims. Op., R. 50, PageID #636–37.

After discovery, Lifestyle Communities and Worthington both moved for summary judgment on the remaining claims. Mot., R. 60, PageID #659;

Mot., R. 65, PageID #1630. The court denied LC's motion and granted Worthington's motion in full. Op., R. 89, PageID #5655. Lifestyle Communities timely appealed. Notice, R. 91, PageID #5657.

## SUMMARY OF ARGUMENT

The City of Worthington, as influenced by David Robinson, broke its promises and its own rules to deny Lifestyle Communities both a fair shake and the freedom to use its property as it sees fit—at least without due compensation. In doing so, Worthington ran afoul of the Takings and Due Process Clauses of the United States and Ohio Constitutions, as well as Ohio's constitutional limits on municipal zoning rules. The district erred threefold in rejecting Lifestyle Communities' claims short of trial.

*First*, the court wrongly granted Worthington summary judgment on Lifestyle Communities' regulatory takings claim. In walking through the familiar *Penn Central* standard—a tripartite test that balances the economic impact of the government's action, the extent to which the government interfered with investment-backed expectations, and the overall character of the government action—the court improperly weighed the evidence against

LC at every step of the way. If anyone was entitled to summary judgment on this record, it was Lifestyle Communities—hence its own motion for summary judgment below. But at minimum, the facts present too close a call for a court sitting in summary judgment and must go to a jury.

*Second*, the court erred in dismissing Lifestyle Communities' various due process claims at the pleading stage. Worthington attacked (and thus the district court addressed) only a sliver of those claims: whether Lifestyle Communities had plausibly alleged a protected interest in *rezoning* the land. The court got that question wrong because it discounted key allegations in LC's complaint. But even worse, it ignored entirely the separate question of whether Lifestyle Communities had plausibly alleged that it held a protected interest in the *property itself*. It did, and so the court erred.

*Third*, the court mistakenly granted summary judgment against LC on its Ohio law declaratory judgment claim because it assumed the claim simply dovetailed with the other claims. Not so. Ohio gives property owners a substantive cause of action to challenge municipal zoning restrictions in a

declaratory judgment action. As the record more than supports Lifestyle Communities, this claim too should be remanded.

## ARGUMENT

I.   THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER THE CITY COMMITTED A PARTIAL REGULATORY TAKING OF THE PROPERTY.

Property rights are "indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). From Locke to Blackstone and beyond, the right to property has been long venerated. *See Ingram v. Wayne County, Michigan*, 81 F.4th 603, 625 (6th Cir. 2023) (Thapar, J. concurring), *abrogated on other grounds by Culley v. Marshall*, 601 U.S. 377 (2024). John Adams perhaps said it best: "[P]roperty must be secured, or liberty cannot exist." *Cedar Point Nursey*, 594 U.S. at 147 (citation omitted).

"A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002). That bundle includes the rights to possess, use, exclude, and dispose. *See Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *City of Norwood v. Horney*, 853 N.E.2d 1115, 1128 (Ohio 2006). Yet property rights are not absolute, particularly

when the exercise of those rights impairs the rights of others. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020–22 (1992). So the State has the competing authority to limit—and sometimes take away—those rights. *Kelo v. City of New London*, 545 U.S. 469, 477–78 (2005).

The Takings Clause of the Fifth Amendment strikes a balance between the peoples' rights and the State's power. The Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V; *see also* Ohio Const. art. I, § 19 ("[W]here private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."). That is, government takings must serve a public use and must result in just compensation to the owners. *Cedar Point Nursery*, 594 U.S. at 147; *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984). The Fourteenth Amendment applies this Clause to the States and their subdivisions. U.S. Const. amend. XIV.

Takings come in many forms. No doubt, a city commits a taking when it physically appropriates land. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002). A city can also commit a taking through functionally ousting the owner. *See, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114, 115–117 (1951) (plurality opinion). But takings are not limited to physical appropriations; the State also commits a taking when it appropriates a single property right, like the right to exclude, and leaves the others. *Cedar Point Nursery*, 594 U.S. at 152.

Sometimes governments get creative, impairing property rights to promote the public good in ways that do not fit neatly within historical tradition. *See Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1307 (Fed. Cir. 2015). Yet it is not the label that controls. *See, e.g.*, *Canal Appraisers of the State of N.Y. v. People ex rel. Tibbits*, 17 Wend. 571, 603–04 (N.Y. 1836). As a result, the Supreme Court recognizes that governments can commit takings through novel means. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123–24 (1978). Under the regulatory takings doctrine, courts ask whether the government has strayed "too far" in interfering with an owner's

rights. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922); *see Penn Cent.*, 438 U.S. at 123–24. Its "central dynamic" is "flexibility." *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017). The "precise form" of the government action is not dispositive. *Dimare Fresh*, 808 F.3d at 1307. "[W]hat is important is the nature or substance of the government's action." *Id.*

Regulatory takings claims apply the familiar *Penn Central* factors, which look to: (*i*) the economic impact of the government's action; (*ii*) whether the action interferes with the owner's reasonable investment-backed expectations; and (*iii*) the character of the action. 438 U.S. at 123–24. If the government strips *all* value, a total regulatory taking has occurred, and the analysis stops. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). Otherwise, courts must weigh all three factors. *Id.* "Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.* at 539.

The district court granted Worthington's motion for summary judgment on Lifestyle Communities' regulatory takings claim. Summary

judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (citation omitted).

However well-intentioned, the district court disregarded these dictates in granting summary judgment to Worthington. In working its way through each of the *Penn Central* factors, the court consistently minimized or ignored outright the myriad of facts in Lifestyle Communities' favor and made factual calls that—at a minimum—should have gone to a jury. Reviewing the district court de novo, this Court should remand for trial. *Id.*

**A.    Lifestyle Communities suffered severe economic loss to the United Methodist property's fair market value.**

Worthington decimated the value of Lifestyle Communities' undeveloped real property. To assess the economic impact of the government's action under *Penn Central*, courts often compare the property's fair market value with and without the challenged government action. *Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1268–69 (Fed. Cir. 2009); *see Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 483 (6th Cir. 2004).

How is value calculated? "The fair market value of property is the price on which a willing seller and a willing buyer would settle in a voluntary sale." *Cincinnati v. Banks*, 757 N.E.2d 1205, 1211 (Ohio Ct. App. 2001). Assessors look beyond past uses. *Masheter v. Kebe*, 359 N.E.2d 74, 75 (Ohio 1976); *see Banks*, 757 N.E.2d at 1211. Rather, they ask whether an "informed, willing purchaser" would pay "more than an amount justified under existing zoning." *Masheter*, 359 N.E.2d at 75. On the other hand, the actual "likelihood" of a favorable zoning change bears on the "credibility of the expert's opinion that a reasonable businessperson would pay more than is

justified under the existing zoning classification." *Wray v. Mussig*, 1996 WL 586755, at *6 (Ohio Ct. App. Sept. 20, 1996). And credibility is a quintessential jury question.

How much economic impact is too much? At the high end, a 100% reduction constitutes a *total* regulatory taking, such that a court need not even consider the other two *Penn Central* factors. *Lingle*, 544 U.S. at 538. At the low end, a *partial* regulatory taking typically requires an impact exceeding 50% diminution. *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011). Most successful partial regulatory takings claims fall somewhere in the middle. *See CCA Assocs.*, 667 F.3d at 1246 (stating that a loss of 77% was sufficient); *Cienega Gardens v. United States*, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (stating that a loss of 96% was sufficient).

**1.** Worthington's actions have devalued the United Methodist property anywhere from 94% to 88%. Lifestyle Communities' expert assessor, Eric Gardner, valued even the undeveloped property at $55,500,000 if rezoned consistent with the 2014 Plan. Gardner Rep., R. 73-2, PageID

#4048.[3] Gardner valued the property at $3,338,000 if zoned consistent with the Midnight Resolution. *Id.*, PageID #4054. Worthington's rebuttal assessor, James Horner, valued the property at $6,623,000 if rezoned to allow low-density housing consistent with the Midnight Resolution. Horner Rep., R. 73-1, PageID #3983, 3970. Yet even Horner conceded that the property's dominant S-1 zoning does "not provide for financially feasible or maximum productive uses." *Id.*, PageID #3969.

Viewed in the light most favorable to Lifestyle Communities, the City's actions have decimated the property's value. Accepting Gardner's assessments—which the court must at summary judgment—the Midnight Resolution devalued the property by 94%.[4] And because the Resolution

---

[3] To be clear, this is the value of the rezoned land before any development even begins. As Gardner also opined, if the land were to be developed, the expected market value within about four years from the start of construction would be in the range of $340 to $360 million. Gardner Rep., R. 73-2, PageID #4076.

[4] In throwaway fashion, Worthington suggested in footnotes that it "will move" to exclude Gardner's testimony. Resp., R. 79, PageID #4466 n.2; Reply, R. 87, PageID #5599 n.2. But it never did, and the district court did not undertake a *Daubert* analysis as part of its summary judgment decision. By only raising this argument in footnotes, Worthington has forfeited any argument related to excluding Gardner's testimony for purposes of this

largely ratified the current zoning scheme, Worthington's decision to deny rezoning and leave the current zoning has similarly devalued the property. But even accepting Horner's more favorable assessment, the Midnight Resolution's framework devalued the property by 88%.

To be sure, both Gardner and Horner made predictions about rezoning and future development. *See* Gardner Rep., R. 73-2, PageID #4048; Horner Rep., R. 73-1, PageID #3983, 3970. But appraisers must do this. *See Masheter*, 359 N.E.2d at 75. And the *probability* that Worthington would actually rezone the property in a particular manner goes to Gardner and Horner's credibility, which is a call the district court cannot make on summary judgment. *Anderson*, 477 U.S. at 255; *Wray*, 1996 WL 586755, at *6.

**2.**    The district court never got that far. It started on the right track by accepting Lifestyle Communities' devaluation evidence. Op., R. 89, PageID #5645. But the court strayed when it summarily held that this prong "weigh[ed] against" Lifestyle Communities, stating merely: "Even accepting

---

appeal. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).

LC's calculation paradigm, 'diminution in the value of property is insufficient to demonstrate a taking.'" *Id.* (quoting *Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 687 n.8 (6th Cir. 2004)).

This laconic analysis is both flawed and deficient. Most importantly, the court misapprehended the language it quoted from this Court's *Raceway Park* decision, which ultimately traces back to the Supreme Court's decision in *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993). There, the Supreme Court observed that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" because it concluded that the *other two* Penn Central *factors had not been satisfied*, meaning the diminution in value was the only leg the plaintiff had to stand on. *Id.* at 644–46. The Court used this observation to sidestep the factual dispute over the exact magnitude of the economic impact in the case. *Id.* at 645. Yet the district court appears to have misread *Concrete Pipe* as suggesting that economic impact can *never* support a partial regulatory taking, essentially striking the first *Penn Central* factor from the test. This mistake alone warrants reversal.

Given this misapprehension, it's unsurprising that the district court failed to explain how or why a 94% devaluation could "weigh[] against" the finding of a partial regulatory taking. Op., R. 89, PageID #5645. Even if this devaluation evidence did not *prove* the claim by itself, it can hardly be said to work *against* it. As explained, a 94% diminution in value is comfortably within the range courts have accepted as constituting a taking. *See CCA Assocs.*, 667 F.3d at 1246; *Cienega Gardens*, 331 F.3d at 1343.

**3.**    It is no answer to say that the economic impact here should be ignored because the City's actions can be characterized as maintaining the status quo. Even withholding permission to develop land can be a taking.

Consider *Loveladies Harbor, Inc. v. United States*, 15 Cl. Ct. 381, 393–94 (Fed. Cl. 1988). There, the property owner could not build on a wetland without first getting a permit from the U.S. Army Corps of Engineers. *Id.* at 383. When the Corps denied the permit, the property owner challenged the denial as a regulatory taking. *Id.* at 390–91. Even though the denial maintained the regulatory status quo, the court found that the Corps' actions reduced the fair market value of the property by 98%. *Id.* at 393–94. It then

denied the Corps summary judgment because, among other reasons, "the resultant value of the property was but a negligible portion of the property's value before the permit denial." *Id.*

So too here. Lifestyle Communities needs the City's blessing to build a mixed-use development like the 2014 Plan envisioned. And the City's rezoning denial and the Midnight Resolution have all but guaranteed that an "informed, willing purchaser" will not pay "more than an amount justified under existing zoning." *Masheter*, 359 N.E.2d at 75. In doing so, Worthington decimated the property's fair market value. It does not matter that the zoning status quo remains. *See Loveladies Harbor*, 15 Cl. Ct. at 390–94; *see also Formanek v. United States*, 26 Cl. Ct. 332, 340–41 (Fed. Cl. 1992) (finding after bench trial that permit denial constituted a regulatory taking entitling property owner to just compensation).

**B.    The City interfered with Lifestyle Communities' reasonable investment-backed expectations.**

There is also (at minimum) a genuine dispute of material fact as to whether the City interfered with Lifestyle Communities' reasonable investment-backed expectations, the second *Penn Central* factor. "Assessing

the reasonableness of a plaintiff's expectations 'is an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiff] should have anticipated.'" *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1159 (Fed. Cir. 2014) (quoting *Cienega Gardens*, 331 F.3d at 1346). It "must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (cleaned up).

**1.** There is no dispute that Lifestyle Communities (*i*) expected to develop the United Methodist property in accordance with the 2014 Plan and (*ii*) backed those expectations with an investment, having bought the lot outright for $5.2 million. DeAscentis Decl., R. 80-1, PageID #4550. And the record reflects that those investment-backed expectations were reasonable for three reasons.

For one thing, Worthington invited developers like Lifestyle Communities to rely on the Plan in the Plan itself. The City adopted the 2014 Plan "to provide guidance" to "future developer[s]" like Lifestyle Communities who seek to "rezon[e] the property" and "to assist the City with its review and evaluation of any proposal." 2014 Plan, R. 65-4, PageID

#2020. And the Plan "provide[d] a framework and direction to the City, reviewing Boards and Commissions, and potential developers as to Worthington's desired vision for any change of use and redevelopment that might occur on the site." *Id.*, PageID #2021.

For another, Lifestyle Communities reasonably believed that the Plan represented the desires of the City and of the public. The Plan's adoption followed a robust "community dialogue" and "represented" the community's "consensus" for future development. *Id.*, PageID #2020; *see* Brown Memo., R. 65-3, PageID #1888. As far back as 2005, Worthington had signaled its intent to rezone the property for a mixed-use development even while the youth facility was still open. 2005 Comprehensive Plan, at AP_000098; *see* Robinson Email, R. 72-7, PageID #3787 (Robinson acknowledging that "the 2005 version can be seen as the 2014 version in nascent form"). The 2014 Plan calls for rezoning too. 2014 Plan, R. 65-4, PageID #2022. Even Worthington's expert Horner acknowledged the unreasonable nature of the status quo. *See* Horner Rep., R. 73-1, PageID #3969.

For a third, Worthington residents expressed support from the earliest stages of LC's outreach. One resident reported feeling "grateful and thrilled that there was someone out there [Lifestyle Communities] that had the same vision for what the property could be that we the city itself had." Meeting Min., R. 60-1, PageID #712. Others characterized LC's initial concept as "a good first step" and said they were "excited about it." *Id.*, PageID #713–17.

**2.**    The district court ignored these facts, and instead favored the City's narrative by pointing to the fact that certain "city officials and members of the public voiced opposition to their plan." Op., R. 89, PageID #5646. Similarly, the court relied on Robinson's abortive attempt to rescind the 2014 Plan in September 2020 as undercutting the reasonableness of LC's expectations, *id.*, while neglecting to mention that Robinson's efforts *failed* due to other councilmembers' concerns over abruptly "set[ting] aside a document that was literally years in the making." Meeting Min., R. 72-10, PageID #3816. To be sure, both sides here can point to facts in the record that cut for or against their arguments. But which facts to credit is the province of the jury, not a district court deciding summary judgment.

3.     The district court also highlighted that an LC representative testified before LC closed on the property that rezoning was "not a sure thing," the implication being that LC couldn't have reasonably expected to change the zoning restrictions that predated the purchase. Op., R. 89, PageID #5646. As an initial matter, these comments were made long after Lifestyle Communities had committed to the project. Although the sale closed in January 2021, LC entered a contract to purchase the property in April 2017. Contract, R. 65-1, PageID #1719; DeAscentis Decl., R. 80-1, PageID #4550.

As to the underlying point, it's true that "[a] reasonable restriction that predates a landowner's acquisition … can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Murr*, 582 U.S. at 398. But an unlawful regulation does not become lawful through the passage of time and title. *Id.* As one court put it, a contrary rule would allow a government to "pass a law that stated that no one could build on their property. After all property had passed hands once, the right to build on one's property would be lost to everyone." *Store Safe Redlands Assocs. v. United States*, 35 Fed. Cl. 726, 735 (1996).

Accordingly, plaintiffs can (and do) challenge restrictions that pre-date their purchase. *See, e.g.*, *F.P. Dev., LLC v. Charter Township of Canton*, 456 F. Supp. 3d 879, 889–91 (E.D. Mich. 2020), *aff'd on other grounds sub nom. F.P. Dev., LLC v. Charter Township of Canton, Michigan*, 16 F.4th 198 (6th Cir. 2021); *Formanek*, 26 Cl. Ct. at 340; *Loveladies Harbor*, 15 Cl. Ct. at 393–94.

Take *F.P. Development* for example. 456 F. Supp. 3d at 889–91. There, a business owner purchased an undeveloped, wooded lot adjacent to his primary business. *Id.* at 883. After the owner cleared the lot, the township told him he had violated an existing ordinance by removing the trees without a permit or replacing the trees. *Id.* at 883–84. The owner sued, alleging that the tree ordinance constituted a partial regulatory taking. *Id.* at 888. The township responded by saying that the owner lacked reasonable investment-backed expectations to develop the land because he was "on notice" of the ordinance "at the time he purchased the [p]roperty." *Id.* at 890.

The court disagreed. It first noted that "acquisition of title after the effective date of the state-imposed restriction does not bar a taking claim under *Penn Central*." *Id.* And although preceding restrictions factored into

– 44 –

the analysis, the court held that the owner had reasonable investment-backed expectations to develop the property because the township had otherwise zoned the property as industrial. *Id.* In other words, the owner reasonably relied on representations from the township that he could develop the land in a certain way—there, industrial zoning—which would necessitate clearing the trees. *See id.* For these reasons and others, the court granted summary judgment to the owner on his regulatory takings claim. *Id.* at 897.

Here too, Lifestyle Communities bought the property after it was already encumbered by restrictive zoning. Yet Lifestyle Communities made the purchase based on the City's representations as to how it wanted the land developed. Indeed, Worthington offered far more explicit guidance than in *F.P. Development*, where the township offered no indication that a developer could, in fact, develop the land for industrial use. *See id.* Worthington's 2014 Plan, by contrast, gave clear instructions to developers, invited reliance, spoke for the community, and focused on the United Methodist property specifically. The district court overlooked these facts, and in doing failed to

Case: 25-3048 Document: 30 Filed: 04/29/2025 Page: 61

construe the evidence "in the light most favorable to" LC. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).

### C. Worthington's actions have the character of a taking.

Finally, Worthington's actions bore the hallmarks of a classic taking, which is the third *Penn Central* factor. 438 U.S. at 124. In evaluating this factor, courts consider: (*i*) whether the government action has the practical effect of a per se taking, *id.*; (*ii*) whether the burden rests on the owner's shoulders alone or is "distributed among property owners," *Lingle*, 544 U.S. at 542; and (*iii*) whether the regulatory scheme provides an "average reciprocity of advantage" to the owner, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987) (citation omitted). Each of these comes down on LC's side.

**1.** Worthington's actions have the effect of a per se taking because they call for a privately-funded public park. Public parks and green spaces are quintessential public uses. *Rindge Co. v. Los Angeles County*, 262 U.S. 700, 707–08 (1923). As a result, governments cannot take property for public green spaces or easements without implicating the Fifth Amendment. *See*

– 46 –

*Dolan v. City of Tigard*, 512 U.S. 374, 392 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987); *Kaiser Aetna*, 444 U.S. at 176.

And so the Supreme Court has limited what governments can exact in exchange for rezoning or permitting. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013). "As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury." *Id.* at 607. Otherwise, governments could just exact the concessions that they cannot afford to take lawfully. *See id.*

That is precisely what happened here. Certain elements within the City, led by Robinson, wanted more parkland and set their sights on the United Methodist property. But Worthington couldn't pay fair market value for the land, and so it set out to exact what it could not afford. Michael Email, R. 72-4, PageID #3604; Greeson Email, R. 65-3, PageID #1903 (proposing Worthington obtain parkland though "[n]egotat[ion]").

Certainly, the 2014 Plan called for "green space balance" throughout the higher density zones and space "usable by the community." 2014 Plan,

R. 65-4, PageID #2026. And Lifestyle Communities' concepts and proposals always included that green space balance—indeed, its last submission dedicated 25% of the total property to open space, including green space for public use. Meeting Min., R. 60-5, PageID #883, 894. But that wasn't enough, so Robinson's pressure campaign continued. *Id.*, PageID #876; Meeting Min., R. 72-5, PageID #3667–68.

Robinson's crusade culminated with Worthington's Midnight Resolution. Now, Lifestyle Communities cannot hope to redevelop the property as a mixed-use development. Rather, any future proposal must devote the majority of the property to a community green space. And if Lifestyle Communities will not cave, no trouble—Worthington will stonewall any proposal until Lifestyle Communities buckles and sells the land to the City at a below-market price it *can* afford, just as Robinson planned. Ballard Memo., R. 72-9, PageID #3795; *see* Robinson Email, R. 73-3, PageID #4083 (Robinson telling constituents to "[s]tay tuned" for the City's plan to "negotiat[e]" to "both acquire and afford" the property for a park "without raising taxes").

Shifting costs to maintain public green space onto private owners is a classic taking. *See, e.g.*, *F.P. Dev.*, 456 F. Supp. 3d at 891 (granting summary judgment to a property owner where "the character of the government action is to require a private property owner to maintain the trees on its property for the benefit of the community at large" even though "[t]his is a burden that should be shared by the community as a whole"); *F.P. Dev.*, 16 F.4th at 205–08.

Consider *Dolan v. City of Tigard*, where the Supreme Court held that a city ran afoul of the Takings Clause when it required a retailer to dedicate 10% of her property to community green space in order to expand her store. 512 U.S. at 380. Worthington's actions have the same character. The City wants Lifestyle Communities to dedicate the bulk of the property for community green space and trails. But as in *Dolan*, these conditions are not "sufficiently related to the city's legitimate interest" in mitigating any societal costs brought on by the development. *Id.* at 393. Indeed, the *Dolan* Court found that a 10% dedication to public green space was not

proportional, yet Worthington rejected as insufficient LC's proposal that dedicated 25% of the property to open space.

The district court strayed by crediting Worthington's preferred narrative. It accepted that the Midnight Resolution did not "require" a public park but instead outlined "important" and "highly desirable" features. Op., R. 89, PageID #5649. The court favored the City's spin that the Midnight Resolution merely "underscored" Worthington's "existing expectation" that the site "incorporate useable park land." *Id.*, PageID #5650.

But the Midnight Resolution goes well beyond the 2014 Plan. True, the Resolution on its face does not explicitly "require" anything. Yet it does say that future development should conform with the existing S-1, C-2, and C-3 zoning and that the center and south of the property should be dedicated to a large, contiguous green space. Res., R. 72-5, PageID #3638. This functionally requires a park over the bulk of the property—a requirement nowhere in the 2014 Plan. Meeting Min., R. 72-3, PageID #3575. Indeed, if the Midnight Resolution had merely parroted an "existing expectation" for green space, then Worthington would not have hastily replaced the 2014 Plan in secret.

These combined expectations are clear, and at summary judgment, the court was required to draw all justifiable inferences in LC's favor. *Anderson*, 477 U.S. at 255. It didn't, and this Court should reverse.

    **2.**    Worthington's actions also bear the hallmarks of a classic taking because they single out Lifestyle Communities. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). Such actions cannot be labeled "mere adjustment[s] of the benefits and burdens of economic life"; they are "outright transfer[s] of wealth." *Sansotta v. Town of Nags Head*, 97 F. Supp. 3d 713, 735 (E.D.N.C. 2014). They thus "raise significant regulatory taking concerns." *FBT Everett Realty, LLC v. Mass. Gaming Comm'n*, 187 N.E.3d 373, 387–88 (Mass. 2022); *see also, e.g.*, *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) ("singl[ing] out" a developer with "red tape"); *Cienega Gardens*, 331 F.3d at 1340 (imposing a "disproportionate" public burden).

The Midnight Resolution applies only to the United Methodist property. "This is not a situation where numerous property owners are subject to the same kind of land use restrictions, and a single property owner is asking the city to allow a new, different use." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 640 (Minn. 2007). Instead, a single private property owner—Lifestyle Communities—is subject to an "extremely restrictive" land use designation that "seems aimed at things that have been considered governmental functions." *Id.* "Under these circumstances … the character factor favors the property owner." *Id.*

**3.**    What's worse, despite bearing the burden of funding a public park, Lifestyle Communities does not stand to receive meaningful reciprocal benefits. It might be one thing if Worthington demanded *private* green space for the site's future residents. But the City wants Lifestyle Communities to fund and maintain park space *for all*.

Consider *Sansotta v. Town of Nags Head*. 97 F. Supp. 3d 713. Following a storm, the town declared beachfront properties to be nuisances and denied the owners permits to rebuild them. *Id.* at 722–23. The court found that the

town's actions had the character of a taking because the owners "bore the entire burden of the Town's efforts to free the dry-sand beaches of residential structures but received none of the benefit." *Id.* at 735. As a result, the government's action constituted "an outright transfer of wealth from the Owners to the beachgoing public and to those who own the would-be oceanfront cottages behind" the owners. *Id.* For these reasons and others, the court refused to grant summary judgment to either party on the partial regulatory takings claim. *Id.* at 737. Here too, LC alone bears the "entire burden of the [City's] efforts" to create additional public park space but will "receive[] none of the benefit" in return. *Id.* at 735.

The district court sidestepped these arguments as only relevant to LC's defunct equal protection claim. Op., R. 89, PageID #5648–49. Not so. Justice Holmes himself incorporated the "reciprocity" theory into the takings context. *Mahon*, 260 U.S. at 415. Since then, the Supreme Court and lower courts have continually reaffirmed its relevance to the regulatory takings inquiry. *See, e.g., E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality op.); *DeBenedictis*, 480 U.S. at 488; *Sherman*, 752 F.3d at 565; *Fla. Rock Indus., Inc. v.*

*United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994). In failing to even consider this relevant factor, the district court erred.

*          *          *

A genuine issue exists regarding Lifestyle Communities' regulatory takings claim. The Court should remand for trial.

## II.    LIFESTYLE COMMUNITIES PLAUSIBLY ALLEGED ITS DUE PROCESS CLAIMS.

Lifestyle Communities pleaded five due process claims—including both procedural and substantive claims. Compl., R. 1, PageID #29–37, 40. The district court, however, dismissed each for the same reason: The court held that Lifestyle Communities had not plausibly alleged a protected interest. Op., R. 37, PageID #513–21; Op., R. 50, PageID #636–37.

The Fourteenth Amendment guarantees due process of law. U.S. Const. amend. XIV. At the outset, due process claims require the plaintiff to identify a protected property or liberty interest. *Paterek v. Village of Armada, Michigan*, 801 F.3d 630, 649 (6th Cir. 2015). Protected property interests are created from "independent source[s] such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

The court below dismissed Lifestyle Communities' due process claims at the pleading stage. When reviewing the pleadings under Rule 12(b)(6), a court considers whether the complaint has provided "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court must "accept as true its factual allegations and draw all reasonable inferences in his favor." *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 511 (6th Cir. 2020). The court next asks whether those allegations "plausibly suggest[] that he can meet the elements of his claim." *Id.* at 512 (citation omitted). This Court reviews de novo. *Id.* at 511.

In concluding that Lifestyle Communities had not alleged a protected interest, the court committed two errors. *First*, the court ignored Lifestyle Communities' arguments concerning its rights in the property itself. *Second*, the court failed to appreciate the complaint's well-pleaded allegations when evaluating whether LC plausibly alleged the City had committed to rezone the property consistent with the 2014 Plan.

Worthington's motion to dismiss did not address the other elements of Lifestyle Communities' due process claims, such as whether the City's

actions deprived LC of its protected interests or whether the City afforded LC sufficient process. Mot., R. 20, PageID #128–39. Given Robinson's various machinations and the City's departures from its own standard procedures to stonewall LC, this was presumably a tactical choice. But in any event, in the briefing below, Lifestyle Communities called out that Worthington had thus forfeited any argument related to the other elements of these claims. Resp., R. 22, PageID #401; *see Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022). The district court (appropriately) did not reach them either. *See* Op., R. 37, PageID #513–21; Op., R. 50, PageID #636–37. Accordingly, this Court need only decide that Lifestyle Communities plausibly alleged a protected interest in order to remand for discovery.

## A.    The district court erred by ignoring Lifestyle Communities' protected interests in the United Methodist property itself.

Ohio law recognizes and protects property rights. *Horney*, 853 N.E.3d at 1128. Those rights include the right to possess, to use, to exclude, and to sell. *Id.* "The substantial value of property lies in its use. If the right of use is denied, the value of the property is annihilated and ownership is rendered a barren right." *City of Akron v. Chapman*, 116 N.E.2d 697, 700 (Ohio 1953).

For that reason, zoning restrictions do not always extinguish property rights. Rather, the Ohio Constitution limits municipalities' ability to impair property rights. *Goldberg Cos., Inc. v. Richmond Hts. City Council*, 690 N.E.2d 510, 514 (Ohio 1998). Cities cannot enact arbitrary or unreasonable zoning schemes without a substantial relationship to public health, safety, morals, or general welfare. *Mayfield-Dorsh, Inc. v. City of S. Euclid*, 429 N.E.2d 159, 160–62 (Ohio 1981). When zoning restrictions go too far, courts will intervene. *See id.* at 162.

Lifestyle Communities alleged in its complaint that Worthington's actions impaired its protected interests in the United Methodist property itself. *See* Compl., R. 1, PageID #1, 6. And LC pressed these arguments in its briefing before the district court. Resp., R. 22, PageID #403–06.

But the court elided these arguments, instead framing its property-interest inquiry solely in terms of "whether Lifestyle has a protected property interest in *re-zoning* the Property" because it held "a legitimate claim of entitlement to that outcome." Op., R. 37, PageID #514 (emphasis added). In fairness, Lifestyle Communities separately raised that point, as

discussed in the following section. Resp., R. 22, PageID #407–12. But the court failed to appreciate that the complaint also alleged due process claims based on Lifestyle Communities' *existing* rights to possess, use, exclude, and dispose of the United Methodist property. That is reversible error.

### B. Lifestyle Communities also had a protected interest in the benefit of rezoning consistent with the 2014 Plan.

Property owners can also have a protected interest in a future benefit. *Roth*, 408 U.S. at 577. Granted, owners do not have such an interest "when the state's decision to award or withhold the benefit is wholly discretionary." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856 (6th Cir. 2012) (citation omitted). Rather, the government must lack "discretion to deny [the owner's] use of the land" once the owner checks certain boxes. *Id.* (citation omitted). This can occur through a "policy, law, or mutually explicit understanding that both confers the benefit[] and limits the discretion of the City to rescind the benefit." *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 573 (6th Cir. 2008) (citation omitted). And Ohio municipalities like Worthington can bind themselves through express agreements. *Musial Offs., Ltd. v. County of Cuyahoga*, 163 N.E.3d 84, 94 (Ohio Ct. App. 2020).

Lifestyle Communities plausibly pleaded that it had a mutually explicit understanding with Worthington that the City would rezone the property consistent with the 2014 Plan. To start, Lifestyle Communities alleged that the City adopted the Plan to prescribe the United Methodist property's redevelopment. Compl., R. 1, PageID #10, 30. The complaint alleged that the 2014 Plan "was not merely an aspirational, forward-looking guide. Rather, by the City's own admission, [the Plan] prescribed that the Property be used for a planned unit development and delineated concrete and objective criteria for development of the Property in that manner." *Id.*, PageID #30. Critically, Lifestyle Communities also pleaded that "City[] officials committed to Lifestyle that, if it would develop the Property in accordance with the [Plan], the City would provide the necessary approvals in accordance with the City's Charter." *Id.*, PageID #12.

The district court concluded that Lifestyle Communities did not have a mutually explicit understanding with Worthington because Ohio municipalities cannot "bargain[] away their legislative or governmental powers." Op., R. 37, PageID #520 (quoting *State ex rel. Gordon v. Taylor*, 149

– 59 –

Ohio St. 427, 436 (1948)). True, Ohio prohibits contract zoning where a city

offers rezoning as consideration for a contract. *Dyke v. City of Shaker Heights*,

2004 WL 231792, at *10 (Ohio Ct. App. Feb. 5. 2004).

But Lifestyle Communities has not alleged that Worthington offered to

rezone the property in exchange for something from LC. Rather, Lifestyle

Communities alleged that Worthington committed to rezone the property

consistent with the City's own policy directives in at least two ways. First,

by setting forth an explicit blueprint for the property and inviting developers

to rely on it, and second, by committing *specifically to Lifestyle Communities*

that if LC "would develop the Property in accordance with the [Plan], the

City would provide the necessary approvals in accordance with the City's

Charter." Compl., R. 1, PageID #12. Accepted as true and taken together,

Lifestyle Communities plausibly alleged a property interest in future

rezoning.

III.   **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE DECLARATORY JUDGMENT CLAIM WITHOUT ANALYSIS.**

Finally, the district court erred in granting Worthington summary judgment as to Lifestyle Communities' declaratory judgment claim without any analysis.

Ohio municipalities exercise general police power through their home rule authority. Ohio Const. art. XVIII, § 3. And municipal zoning authority derives from that police power. *Rispo Realty & Dev. Co. v. City of Parma*, 564 N.E.2d 425, 427 (Ohio 1990). As a result, municipal zoning actions that go beyond the police power are unlawful. *Goldberg Cos.*, 690 N.E.2d at 514.

Ohio law thus allows property owners to challenge unlawful zoning ordinances in a declaratory judgment action. *See* Ohio Rev. Code § 2721.03; *Karches v. City of Cincinnati*, 526 N.E.2d 1350, 1354–55 (Ohio 1988). The owner "bears the burden of establishing that the application of the zoning ordinance to his property was unconstitutional beyond fair debate." *Ross v. City of Toledo*, 2009 WL 806903, at *3 (Ohio Ct. App. Mar. 20, 2009). Courts must closely analyze the "unique facts" presented by each case. *Jaylin Invs., Inc. v. Moreland Hills*, 839 N.E.2d 903, 907 (Ohio 2006).

In its summary judgment briefing, Lifestyle Communities repeatedly argued that it was entitled to a declaratory judgment that Worthington's zoning decisions violated the Ohio Constitution. Mot., R. 65, PageID #1675; Resp., R. 80, PageID #4545–46; Reply, R. 88, PageID #5618. Worthington ignored these arguments and instead assumed that the declaratory judgment claim merely "related" to LC's other substantive claims. *See* Resp., R. 79, PageID #4461–62.

The court regrettably made the same error, disposing of the claim in one sentence: "Finally, because [Lifestyle Communities'] substantive claims fail, so too does it claim for declaratory judgment." Op., R. 89, PageID #5654. But as the briefing made clear, Lifestyle Communities' declaratory judgment claim *is* itself a "substantive" claim.

Nor could the court deny this claim so easily. Such claims require a close analysis of the "unique facts" at issue. *Jaylin Invs.*, 839 N.E.2d at 907. And many of the relevant factors weigh in Lifestyle Communities' favor when taking the facts in the light most favorable to it. For example, Worthington arbitrarily deviated from the 2014 Plan when rejecting Lifestyle

Communities' application. *See Ross*, 2009 WL 806903, at *3 ("failure to make decisions consistent with the comprehensive plan" can show a municipality acted arbitrarily and unreasonably). The zoning denial and the Midnight Resolution have had a dramatic economic impact on the property. *See C. Miller Chevrolet, Inc. v. City of Willoughby Hills*, 313 N.E.2d 400, 404 (Ohio 1974) (while not dispositive alone, "[e]vidence that the removal of a zoning restriction would result in an increase in the value of the affected land is relevant when the validity of a denial of a zoning variance is challenged"). Finally, as outlined above, Worthington's zoning decisions do not rationally balance the public benefit against the burdens placed on Lifestyle Communities. *See Jaylin Inv.*, 839 N.E.2d at 907 (courts reviewing zoning challenges "must strive to balance the benefits to the public against the disadvantages to the private interests of the landowner").

A genuine dispute of material fact exists as to Lifestyle Communities' declaratory judgment claim, and this Court should remand for trial.

## CONCLUSION

Lifestyle Communities respectfully requests this Court vacate the district court and remand for further proceedings.

Dated: April 29, 2025

Respectfully submitted,

*/s/ Michael R. Gladman*

Michael R. Gladman
Yvette McGee Brown
Dustin M. Koenig
Timothy D. Lanzendorfer
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
(614) 469-3939
mrgladman@jonesday.com
ymcgeebrown@jonesday.com
dkoenig@jonesday.com
tlanzendorfer@jonesday.com

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

## CERTIFICATE OF COMPLIANCE

Counsel for Lifestyle Communities, Ltd. and Worthington Campus, LLC hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The foregoing brief contains 11,866 words in Palatino Linotype (14-point) proportional type. The word processing software used to prepare this brief was Microsoft Office Word 2007.

*/s/ Michael R. Gladman*
Michael R. Gladman

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

Dated: April 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2025, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Sixth Circuit the foregoing Brief of Appellants Lifestyle Communities, Ltd. and Worthington Campus, LLC, and further certify that opposing counsel will be notified by the appellate CM/ECF system.

*/s/ Michael R. Gladman*
Michael R. Gladman

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

**ADDENDUM**

Pursuant to Sixth Circuit Rule 30(g), Plaintiffs-Appellants designate the following documents from the lower court records as relevant to the instant appeal:

| Record Entry | Description | PageID# Range |
|---|---|---|
| 1 | Complaint | 1–44 |
| 20 | Worthington's Motion to Dismiss | 114–159 |
| 22 | Lifestyle Communities' Response in Opposition to Worthington's Motion to Dismiss | 378–434 |
| 37 | Opinion and Order for Motion to Dismiss | 507–532 |
| 43 | Worthington's Answer to the Complaint | 558–593 |
| 50 | Opinion and Order for Motion for Reconsideration | 635–641 |
| 60 | Worthington's Motion for Summary Judgment | 659–701 |
| 60-1 | Meeting Minutes of the Worthington Municipal Planning Commission's June 29, 2015 Meeting | 702–767 |
| 60-5 | Meeting Minutes for the Worthington Municipal Planning Commission's October 14, 2021 Meeting | 846–903 |
| 61-1 | Bo Brownlee Deposition & Exhibits | 922–1103 |
| 62-1 | David Robinson Deposition & Exhibits | 1106–1291 |
| 65 | Lifestyle Communities' Motion for Summary Judgement | 1630–1679 |
| 65-1 | Development Agreement | 1700–1718 |

| Record Entry | Description | PageID# Range |
|---|---|---|
| 65-1 | Real Estate Purchase Contract | 1719–1738 |
| 65-3 | Brown Memorandum | 1888–1889 |
| 65-3 | Greeson Email | 1894–1906 |
| 65-3 | Robinson Email | 1907–1909 |
| 65-3 | Greeson Memorandum | 1973–1976 |
| 65-4 | 2014 Plan | 2020–2030 |
| 69-1 | Raymond Lee Brown Deposition & Exhibits | 2555–3039 |
| 69-1 | Lifestyle Communities' Revised Application | 2965–2981 |
| 72-1 | Meeting Minutes of the Worthington Municipal Planning Commission's January 14, 2021 Meeting | 3415–3472 |
| 72-3 | Meeting Minutes of the Worthington City Council's December 13, 2021 Meeting | 3568–3583 |
| 72-4 | Michael Email | 3604 |
| 72-5 | Midnight Resolution | 3636–3638 |
| 72-5 | Meeting Minutes of the Worthington City Council's January 18, 2022 Meeting | 3639–3677 |
| 72-5 | Florey Memorandum | 3678–3681 |
| 72-5 | Robinson Email | 3682–3684 |
| 72-5 | Robinson Email | 3685–3688 |
| 72-6 | Robinson Letter | 3722–3725 |
| 72-6 | Robinson Email | 3726–3727 |
| 72-6 | Robinson Email | 3768–3770 |
| 72-7 | Robinson Email | 3787 |
| 72-9 | Ballard Memorandum | 3795 |
| 72-10 | Meeting Minutes of the Worthington City Council's September 21, 2020 Meeting | 3806–3819 |

| Record Entry | Description | PageID# Range |
|---|---|---|
| 72-10 | Robinson Email | 3820–3824 |
| 72-12 | Coulter Email | 3838–3839 |
| 72-14 | Sudy Report | 3852–3877 |
| 73-1 | Horner Report | 3936–4029 |
| 73-2 | Gardner Report | 4038–4081 |
| 73-3 | Robinson Email | 4083–4085 |
| 73-5 | Resolution 39-2014 | 4122 |
| 79 | Worthington's Memorandum in Opposition to Lifestyle Communities' Motion for Summary Judgement | 4461–4482 |
| 80 | Lifestyle Communities' Opposition to Worthington's Motion for Summary Judgement | 4488–4547 |
| 80-1 | Declaration of Michael DeAscentis | 4549–4551 |
| 81-1 | Deposition of Mikel Coulter & Exhibits | 4563–4659 |
| 87 | Worthington's Reply Memorandum in Support of Motion for Summary Judgement | 5597–5608 |
| 88 | Lifestyle Communities' Reply in Support of Motion for Summary Judgement | 5609–5620 |
| 89 | Opinion and Order for the Motions for Summary Judgment | 5621–5655 |
| 90 | Judgment | 5656 |
| 91 | Notice of Appeal filed by Lifestyle Communities, Ltd. and Worthington Campus, LLC | 5657–5659 |