No. 25-3048
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

LIFESTYLE COMMUNITIES, LTD.; WORTHINGTON CAMPUS LLC
*Plaintiffs-Appellants*

v.

CITY OF WORTHINGTON, OH
*Defendant-Appellee*,
_____

On Appeal from the United States District Court for the
Southern District of Ohio, Case No. 2:22-cv-01775
_____

**BRIEF OF APPELLEE THE CITY OF WORTHINGTON, OHIO**
_____

Yazan S. Ashrawi
Thaddeus M. Boggs
Frost Brown Todd, LLC
10 W. Broad Street, Suite 2300
Columbus, Ohio 43215
(614) 464-1221

Paul J. Schumacher
Dickie, McCamey & Chilcote, P.C.
600 Superior Avenue East
Fifth Third Center, Suite 2330
Cleveland, Ohio 44114
(216) 685-1827

Richard J. Silk, Jr.
Dickie, McCamey & Chilcote, P.C.
10 West Broad Street, Suite 1950
Columbus, Ohio 43215
(614) 258-6000

*Attorneys for Appellee*
*City of Worthington, Ohio*

**CORPORATE DISCLOSURE AND FINANCIAL INTEREST**

The City of Worthington, Ohio is a political subdivision and is therefore not required under FRAP 26.1 and 6 Cir. 26.1(a) to provide a corporate disclosure or disclose financial interests.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE AND FINANCIAL INTEREST ............................ i

Table of Authorities ................................................................. iv

STATEMENT REGARDING ORAL ARGUMENT ............................ xi

STATEMENT OF ISSUES ........................................................ xii

STATEMENT OF FACTS .......................................................... 1

PROCEEDINGS BELOW .......................................................... 14

SUMMARY OF ARGUMENT ..................................................... 14

ARGUMENT ....................................................................... 16

A.    The Court Should Affirm Summary Judgment on LC's Partial Regulatory Takings Claim. ................................................ 16

    1.    LC's takings claim fails because it has no cognizable property interest in rezoning. ............................................... 18

    2.    LC cannot establish a taking under *Penn Central* .............. 20

        i.    LC lacks objectively reasonable investment-backed expectations. ................................................... 21

            a.    LC purchased the Property with the existing zoning in place. ........................................ 22

            b.    LC was aware the majority of residents opposed its plan for the Property before filing the Application. ....... 26

            c.    LC knew its development plan might be challenged through a referendum. ............................... 27

        ii.    It is undisputed that LC has economically viable uses available. ..................................................... 29

            a.    LC's highest and best use doesn't support a regulatory takings claim. .................................. 29

            b.    LC's flawed diminution of value argument does not demonstrate economic impact under *Penn Central*. ........................................................ 30

            c.    LC ignores the Property's current zoning. .................... 34

            d.    LC's expert report and testimony are immaterial. .......... 36

        **iii.**    The City's actions do not establish a classic taking. ...............37

                **a.**    The City is not taking the Property for a public park. ..........................................................................38

                **b.**    The City did not single out LC. .....................................40

**B.**    The Court Should Affirm the Trial Court's Dismissal of LC's Due Process Claims........................................................................................41

    **1.**    LC lacks a protected property interest. ...............................41

           **a.**    LC waived the argument that its protected property right arose from its right to possess, use, exclude, or dispose of its property under the existing zoning. .........................................................................42

           **b.**    Even assuming LC preserved this argument, or the Court considers it, it fails because the City's zoning is not unconstitutional and the City never acted adverse to existing zoning....................................44

    **2.**    LC does not have a protected property interest in a discretionary rezoning. ................................................................................47

           **a.**    LC's understanding of the 2014 Comp Plan is misguided....................................................................47

           **b.**    LC is not entitled to rezoning under the 2014 Comp Plan. .................................................................49

**C.**    The District Court Correctly Granted Summary Judgment on LC's Declaratory Judgment Claim...........................................................52

**D.**    LC Forfeited its Equal Protection and First Amendment Claims. ...............55

CONCLUSION .........................................................................................................55

CERTIFICATE OF COMPLIANCE......................................................................56

CERTIFICATE OF SERVICE ...............................................................................57

ADDENDUM ..........................................................................................................58

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Alexander Invest. v. United States*,
  51 Fed.Cl. 102 (2001) ......................................................................18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .........................................................................18

*Andreano v. City of Westlake*,
  136 Fed.Appx. 865 (6th Cir. 2005).................................................51

*Andrews v. City of Mentor*,
  11 F.4th 462 (6th Cir. 2021) ...........................................................35

*Appolo Fuels, Inc. v. United States*,
  381 F.3d 1338 (Fed. Cir. 2004) .................................................22, 31

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)..........................................................................50

*Braun v. Ann Arbor Charter Twp.*,
  519 F.3d 564 (6th Cir. 2008) .....................................................16, 49

*C. Miller Chevrolet, Inc. v. City of Willoughby Hills*,
  313 N.E.2d 400 (Ohio 1974) ...........................................................54

*CCA Assocs. v. United States*,
  667 F.3d 1239 (Fed. Cir. 2011) .......................................................31

*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063, 210 L.Ed.2d 369 (2021).........................................21

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003) .......................................................31

*City of Norwood v. Horney*,
  853 N.E.2d 1115 (Ohio 2006) ....................................................45, 46

*Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*,
  365 F.3d 435 (6th Cir. 2004) ...........................................................18

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018) ............................................................... 31

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*
*for S. Cal.*,
508 U.S. 602 (1993) ..................................................................... *passim*

*Cty. of Kauai v. Pacific Std. Life Ins. Co.*,
653 P.2d 766 (Haw. 1982) ................................................................... 28

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ...................................................................... 39, 40

*EJS Props., LLC v. City of Toledo*,
698 F.3d 845 (6th Cir. 2012) ......................................................... 49, 51

*F.P. Dev., LLC v. Charter Township of Canton*,
456 F. Supp. 3d 879 (E.D. Mich. 2020) ........................................ 24, 40

*Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights*,
209 F.3d 626 (6th Cir. 2000) ............................................................... 37

*Formanek v. United States*,
26 Cl. Ct. 332 (1989) .......................................................................... 24

*Foster v. Barilow*,
6 F.3d 405 (6th Cir. 1993) .................................................................. 42

*Fuller v. Quality Casing Co., Inc.*,
--- N.E.3d ----, 2025-Ohio-361 (1st Dist. Ohio 2025) ....................... 52

*Goldberg Cos., Inc. v. Richmond Hts. City Council*,
690 N.E.2d 510 (Ohio 1998) .............................................................. 45

*Goldblatt v. Town of Hempstead*,
369 U.S. 590, 8 L.Ed.2d 130, 82 S.Ct. 987 (1962) ............................ 33

*Golden Pac. Bancorp v. United States*,
15 F.3d 1066 (Fed. Cir. 1994) ............................................................ 22

*Good v. United States*,
189 F.3d 1355 (Fed. Cir. 1999) .......................................................... 22

*Gorieb v. Fox*,
274 U.S. 603 (1927)...........................................................................30

*Gross Builders v. City of Tallmadge*,
2005 WL 1966775 (Ohio App. 2005)...........................................47, 48

*Guggenheim v. City of Goleta*,
638 F.3d 1111 (9th Cir. 2010) .........................................................32

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915)...........................................................................31

*Harris v. City of St. Clairsville*,
2006 U.S. Dist. LEXIS 92523 (S.D. Ohio Dec. 21, 2006), *aff'd*,
330 Fed. Appx. 68, 2008 U.S. App. LEXIS 8869 (6th Cir. 2008)..............35, 37

*Henry v. Jefferson Cty. Comm'n*,
637 F.3d 269 (4th Cir. 2011) ..............................................19, 31, 35

*Horn v. City of Mackinac Island*,
938 F. Supp. 2d 712 (W.D. Mich. 2013) ........................................37

*Iowa Coal Mining Co. v. Monroe County*,
257 F.3d 846 (8th Cir. 2001) ..........................................................31

*Jaylin Investments, Inc. v. Moreland Hills*,
839 N.E.2d 903 (Ohio 2006) ...........................................45, 53, 54

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979)...........................................................................21

*Karches v. City of Cincinnati*,
526 N.E.2d 1350 (Ohio 1988) ...................................................53, 54

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)...........................................................................34

*Knight v. Metro. Gov't of Nashville & Davidson Cty.*,
67 F.4th 816 (6th Cir. 2023) ..........................................17, 21, 23, 37

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)....................................................................20, 38

*Loreto Dev. Co. v. Village of Chardon*,
  Nos. 97-3502/97-3656, 1998 U.S. App. LEXIS 12183 (6th Cir.
  June 4, 1998) ........................................................................................*passim*

*Loveladies Harbor, Inc. v. United States*,
  15 Cl. Ct. 381 (1988) ...........................................................25, 26, 32

*Lucas v. S. C. Coastal Council*,
  505 U.S. 1003 (1992) .........................................................................19, 33

*McFarland v. Henderson*,
  307 F.3d 402 (6th Cir.2002) .................................................................42

*Med Corp., Inc. v. City of Lima*,
  296 F.3d 404 (6th Cir. 2002) ................................................................50

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
  714 F.3d 1118 (9th Cir. 2013) ..............................................................31

*Murr v. Wisconsin*,
  582 U.S. 383 (2017) .........................................................................22, 37

*Nekrilov v. City of Jersey*,
  45 F.4th 662 (3d Cir. 2022) ..................................................................39

*Oberer Land Devs. v. Sugarcreek Twp., Ohio*,
  No. 21-3834, 2022 U.S. App. LEXIS 15290 (6th Cir. June 1, 2022) ........*passim*

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
  305 F.3d 566 (6th Cir. 2002) ................................................................44

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) (O'Connor, J., concurring) ..................................22, 35, 44

*Penn Central Transp. Co. v. New York City*,
  438 U.S. 104 (1978) ...........................................................................*passim*

*Prater v. City of Burnside*,
  289 F.3d 417 (6th Cir. 2002) ................................................................18

*ProgressOhio.org, Inc. v. JobsOhio*,
  13 N.E.3d 1101 (Ohio 2014) ................................................................52

*Pulte Home Corp. v. Montgomery Cty.*,
  909 F.3d 685 (4th Cir. 2018) ..................................................................*passim*

*Purple Munky Property Cty., LLC v. Walnut Twp.*,
  No. 2:23-cv-853, 2023 U.S. Dist. LEXIS 72462 (S.D. Ohio Apr.
  25, 2023) ............................................................................................23

*State ex rel. R.T.G., Inc. v. State*,
  780 N.E.2d 998 (Ohio 2002) ...............................................................20

*Raceway Park, Inc. v. Ohio*,
  356 F.3d 677 (6th Cir. 2004) ......................................................19, 36

*Ruckelshaus v. Monsanto Co.*
  467 U.S. 986 (1984)............................................................................21

*SAS Assoc. 1, LLC v. City Council for City of Chesapeake, Virginia*,
  91 F.4th 715 (4th Cir. 2024) ...................................................2, 16, 17

*Silver v. Franklin Tp. Bd. of Zoning Appeals*,
  966 F.2d 1031 (6th Cir. 1992) ............................................................51

*Snider-Cannata Interests, LLC v. Ruper*,
  190 Ohio App.3d 347, 941 N.E.2d 1242 (8th Dist. Ohio 2010) .......................53

*Southgate Corp. v. Village of Granville*,
  2019 WL 2366884 (Ohio App. 2019)...................................19, 47, 48

*Tennessee Scrap Recyclers Assn. v. Bredesen*,
  556 F.3d 442 (6th Cir. 2009) ..............................................................30

*Triomphe Investors v. City of Northwood*,
  49 F.3d 198 (6th Cir. 1995) ................................................................51

*Troche v. Crabtree*,
  814 F.3d 795 (6th Cir. 2016) ..............................................................17

*United States v. Banisadr Building Joint Venture*,
  65 F.3d 374 (4th Cir. 1995) ................................................................34

*United States v. Seventeen Firearms*,
  170 F. App'x 418 (6th Cir. 2006) .......................................................42

*Village of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926)..........................................................................30, 31, 45

*Village of Maineville v. Hamilton Twp., Ohio Bd. of Tr.*,
  902 F. Supp. 2d 1072 (S.D. Ohio 2012), *aff'd*, 2013 U.S. App.
  LEXIS 16517 (6th Cir. 2013) ............................................................33

*Warren v. City of Athens*,
  411 F.3d 697 (6th Cir. 2005) ............................................................16

*Wyatt v. United States*,
  271 F.3d 1090 (Fed. Cir. 2001) ........................................................18

**Statutes**

R.C. 713.10 .......................................................................................51

R.C. 731.29 .........................................................................................3

R.C. 2721.03 .....................................................................................52

**Other Authorities**

Ohio Const. article I, § 19 ...........................................................20, 45

Ohio Const. article II, § 1f ...............................................................3

U.S. Const. amend XIV ....................................................................20

Worthington Ord. 149.02(b) .............................................................48

Worthington Ord. 1101.01(i) ............................................................48

Worthington Ord. 1123.22(b) .............................................................1

Worthington Ord. 1123.23 .................................................................48

Worthington Ord. 1141.02(b) .............................................................1

Worthington Ord. 1141.03(b) .............................................................1

Worthington Ord. 1141.04(b) .............................................................1

Worthington Ord. 1145.05 .................................................................12

Worthington Ord. 1174................................................................................2

Worthington Ord. 1174.08...............................................................2, 24, 51

Worthington Ord. 1174.08(b)(2)...................................................2, 6, 50

## STATEMENT REGARDING ORAL ARGUMENT

The City of Worthington, Ohio respectfully submits that there is no compelling reason to conduct oral argument in this Appeal. This is a run of the mill, home rule case in which Appellants lack a factually or legally supported basis for overturning decades of precedent established by the Supreme Court, Sixth Circuit, and other federal courts concerning Appellants' partial takings and due process claims.

## STATEMENT OF ISSUES

1.      Whether the district court correctly awarded summary judgment to the City of Worthington, Ohio on Appellants' partial regulatory takings claim under the United States and Ohio Constitutions, where Appellants lack a cognizable property interest in rezoning, and, under Penn Central, lack objectively reasonable investment-backed expectations for rezoning approval, Appellants' property has multiple other lucrative uses, and the City of Worthington, Ohio's actions did not constitute a classic taking.

2.      Whether the district court correctly dismissed at the pleading stage Appellants' due process claims under the United States and Ohio Constitutions, when the Complaint failed to plausibly plead a protected property interest in future rezoning and Appellants waived their argument about alleged property interests in both the property's preexisting zoning.

3.      Whether the district court correctly awarded summary judgment to the City of Worthington, Ohio on Appellants' Ohio law declaratory judgment claim, where Appellants' arguments duplicated their takings and due process claims, those claims failed, and Appellants' declaratory judgment claim was perfunctorily pleaded as a remedy.

## STATEMENT OF FACTS

The Comprehensive Plan (the "Comp Plan") is the City of Worthington, Ohio's (the "City") land-use planning document, a conceptual guide for prospective developers regarding the types of developments that might be desirable in different areas of the City. Brown Dep., R. 69-1, PageID #2594-6. The Comp Plan is not and has never been law and is subordinate to the City Code when evaluating rezoning applications. *Id*. at PageID #2595-6.

The Comp Plan includes a section for the UMCH Focus Area (the "Property"), which for many years has had multiple parcels with R-10, C-2, C-3, and S-1 zoning classifications.[1] LC Appendix, pp. 5-123. In 2014, City Council approved an update

---

[1] The zoning classifications provide as follows: "'R-10' Low Density Residence: For low density residential development which has ready access to most community facilities. Community water and sewerage facilities are required." Zoning Ordinance 1141.03(b). "'C-2' Community Commercial: Commercial centers of an integrated design which contain a concentration of a wide variety of retail and service establishments which are currently located in the community or within the population they serve, having adequate parking and direct access to major thoroughfares, with limited points of access, being screened or fenced from surrounding residential areas, and serving the day-to-day needs of the community supplying the more durable and permanent needs of the whole community. Community commercial uses include, but need not be limited to: supermarkets, department stores, specialty stores, hardware stores, apparel and shoe stores, jewelry stores, appliance and furniture stores, drugstores, personal and business service outlets and discount markets. Community water and sewerage facilities are required." Zoning Ordinance 1141.04(b); *see also* Zoning Ordinance 1123.22(b). "'S-1' Special: Areas which are: (1) large public or semipublic land holdings, (2) suitable for noncommercial recreation [including parks], (3) to be kept open for highway interchanges." Worthington Ord. 1141.02(b).

to the Property to conceptualize redevelopment that may include a mix of uses and open space, including a Planned Use District ("PUD"). Brown Dep., R. 69-1, PageID #2621, 2843-53 (2014 Comp Plan Update); Worthington Ord. Chapter 1174.

Rezoning to PUD requires Council's approval <u>and</u> an unsuccessful referendum effort, neither of which were guaranteed. Under Zoning Ordinance 1174.08(b)(2), Council has sole discretionary authority to determine a PUD rezoning request:

> <u>City Council.</u> Upon receipt of the ***recommendation*** of the [MPC], the requested [PUD rezoning] shall be set forth in Ordinance form and shall thereafter be introduced in writing at a meeting of the City Council * * *

> After receiving from the [MPC] the recommendations for the proposed PUD and after holding the above public hearing, ***the City Council shall consider such recommendations and vote on the passage of the proposed PUD Ordinance. The City Council may, by a majority of all its members, adopt or reject the proposed Ordinance, with or without change.***

Worthington Ord. 1174.08 (emphases added); *see also*, Hart Dep., R. 70-1 PageID #3220-6 (discussing an internal email identifying potential timelines based on the upcoming election and the possibility of a denial).

LC was aware that residents were highly likely to petition for a referendum if Council approved <u>any</u> rezoning application that did not sufficiently address resident concerns about the Property. A 2019 email establishes that LC knew about residents' constitutional right to seek a referendum on any affirmative rezoning decision made

by Council, and <u>actually anticipated</u> that if Council approved the Application, residents would seek a referendum to potentially override Council's approval. Hart Dep., R. 70-1 PageID #3117-9; *see also*, Brownlee Dep., R. 61-1 PageID #968 (admitting that LC would not consider rezoning successful unless residents failed to obtain sufficient signatures for a referendum). City Charter Section 1.04 states:

> (A)   Notwithstanding any other provision of this Charter, the power of referendum on any ordinance or other measure passed by the Council amending the City's zoning code or changing the zoning for any property in the City may be exercised in the manner provided by the laws of the State of Ohio except that the petition may be filed upon passage of any ordinance or other measure by Council and within sixty (60) days following publication in order to afford an opportunity during the period for the filing of referendum petitions thereon.

> (B)   Notwithstanding any other provision of this Charter, no ordinance or other measure passed by the Council amending the City's zoning code or changing zoning for any property in the City shall go into effect until sixty (60) days following publication in order to afford an opportunity during that period for the filing of referendum petitions thereon; nor shall any such ordinance or measure be passed on an emergency basis.

*Id.*; s*ee also* Ohio Constitution, Article II, Section 1f; City Charter 1.03, and R.C. 731.29.

Before closing on the Property, but a mere two weeks after filing its Application, LC appealed to the Franklin County Auditor's Board of Revisions ("BOR") to reduce the Auditor's $12.9 million valuation of the Property and anticipated tax liabilities. Brownlee Dep., R. 61-1 PageID # 962-3, 1033 (3/31/20

Appeal). Appearing before the BOR on October 19, 2020, LC's representative admitted that it would be very difficult to get the rezoning—it was not a "sure thing." BOR Hearing, R. 60-2 PageID #774. LC's representative also disclosed discussions between LC and UMCH about purchasing the Property *before* a rezoning decision, specifically that UMCH wanted to waive the rezoning contingency and sell at a discount because UMCH "just didn't have the appetite for what was probably going to be a prolonged rezoning battle". *Id.* at PageID #775. By eliminating the rezoning contingency, LC purchased the Property for $5.2 million, an $800,000 discount. Brownlee Dep., R. 61-1 PageID #965. The appraiser retained by UMCH who appraised the Property at $5.6 million testified that the applicable zoning classifications and the *unknowns with rezoning* were factored into his appraisal. BOR Hearing, R. 60-2 PageID #777-82.

The BOR assigned the reduced value to the Property. Brownlee Dep., R. 61-1 PageID #970-1. On January 20, 2021, LC closed on the Property for $5.2 million, less than the appraised value presented to the BOR. *Id.* at PageID #964-5; Deeds, R. 60-3 PageID #784-7.

LC's CEO conceded that rezoning would be difficult:

> **Q (Schumacher): But even before that meeting occurred, you knew that zoning was going to be difficult, getting rezoned?**
>
> **A (DeAscentis): Yes. That's what this email says.**

DeAscentis Dep., R. 78-1, PageID #4318. In fact, he confirmed that he was

"concerned" because "[z]oning is going to be a bitch." *Id*. at PageID #4319.

Moreover, LC's valuation expert acknowledged that the City had the discretion to reject LC's rezoning application even if the plan had generally followed the Comp Plan:

> **Q (Ashrawi): So back to my question. In your opinion, is the city required to approve the planned unit development if it contains a density for the Neighborhood Core between the 6 and 14 dwelling units per acre that's outlined in the 2014 focus area document?**
>
> **A (Sudy):   No.**

Sudy Dep., R. 64-1, PageID #1558-59.

On June 29, 2015, LC presented a conceptual development plan to rezone and redevelop the Property into a mixed-use residential, office, and commercial project at the Municipal Planning Commission ("MPC") public meeting attended by roughly 350 City residents and Councilmembers. Brown Dep.. R. 69-1 PageID #2642-7, 2795, 2891-2906 (6/29/2015 Mtg.).

Contrary to LC's misrepresentations in its appellate brief, residents overwhelmingly voiced opposition to the plan, raising numerous concerns, including high residential density, the mix of housing types, lack of corresponding useable greenspace, connectivity, stormwater, traffic, impact on schools and the environment, pollution, safety, and interference with fire station and police. 6/29/2015 Mtg., R. 60-1 PageID #707-17. Residents also discussed a resident

group's 2013 survey that indicated 86% were in favor of greenspace and other types of public uses. *Id*. at PageID #707.[2]

In June 2015, LC contracted with UMCH to develop the Property. Brownlee Dep., R. 61-1 PageID #946. Section 6.5 contains a zoning contingency provision demonstrating that LC knew there was no guarantee that the City would approve rezoning. *Id*. at PageID #956. In April 2017, LC entered into a purchase agreement with UMCH for $6.0 million, with closing again contingent upon successful rezoning of the Property. Brownlee Dep., R. 61-1 PageID #958, #1013-29 (4/20/17 Contract). The contingency provisions confirm that, before applying for rezoning, LC knew the zoning classifications of the Property and knew Council had absolute discretion whether to approve rezoning under Zoning Ordinance 1174.08(b)(2). *Id*. at PageID #1034-1103 (Appraisal Report 1/1/19); Hart Dep., R. 70-1 PageID #3076-7.

LC falsely asserts in its Complaint and briefing that the City directed staff to ignore LC and treat it differently than other applicants for rezoning. Several weeks after the 2015 presentation, Council advised LC to "engage in a comprehensive, inclusive community outreach process to listen and respond to the interests of

---

[2] *See also* Robinson Dep., R. 62-1 PageID #1125-30 (discussing the desire for substantial office/commercial development along High Street conforming with existing zoning, modest residential, some apartments with the commercial property, and a central useable greenspace and how the desire for contiguous greenspace is widely shared by the public).

Worthington citizens" and that the many issues raised by residents in the MPC meeting should be "incorporate[d] into future discussions, studies and conceptual plans." *Id*. at PageID #3261 (7/15/15 Letter).

LC failed to respond to requests by City staff members to meet and debrief the June 2015 presentation and public comments. See Brown Aff., R. 79-1 PageID #4483-5. Rather than engaging with the City and its residents, LC went dark over the next five years, conducting little communication with the City or outreach to residents. Brown Dep., R. 69-1 PageID #2715-6.

When LC notified the City in September 2020 that it would be submitting its application for rezoning (the "Application"), City staff met with LC to discuss the development plan and regularly followed up with LC between the filing of LC's Application and its subsequent revised development concept presented to the MPC and Council at the end of 2021. Brown Dep., R. 69-1, PageID #2763-68; Brown Aff., R. 79-1, PageID #4484-87; Greeson Dep., R. 67-1, PageID #2317-23. LC's representatives admitted that City staff met with LC throughout the process. Brownlee Dep., R. 61-1, PageID #985-87; Hart Dep., R. 70-1, PageID #3090-92, 3105-06.

On October 2, 2020, with the unequivocal understanding of residents' opposition to multiple elements of LC's proposed plan and the likelihood of a referendum to challenge rezoning approval, LC applied to rezone the Property. Hart

7

Dep., R. 70-1 PageID #3072-7, 3259-60 (Application)). Conspicuously, from that time forward, only LC's attorneys, not its development or other staff, met and corresponded with the City and appeared at public meetings on LC's behalf. Brownlee Dep., R. 67-1 PageID #976, 981. After LC filed the Application, City staff members made LC aware of the need to discuss the development plan primarily in the public forum because the Property was a singularly unique property historically, geographically, and emotionally for the residents, and should not be treated as a routine rezoning application. Brown Dep., R. 79-1 PageID #4486.

LC's disingenuous mantra throughout this litigation and in its brief that the Application fully complied with the Comp Plan's conceptual guidelines is also false. Brown Dep., R. 69-1, PageID# 2698-2700, 2711-14, 2616-17, 2719, 2725, 2728-29, 2732. In response to the Application, on January 8, 2021, the City's Director of Planning and Building issued a Staff Memo to the public and MPC for the January 14, 2021 MPC meeting, recommending the denial of LC's Application while also advising that if LC were to make significant modifications and changes integrating comments from City staff, MPC members, and City residents, staff would recommend tabling the Application for LC to make those changes. *Id*. at PageID #2697-2700, 2907-64 (1/14/21 Mtg.); 1/14/21 Mtg., R. 60-4 PageID #788-845.

The Staff Memo identified the relevant zoning code sections and conceptual guidelines in the Comp Plan and discussed issues with density mixes and types,

connection points, lack of contiguous useable greenspace, stormwater, and traffic among other things. Brown Dep., R. 69-1 PageID# 2699-2751, 2907-64 (1/14/21 Mtg.).

After LC's attorneys made their presentation to the MPC, City residents and the MPC voiced similar concerns about density, height and number of buildings—particularly that the number of units *increased* from 571 in the 2015 proposal to 730 units—lack of useable greenspace, and impact on schools, traffic, police, fire, and EMS services. *Id*. at PageID #2912-3, 2953-64. Among the conceptual criteria in the Comp Plan is the recommendation for increasing greenspace as residential density increases. *Id*. at PageID #2710. Significantly, before submitting the Application or LC's later revised plan, LC admitted that, although it had increased density from 571 to 730 units, it never considered the Comp Plan's recommendation for increasing greenspace as density increased. Brownlee Dep., R. 67-1 PageID #977, 980.

Based on LC's failure to engage with City staff members, the January 2021 Staff Memo states that staff had difficulty scheduling meetings with LC. Brown Dep., R. 69-1 PageID #2931-2. LC also failed to respond to Council's written list of questions by the date of the meeting. *Id.* at PageID #2940. After that, City staff continued to meet in person or otherwise communicate with LC to discuss issues with the pending Application. *Id*. at PageID #2763-5. However, because residents had expressed concerns about secret meetings and held the right to referendum, the

City again told LC it would be best to discuss the Application in a public forum, rather than behind closed doors, due to residents' fear that the Application would be approved without resident input. Brown Dep., R. 69-1, PageID #2785-86.

On or about September 11, 2021, LC submitted a revised version of its development plan, which LC's attorneys then presented at the October 14, 2021 MPC meeting. *Id.* at PageID #2773-5, 2965-81 (Updated Proposal). While addressing a few concerns identified in the previous Staff Memo, the revised plan still did not satisfy all of the Comp Plan's conceptual guidelines or address all concerns repeatedly articulated by the MPC and City residents following the June 2015 and January 2021 meetings, so the Staff Memo again recommended denial of the Application. *Id.* at PageID #2783, 2787-8, 2982-3038 (10/14/21 Mtg.). Notably, although residential density had been reduced from 730 to 600 units, density still remained higher than the 571 units proposed in 2015 and increased the number of apartments from 350 to 540. *Id.* at #2935.

During the October 14, 2021 MPC meeting, LC stated that high-density residential was an indispensable part of its plan, in response to which City residents reiterated that the density was still too high and further identified LC's lack of community engagement and failure to address their previously raised concerns. 10/14/21 Mtg., R. 60-5 PageID #884-893. The MPC echoed residents' concerns about LC's failure to engage residents, local civic groups, and members of the

community, then unanimously recommended denial of LC's Application, again
citing issues with overall density, building height and number of units, lack of
contiguous greenspace, connecting points, and traffic. *Id*. at PageID #893-902.

MPC members also explained why they did not table the Application, pointing
out that LC had the option of withdrawing the Application rather than conceding its
referral to Council for vote, which LC declined to do. *Id*. at PageID #894-901; Hart
Dep., R. 70-1, PageID #3166. City staff would have recommended tabling the
Application had LC made the changes repeatedly requested by the City and residents
since 2015 and during the Application review process. Brown Dep., R. 69-1, PageID
#2698-702, 2750-51; 10/14/21 Mtg., R. 60-5, PageID #883.

LC ignored those requests and, in fact, admitted that it *purposefully* ignored
feedback received in June 2015 in preparing the Application. Brownlee Dep., R. 67-
1, PageID #977-80; Dec. 13, 2021 Mtg., R. 60-6, PageID #911-914 (Council
discussing the need to address ongoing concerns). The MPC had previously voted
to table the Application with the mistaken assumption that LC would make
significant changes. 1/14/2021 Mtg., R. 60-4, PageID #841-45.

During the December 13, 2021 Council meeting, residents and
Councilmembers repeated many of the same concerns raised since 2015. 10/13/21
Mtg., R. 60-6 PageID #905-15. Councilmembers also publicly discussed Ordinance
1145.05 and did not in any way state that LC could not submit an application of any

kind during the required waiting period. Dec. 14, 2021 Mtg., R. 60-6, PageID #914-5. Zoning Ordinance 1145.05 states that

> [n]o application for rezoning of any parcel of ground, once formally acted upon by either the Council or the [MPC], may be again considered for any rezoning change by Council or the [MPC] until 180 days has elapsed from the date of formal action.

*Id.* LC knew it was not precluded from submitting a new application to develop the Property after the mandatory waiting period. Brownlee Dep., R. 61-1 PageID #982. Rather than wait and reapply, LC was already anticipating "legal matters" as early as January 26, 2022. Hart Dep., R. 70-1 PageID #3228-9. Two months later, LC filed this lawsuit. Three years later, LC still has not reapplied for rezoning.

On January 18, 2022, Council passed Resolution 04-2022 in a 4-3 decision, updating the UMCH portion of the Comp Plan. Smith Dep., R. 63-1 PageID #1401-2, 1472-4 (04-2022). Those who voted in favor of the amendment did so because, based on discussions with the community over the years, amending it supported residents' vision for the Property and provided additional conceptual guidance to developers and residents. Brewer Dep., R. 66-1 PageID #2106-8; Bucher Dep., R. 68-1 PageID #2523; Smith Dep., R. 63-1 PageID #1436-7; Robinson Dep., R. 62-1 PageID #1240-4.

Finally, LC's brief relies on its unsupported conspiracy theory that David Robinson somehow controlled the majority of the City's 14,700+ residents and every Councilmember to the detriment of a powerless LC, a multi-million dollar company

12

that has developed PUDs and other projects in several states across the country. DeAscentis Dep., R. 78-1 PageID #4280-1, 4380. LC's conspiracy theory is false— Robinson is one Councilmember with one vote.

As early as June 2015, years before getting elected, Robinson disliked the 2014 Plan Update because he believed that it did not accurately reflect resident consensus. Robinson Dep., R. 62-1 PageID #1136-43. Mr. Robinson wanted to amend the 2014 Plan to reflect his understanding of the local consensus about conceptual development of the Property. *Id.* at PageID #1148. In early 2018, newly-elected Councilmember Robinson wrote to City staff and Council inquiring about conducting a cost-to-serve analysis of multiple potential outcomes at the Property, including commercial, residential, greenspace, and City acquisition. *Id.* at PageID #1152-9. In September 2020, before LC filed its Application and purchased the Property, Robinson failed in his effort to rescind or suspend the 2014 Plan Update. *Id.* at PageID #1200-4.

LC companies develop hundreds of properties nationally. DeAscentis Dep., R. 78-1, PageID #4297. It is patently false for LC to claim it is chilled from pursuing rezoning of the Property, let alone the alleged conspiratorial efforts of a single Councilmember. Despite public opposition, LC's CEO firmly declared, "I knew I would get it zoned", "[t]here's always community oppositions to plans." *Id*. at PageID #4334.

## PROCEEDINGS BELOW

LC filed this lawsuit on March 24, 2022. Compl. R. 1, PageID #1. The City moved to dismiss. Mot., R. 20, PageID #114. The district court granted in part and denied in part the Motion. Op., R. 37, PageID #507. Germaine here, the district court dismissed LC's due process claims because LC lacked a protected property interest. *Id.*, PageID #513–21. The district court denied the Motion as to LC's partial regulatory takings claim and the declaratory judgment claim related to the partial taking. *Id.*, PageID #531–32. LC moved for reconsideration. Mot., R. 45 PageID #595. The district court denied the Motion as to LC's due process claims. Op., R. 50, PageID #636–37.

LC and the City filed opposing Motions for Summary Judgment on LC's partial takings, First Amendment retaliation, and associated declaratory judgment claims. City Mot., R. 60, PageID #659; LC Mot., R. 65, PageID #1630. The district court granted The City's Motion and denied LC's Motion. Op., R. 89, PageID #5655. LC appealed. Notice, R. 91, PageID #5657.

## SUMMARY OF ARGUMENT

LC owns the property with the same zoning classifications and uses today as when it investigated and then purchased the Property. But LC lacks a property interest in *rezoning*, which is fatal to LC's partial regulatory takings claim.

LC also cannot pass the *Penn Central* test. It lacks objectively reasonable

14

investment-backed expectations for rezoning approval. LC, a sophisticated developer, knew rezoning approval would be difficult, knew residents opposed multiple aspects in its proposed plan, and anticipated that residents were likely to seek a referendum to overturn rezoning if approved regardless of the developer. LC specifically took steps to protect itself from the uncertainties inherent in rezoning when contracting to purchase the Property but then waived rezoning contingencies to purchase the Property at a significant discount. Any economic impact the perpetuation of current zoning may have on LC was brought upon by LC's own actions and unrealized unilateral expectations, not those of the City. The district court correctly granted summary judgment for the City.

LC's lack of a protected property interest in rezoning is also fatal to its due process claims. The Due Process Clause protects persons from deprivation of life, liberty, or property without due process—in the absence of any of these interests to "deprive", no process is due. The district court properly dismissed LC's due process claims as a result.

For its state-law declaratory judgment claim, LC is required to show that the challenged zoning ordinances deprive all economically viable uses of LC's property without a corresponding public interest. Having already determined in the regulatory takings context that no such deprivation occurred, the district court correctly dismissed the declaratory judgment claim.

LC waived all other claims.

## ARGUMENT

### A.  The Court Should Affirm Summary Judgment on LC's Partial Regulatory Takings Claim.

It is well-established that "zoning decisions are presumptively the province of local governments." *SAS Assoc. 1, LLC v. City Council for City of Chesapeake, Virginia*, 91 F.4th 715, 720 (4th Cir. 2024). These decisions "lie at the core of local governments' historic responsibilities in much the same way that state governments regulate domestic relations and the federal government oversees matters of national security." *Id*. Courts do "not interfere with local zoning decisions unless the locality's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare.'" *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008) (quoting *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005)).

Courts have good reasons not to interfere in local zoning decisions. The position taken by LC here would force this Court to "intervene in local affairs" and "zoning decisions [that] primarily impact the communities to which they apply." *SAS Assocs.*, 91 F.4th at 720. Whereas "[l]ocal officials are well equipped to make such decisions because they interact with those most affected and can remain

attentive to their changing needs", the courts "cannot inform [themselves] about individual communities well enough to know their needs[.]" *Id.*

Accepting LC's arguments here would undermine Ohio's local zoning process and legal precedent, invite disgruntled owners to seek federal zoning relief if they cannot put their property to the highest most profitable use, and make federal courts *de facto* local zoning authorities. The district court did not take the bait.

In its brief, LC directs its entire argument to the *Penn Central* test, incorrectly arguing that the City barred it from rezoning the Property, yet ignores the threshold requirement for an affected property right. LC had no cognizable property interest in *rezoning* the Property—Council had absolute discretionary authority to determine whether to approve rezoning.

Notwithstanding, LC fails the *Penn Central* test. Courts, not juries, are initially called to "subjectively judg[e] how far is 'too far'" such that a partial regulatory taking has occurred. *Knight v. Metro. Gov't of Nashville & Davidson Cty.*, 67 F.4th 816, 832 (6th Cir. 2023). Yes, the *Penn Central* analysis involves a factual inquiry, but district courts routinely grant—and appellate courts affirm—summary judgment when the evidence is "so one-sided that" the government "must prevail as a matter of law." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016).

That is exactly what the district court did here. The standard on summary judgment that "[t]he *evidence* of the non-movant is to be believed" does not mean

LC's *spin on the evidence* must be believed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added). The district court rightly saw through LC's hyperbole and conspiratorial theories.

### 1.    LC's takings claim fails because it has no cognizable property interest in rezoning.

To succeed on its partial regulatory takings claim, LC must sufficiently demonstrate that (1) it possesses a cognizable "property interest" and (2) a "taking" of that property interest occurred. *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004); *Prater v. City of Burnside*, 289 F.3d 417, 425-27 (6th Cir. 2002). Therefore, this Court need not apply the *Penn Central* analysis, which relates to the second question, unless LC can clear the first hurdle by demonstrating that it "owned a distinct property interest at the time it was allegedly taken[.]" *Alexander Invest. v. United States*, 51 Fed.Cl. 102, 109 (2001) (citing *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001)) (holding that "the existence of a valid property interest is necessary in all takings claims"). This, LC cannot do since it did not have a valid property interest in *rezoning* the property.

Neither the City's denial of LC's Application nor Resolution 04-2022 deprived LC of a property interest it *already* held. LC's property interests arise under the Property's existing R-10, C-2, C-3, and S-1 zoning classifications. LC maintains those same property interests existing in 2015 when LC first entered into the contingent purchase agreements. The City's actions did not deprive LC of those

interests or otherwise alter zoning law. *Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 683 (6th Cir. 2004) (no taking if, as a threshold matter, there is no cognizable property interest).

For purposes of establishing a taking, the property rights at issue are defined by "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law. *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1030 (1992). The City's Comp Plan, the linchpin of LC's novella, was not and has never been codified into the City's zoning ordinances. It was never part of City zoning law, only a conceptual guideline. *Southgate Corp. v. Village of Granville*, 2019 WL 2366884, ¶ 13 (Ohio App. 2019). Irrespective of the Comp Plan's language, Council had absolute discretion to deny the Application and amend the Plan. Thus, there was no taking because LC's sole cognizable property interest is in the existing decades-long zoning classifications, not LC's desire for rezoning.

"[W]here a due process claim is unsuccessful, it would be surprising indeed to discover the challenged statute nonetheless violat[es] the Takings Clause." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 641 (1993) (internal quotation marks and citation omitted); *see also Henry v. Jefferson Cty. Comm'n*, 637 F.3d 269, 276 (4th Cir. 2011) ("[W]e are reluctant to push the notion that the denial of a permit in which one has no property interest can

19

somehow amount to an unconstitutional taking.").

The takings inquiry ends here. On this basis alone, summary judgment was proper.

### 2. LC cannot establish a taking under *Penn Central*.

It is difficult to imagine how a taking could occur when the City didn't change zoning law, didn't obstruct LC's right to due process, and didn't impair LC's fundamental equal protection rights. To the extent LC's partial regulatory takings claim is precariously premised on the City "taking" a portion of the Property to be used as a park, that claim also fails under *Penn Central*.

Under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), this Court balances several factors, including the "economic impact of the regulation on the claimant", "extent to which the regulation has interfered with distinct investment-backed expectations", and "character of the governmental action." *Id*., 438 U.S. at 124; *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005)).[3]

Ultimately, the purpose of the *Penn Central* analysis is to determine whether a

---

[3] LC's takings claim is brought under the Takings Clause applied to the states through the Fourteenth Amendment to the U.S. Constitution and the Ohio Constitution, Article I, Section 19. Ohio courts apply *Penn Central* when analyzing a regulatory taking claim under Ohio's Constitution. *See, e.g., State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, ¶¶ 33-39 (Ohio 2002). The City's arguments apply to both the federal and state constitutional claims.

use restriction "goes too far" resulting in a "physical invasion or confiscation." *Knight v. Metro. Govt. of Nashville & Davidson Cty.*, 67 F.4th 816, 823 (6th Cir. 2023) (citing *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072, 210 L.Ed.2d 369 (2021). The analysis is informed by the purpose of the Takings Clause, which is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central*, 438 U.S. at 123 (citation omitted).

Here, the evidence establishes there was no taking for a public park. That is a myth concocted by LC by twisting the record and unduly zeroing in on the opinions of one Councilmember.

### i.   LC lacks objectively reasonable investment-backed expectations.

While evaluation of the three *Penn Central* factors is "an 'ad hoc, factual' inquiry," "the force of one of the three factors may be so overwhelming . . . that it disposes of the taking question." *Ruckelshaus v. Monsanto Co.* 467 U.S. 986, 1005 (1984) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175 (1979)). Although a regulatory impact on a property owner's justifiable, reasonable investment-backed expectations might singly demonstrate a taking,[4] the reverse is also true. Thus, the absence of investment-backed expectations could also conclusively compel

---

[4] *Loreto Dev. Co. v. Village of Chardon*, Nos. 97-3502/97-3656, 1998 U.S. App. LEXIS 12183, at *12-13 (6th Cir. June 4, 1998).

dismissal of LC's partial takings claim. *See, e.g.*, *Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999) (affirming summary judgment solely on the lack of reasonable investment-backed expectations); *Golden Pac. Bancorp v. United States,* 15 F.3d 1066, 1074 (Fed. Cir. 1994) (concluding lack of reasonable investment-backed expectations disposed of takings claim). The evidence here so overwhelmingly demonstrates LC's lack of *reasonable* investment-backed expectations that summary judgment was warranted on this basis alone.

### a.    LC purchased the Property with the existing zoning in place.

This Court "should give substantial weight" to the zoning regulations in place when LC purchased the Property. *Murr v. Wisconsin*, 582 U.S. 383, 397 (2017). Zoning that predates a landowner's acquisition is "one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property", especially an experienced, national developer like LC. *Id*. at 398. "[T]he regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring); *see also Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004).

LC knew when it purchased the Property that: for years it had been zoned R-10, C-2, C-3, and S-1, the latter of which includes park space, the 2014 Comp Plan recommends increasing greenspace as residential density increases, and residents

were strongly in favor of retaining greenspace regardless of who developed the Property. Yet, LC purposefully ignored all of that. The City's denial of the Application could not have "come as a surprise", obviating any reasonable investment-backed expectations. *Knight*, 67 F.4th at 823.

In *Loreto*, *supra*, this Court concluded that the plaintiff "knew or should have known about the property restrictions before it entered into negotiations with Wal-Mart", and thus did not have a reasonable expectation to use the property for its retail business. *Id.* at *12-13; *see also Purple Munky Property Cty., LLC v. Walnut Twp.*, No. 2:23-cv-853, 2023 U.S. Dist. LEXIS 72462, *11 (S.D. Ohio Apr. 25, 2023) (plaintiffs lacked reasonable investment-backed expectations because they purchased their properties with preexisting zoning districts and permitted uses).

In *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685 (4th Cir. 2018), the developer's regularly takings claim was based on an amendment to an existing master plan under which the county had absolute discretion to amend it and reject sewer permits—similar to LC's complaint here under the Comp Plan, <u>with the notable distinction that the City's Comp Plan isn't zoning law</u>. *Id*. at 689-691. The Fourth Circuit concluded that an alleged investment-backed expectation for approval was not reasonable because the county had discretion to amend the master plan, the plaintiff knowingly purchased undeveloped land with no water and sewer access and

no guarantee for access, and the plaintiff had not obtained a permit or begun construction when the amendment was adopted. *Id.* at 691-693, 696.[5]

Likewise, LC's reliance on the Comp Plan is unreasonable since it is not law and does not limit the City's discretion on zoning matters. Under Zoning Ordinance 1174.08, enacted long before LC filed its Application, Council has full discretion to accept or reject rezoning to a PUD. Thus, LC could not have reasonably relied upon the Comp Plan, particularly when LC did not follow recommendations in the Comp Plan, including the balance between density, greenspace, and commercial office space.

LC's description of *F.P. Dev., LLC v. Charter Township of Canton*, 456 F. Supp. 3d 879 (E.D. Mich. 2020), only highlights why the plaintiff in that case was successful in defeating the preexisting land restriction compared to LC. While the new forest preservation *ordinance* restrained tree removal without a permit, the pre-purchase zoning permitted tree removal. *Id.* at 890. Here, the preexisting zoning does not permit LC's proposed PUD and no new ordinance was enacted.

The other cases cited by LC (without discussion) are also distinguishable. In *Formanek v. United States*, 26 Cl. Ct. 332, 340-341 (1989), the plaintiff was not aware when he purchased the industrial-zoned property that it contained important

---

[5] In *Pulte*, the plaintiff did not have a protected property interest, and thus there was no partial regulatory taking. Only 17% of the property could be developed after the amendment. *Pulte*, 909 F.3d at 692-693, 695-697.

wetlands and did not intend to purchase a nature conservancy. In *Loveladies Harbor, Inc. v. United States*, 15 Cl. Ct. 381 (1988), the plaintiffs purchased the land in 1956, long before the laws enacted in the 1970s that interfered with development. *Id.* at 383. The plaintiffs were nevertheless denied summary judgment because they could not prove that the land lacked any viable use. *Id*. at 399.

LC's purchase agreement contingencies belie LC's claim of reasonable investment-backed expectations for rezoning. In *Oberer Land Devs. v. Sugarcreek Twp., Ohio*, No. 21-3834, 2022 U.S. App. LEXIS 15290 (6th Cir. June 1, 2022), this Court focused on the purchase agreement, which was "subject to necessary government approvals" for the planned development, holding that "the denial of [the developers'] 'ability to exploit a property interest' that they thought *might* be 'available for development' is insufficient to establish a regulatory taking[.]" *Id*. at *15-16 (quoting *Penn Central*, 438 U.S. at 130).

LC required various contingency provisions nullifying the purchase if the rezoning was denied. Despite significant risk, LC seized the opportunity for a discounted purchase price of nearly $1 million, waiving the rezoning contingency before the MPC recommended denial of LC's Application, Council denied the Application, and Council amended the non-binding Comp Plan.

Thus, LC did not buy the Property "in reliance on a state of affairs that did not include the challenged regulatory regime." *Oberer*, 2022 U.S. App. LEXIS 15290,

at *16 (quoting *Lovelades*, 28 F.3d at 1177). This undisputed fact weighs substantially in the City's favor, compelling summary judgment on this basis alone.

> **b.    LC was aware the majority of residents opposed its plan for the Property before filing the Application.**

Shockingly, LC describes City residents as "supportive" of the development early-on. Not so. At the June 2015 MPC meeting, all but a few of the residents that offered comments opposed LC's concept for several reasons, including residential density, citing surveys that found over 80% of residents strongly opposed high-density housing. Favorable comments from a minority in 2015, <u>before</u> the number of residential units increased from 571 to 725, does not create a genuine issue of material fact about how most residents felt about the plan. Nor do they demonstrate LC reasonably believed that the City would approve the rezoning, especially after LC purposefully ignored residents' concerns and the City's recommendation to engage residents to address those concerns.

LC representatives knew rezoning would be difficult. During the October 19, 2020 BOR hearing, LC sought to reduce the value of the Property and tax burden by *arguing that rezoning is speculative and not guaranteed*. LC's representative was asked, under oath, whether he had any reason to believe the rezoning would be approved to which he responded that it was likely to be very difficult. He further conceded that rezoning is not "a sure thing" and that UMCH might waive the rezoning contingency because UMCH "didn't have the appetite for what was

probably going to be a prolonged rezoning battle." BOR Tr., R. 60-2, PageID #774-5. The appraiser hired by UMCH who appraised the Property at $5.6 million and testified at the hearing agreed that the unknowns of the rezoning process were included in the analysis.

Contrary to LC's argument in its brief, LC had not yet committed to the project when this testimony was given to the BOR. The contingency agreement in the purchase agreement had not been waived until three months later, when LC closed on the Property for $5.2 million, an $800,000.00 discount.

LC's CEO was also fully aware that getting the Property rezoned would be difficult. LC's own valuation expert admitted that LC did not have any expectation for rezoning approval even if its plan complied with the Comp Plan, essentially conceding that LC's reliance on the Comp Plan for the basis of its claims here is misplaced at best.

LC cannot point to any material evidence that LC's representatives expected the rezoning to be approved and survive a referendum. The opposite is true—any developer with LC's nationwide experience would not have reasonably expected to obtain rezoning in the face of staunch resident opposition, opposition which LC admitted it purposefully ignored when preparing its Application.

> **c.    LC knew its development plan might be challenged through a referendum.**

When LC filed its Application, it knew that <u>every</u> rezoning approval, even if

Council approved the Application then or in the future, is subject to the right of residents to send the rezoning decision to a vote. LC actually anticipated that residents would attempt to overturn approval through a referendum. LC encountered substantial vocal opposition to the proposed development of the Property since its first conceptual presentation to the MPC and 350 residents in 2015. LC has not had any fact-based rationale for believing that the City's voters would not seek to overturn the approval of an application that did not address resident concerns.

The plaintiffs in *Oberer*, *supra*, faced a similar risk. In *Oberer*, 130+ residents attended the zoning commission's public meeting, most of whom voiced opposition to the proposed development, specifically voicing concerns about the threat of annexation, traffic, density, and loss of scenic open space. *Oberer*, at *6. Like the instant matter, the zoning commission in *Oberer* voted unanimously to recommend denial of the application due to "concerns about density, traffic, and a failure to meet the standards for an R-PUCD". *Id. at* *6-7.

This Court concluded that the plaintiffs failed to show the denial interfered with any "distinct investment-backed expectations[.]" *Id*. at *15; *see also Cty. of Kauai v. Pacific Std. Life Ins. Co.*, 653 P.2d 766, 338 (Haw. 1982) (where warnings to potential investors about a referendum supported the "unreasonableness and speculative nature of the expenditures" and lack of reasonable investment-backed expectations).

Like the plaintiffs in *Loreto*, *Oberer*, and *Pulte*, LC here lacked any justifiable, reasonable investment-backed expectations that the Property would be rezoned, let alone survive a referendum. On this basis alone, LC's partial regulatory takings claim fails.

> ## ii.    It is undisputed that LC has economically viable uses available.

The crux of LC's claim is that the Property's existing zoning does not presently permit it to develop the Property. LC is essentially arguing that the Property has no viable use other than the lucrative high-density, mixed-use development it envisions—its most profitable use. The City's denial of LC's maximum-profit plan does not violate the Constitution. The facts LC relies upon demonstrate that the property has economic value and LC <u>can</u> use the Property for many economically viable uses.

> ### a.    LC's highest and best use doesn't support a regulatory takings claim.

"A regulation is not a taking merely because it prohibits the most beneficial use of the property." *Pulte*, 909 F.3d at 696. The Supreme Court has consistently "upheld land-use restrictions that destroyed or adversely affected recognized real property interests." *Penn Central*, 438 U.S. at 125. "Zoning laws are, of course, the classic example [of land-use restrictions], which have been viewed as permissible governmental action *even when prohibiting the most beneficial use of the property*."

29

*Id.* (emphasis added); *see Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365 (1926) (prohibition of industrial use); *Gorieb v. Fox,* 274 U.S. 603, 608 (1927) (requirement that portions of parcels be left undeveloped).

This Court has already expressly rejected LC's flawed logic. In *Oberer,* where the denial of a rezoning application prevented a plaintiff from realizing higher value through its desired development, this Court found it "far from what is required to establish a regulatory taking." *Oberer*, U.S. App. LEXIS 15290, at \*15. Because LC's entire argument rests on its inability to develop the property to its most profitable use, it fails as a matter of law. The Court's inquiry should stop here.

> **b.    LC's flawed diminution of value argument does not demonstrate economic impact under *Penn Central*.**

To show the purported economic impact of the City's actions, LC argues an alleged extreme diminution in value of the Property. Even if it were true (it isn't), that's not enough: "our cases have long established that mere diminution in the value of property, **however serious**, is insufficient to demonstrate a taking." *Tennessee Scrap Recyclers Assn. v. Bredesen*, 556 F.3d 442, 456 (6th Cir. 2009), fn. 6 (quoting *Concrete Pipe*, 508 U.S. at 645) (emphasis added). Indeed, for more than a century, the Supreme Court and lower federal courts have repeatedly recognized that even a substantial diminution in value does not constitute a partial taking. Specifically— and contrary to LC's assertion—these courts have found local zoning ordinances to be a valid exercise of authority, upholding diminutions in value of 75%, 83%, and

92.5%. *See Euclid,* 272 U.S. at 384 (75% diminution not a taking); *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915) (92.5% diminution not a taking); *Concrete Pipe*, 508 U.S. at 645 (citing *Hadacheck* and *Euclid*); *Pulte*, 909 F.3d at 696 (4th Cir. 2018) (83% diminution not a taking); *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (81% diminution not a taking); *Henry*, 637 F.3d at 277 (75% and 92.5% not takings); *Appolo Fuels*, 381 F.3d at 1348, 1351 (78% and 92% not takings); *Iowa Coal Mining Co. v. Monroe County*, 257 F.3d 846, 853 (8th Cir. 2001) (75% diminution not a taking).

In fact, LC's cited case law *supports* the City's position. In two of the three cases, the court found in favor of the government by determining <u>there was no taking</u>. *See Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018); *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011). The court in *Colony Cove* explicitly stated that "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking." *Colony Cove*, 888 F.3d at 451.

In the third case cited by LC, which involved a newly-passed statute abrogating a pre-existing contractual right to prepay a mortgage loan on low-rent properties, the court's labeling of a 96% loss on the possible rate of return as a "serious financial loss" was specifically tied to the unique property interest at stake: "the contractual right to prepay and then repossess the real property." *Cienega*

*Gardens v. United States*, 331 F.3d 1319, 1345 (Fed. Cir. 2003). That scenario is wildly distinct from situations involving unchanged preexisting local zoning laws and the numerous factually-similar zoning cases where the government prevailed under *Penn Central*. *See Oberer*, *supra*; *Loreto*, *supra*; *Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2010).

Furthermore, LC's position that the Supreme Court's statement in *Concrete Pipe* that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking" was the Court explaining the other two factors had not been satisfied is not supported by the language in that decision. *See Concrete Pipe*, 508 U.S. at 645. Instead, it reflects that, when analyzing the economic impact of the regulation, there must be some additional impact on the property other than diminution in value. The decision in *Loveladies*, *supra*, cited by LC, answers this question—to LC's detriment.

In *Loveladies*, the court found that although there was a diminution in value over 98% (from $3,790,000 to $13,725.50), the diminution resulting from the permit denial was only one relevant factor and *did not conclusively establish a taking* because the claim also required facts showing that the property has been deprived of "all economically viable use". *Id.* at 394-395 (citation omitted). "In other words, after a showing of devaluation has been made, the focus of inquiry must turn to the remaining possible uses that the interfering regulations permit." *Id.* at 395 (citing

*Penn Central,* 438 U.S. at 131).

A partial regulatory taking occurs only when "a regulation places limitations on land that fall short of eliminating all economically beneficial use." *Lucas,* 505 U.S. at 1015 (citing *Penn. Central,* 438 U.S. at 124). Again, LC has the potential to develop the Property in a variety of financially lucrative ways.

This conclusion follows decisions within this Circuit dismissing partial regulatory takings claims because the plaintiff maintained the option to develop the property albeit not in accordance with the plaintiff's plan. *See, e.g., Village of Maineville v. Hamilton Twp., Ohio Bd. of Tr.*, 902 F. Supp. 2d 1072, 1079-1080 (S.D. Ohio 2012), *aff'd,* 2013 U.S. App. LEXIS 16517 (6th Cir. 2013) (the resolution was not "unduly restrictive" despite imposing additional development costs).

The decision in *Pulte* highlights this point. In *Pulte,* the owner was able to develop approximately 17% of its property (93 of its 540 acres), yet the court held that "[e]ven if we assume that Pulte has suffered an eighty-three percent diminution in the value of its property, that is not enough on its own to establish a taking." *Pulte,* 909 F.3d at 696 (citing *Concrete Pipe,* 508 U.S. at 645). *Pulte* reaffirmed that a "regulation is not a taking merely because it prohibits the most beneficial use of the property." *Id.*; *see also Loreto,* at *11 (citing *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592, 8 L.Ed.2d 130, 82 S.Ct. 987 (1962)). This is particularly true for a partial regulatory takings claim where potential available damages are limited

because the Property is comprised of multiple separate parcels which have separate

identities and zoning designations. *See, e.g.*, *United States v. Banisadr Building Joint*

*Venture*, 65 F.3d 374, 378 (4th Cir. 1995).

That is precisely the scenario here.

### c.    LC ignores the Property's current zoning.

LC targets the S-1 zoning district, relying on a single comment from the City's

defense expert about this portion of the Property while ignoring the Property's other

zoning classifications. Horner Rep., R. 73-1, PageID 3969. The S-1 zoning district

occupies 27.5 of the 37.6 acres (73%) of the property. *Penn Central* stresses that the

analysis focuses on the character of the action and "interference with rights in the

parcel as a whole." *Penn Central*, 438 U.S. at 130-31. LC appraised the Property as

a single unit and seeks to develop it as a single PUD. "Where an owner possesses a

full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a

taking because the aggregate must be viewed in its entirety." *Keystone Bituminous*

*Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Even assuming LC cannot

develop these 27.5 acres (which is patently false), that results in a speculative

diminution of 73% of value, not the exaggerated 88%-94% diminution LC suggests.

Like *Pulte* and the cases listed above, even a 73% diminution of value would not

constitute a taking.

Moreover, it bears repeating here that, in addition to the ability to file another

application for a PUD with a better balance of density, greenspace, and commercial office space that Council and residents might support, LC also maintains the right to pursue multiple development opportunities under current zoning designations. It is undisputed that the Property's current zoning designations permit multiple economic uses, including residential (R-10); commercial, retail, and service establishments with top-floor residential (C-2); nonretail establishments of a social, educational, religious, medical, research, charitable or philanthropic nature (C-3); and "open area" services including parks, and institutions of an educational, religious, medical, charitable or philanthropic nature (S-1). LC could also seek rezoning of the S-1 portion to any of the City's residential classifications.

Accordingly, LC has not incurred a sufficiently severe economic impact to constitute a taking. *See Harris v. City of St. Clairsville*, 2006 U.S. Dist. LEXIS 92523 (S.D. Ohio Dec. 21, 2006) at *50-52, *aff'd*, 330 Fed. Appx. 68, 2008 U.S. App. LEXIS 8869 (6th Cir. 2008) (plaintiff not denied economically viable use because he was permitted to use it for medical services, among others); *see also Andrews v. City of Mentor,* 11 F.4th 462 (6th Cir. 2021) (where this Court was "highly skeptical" that rezoning left the property economically idle "given that [it could] still construct 13 single-family residences") (quoting *Palazzolo,* 533 U.S. at 631 (2001)); *Henry*, 637 F.3d at 275-276 (4th Cir. 2011) (owner denied a 51-unit CUP, but allowed a 14-unit CUP and other uses).

### d.      LC's expert report and testimony are immaterial.

Relying upon its expert's calculations, LC proposes that the economic impact of the City's actions is the difference between $55,500,000 (the value of the undeveloped land rezoned for PUD) and $3,338,000 (the value of the Property under the current zoning). At best, LC's expert confirms that the Property's value under the current zoning has theoretically diminished from the $5,600,000 it argued before the BOR, which does not help its claim. *See Raceway Park*, 356 F.3d at 687 n.8 (quoting *Concrete Pipe*, 508 U.S. at 645). Indeed, LC's expert proves that the property still has value.

Notwithstanding, LC omitted key facts. LC had the Property appraised twice before this litigation and arrived at values of $5,600,000 and $8,400,000, the latter of which could be higher if development ready. Gardner Dep., R. 71-1, PageID 3357-58. Again, LC purchased the Property with the existing zoning in place for $5.2 million, obliterating LC's absurd position that the real property alone could be worth $55.5 million dollars if rezoned to LC's desire and thereby diminished by 94%.[6]

Regardless, the differing appraisal values do not create material factual disputes or preclude summary judgment in the City's favor. The only ***material fact*** is that, under

---

[6] LC relies on the City's footnote criticizing Garner's methodology, falsely suggesting that the district court improperly discarded Garner's report when granting summary judgment. The City's Motion was not based on Garner's methodology. The City *assumed arguendo* that the $3.3 million was correct, but that was not the type of severe economic impact constituting a taking.

any valuation analysis—even LC's willfully blind, self-serving expert opinion—the Property still has value exceeding $3.3 million. At best, it demonstrates a diminution of value under the current zoning, nothing more. That does not constitute a taking.

### iii. The City's actions do not establish a classic taking.

The third and final *Penn Central* factor, the character of the governmental action, favors the City because it has "an adequate justification for the use restriction[.]" *Knight*, 67 F.4th at 823. Courts considering the character of the governmental action focus on the reason for the zoning decision—whether the regulation has a "legitimate public purpose." *Murr*, 582 U.S. at 405 ("effort to preserve the river and surrounding land" a legitimate motive); *Penn Central*, 438 U.S. at 124 (regulation less likely to be a taking if it "merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good"); *Loreto*, 1998 U.S. App. LEXIS 12183, at *14-15 (desire to reduce traffic and preserve the community aesthetic are "permissible motive[s]"); *Horn v. City of Mackinac Island*, 938 F. Supp. 2d 712, 721 (W.D. Mich. 2013) (citing *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights,* 209 F.3d 626, 637 (6th Cir. 2000)) (governments have legitimate interest in controlling traffic and maintaining safe thoroughfares); *Harris*, 2006 U.S. Dist. LEXIS 92523, at *52-53 (focusing on whether the zoning decision was rational and based on a deliberative process).

Here, the City worked through its deliberative statutory process and Council articulated legitimate concerns about LC's plan with respect to the welfare of the City and its residents, including, for example, the potential impact of increased residential densities on school, police, fire department, traffic, and the like. LC had every opportunity to address those concerns, yet chose not to and, in fact, admitted ignoring those concerns, instead *increasing* its proposed residential density. At the December 13, 2021 meeting, Councilmembers suggested LC should start fresh with a new Application addressing the concerns. Of course, LC chose to file this lawsuit instead.

### a.    The City is not taking the Property for a public park.

The *Penn Central* test also looks for regulatory actions that are functionally equivalent to a classic taking where government directly appropriates property. *Oberer*, 2022 U.S. App. LEXIS 15290, at *16 (quoting *Lingle*, 544 U.S. at 539). Under any reasonable interpretation, the City's legitimate discretionary denial of LC's zoning Application is not equivalent to a classic taking.

The Property has been zoned for many uses for decades, including the S-1 designation, which includes green space and parks. The 2014 Comp Plan and Resolution 04-2022 are not binding zoning law, although those guidelines conceptually reference maintaining green space on the Property, including increasing greenspace as residential increases, but significantly and expressly contemplate mixed use residential and commercial development, not a public park.

Neither the denial of the Application nor Resolution 04-2022 changed the preexisting zoning law and the City has never taken a single step to restrict the Property's use solely to a public park, instituted appropriation proceedings, or voted to acquire the Property. That Councilmember Robinson, while a resident and later as an elected Councilmember, years before LC's Application and purchase of the Property, began advocating for including park space doesn't change the analysis. The Comp Plan includes that same conceptual use within residential and commercial uses.

In addition to the fact that the City may, under the law of exactions, require dedication of some park space without a compensable taking (which it also hasn't done), any alleged improper motivation by Councilmember Robinson cannot be imputed to the City. S*ee Nekrilov v. City of Jersey*, 45 F.4th 662, 677 (3d Cir. 2022) (the "character of the government action" did not weigh in plaintiff's favor due to one councilmember's alleged bad faith in passing an ordinance because "regardless of [his] subjective motivations, the council members voted 7-2 for the regulation"). Council voted unanimously to deny the Application and 4-3 to pass Resolution 04-2022.

In *Dolan v. City of Tigard*, 512 U.S. 374 (1994), cited by LC for the first time on appeal, the Supreme Court addressed the constitutionality of a city's action conditioning a permit upon the landowner dedicating property to the City's land use

plan. *Dolan* is a big leap from this case where the preexisting zoning ordinances and Comp Plan's guidance included greenspace.

LC's other case, *F.P. Dev*., *supra*, where landowners were required by ordinance to pay replacement fees for trees removed from their property, presented a unique burden on the land—replacement costs would exceed the value of the property, a situation not present here.

### b.    The City did not single out LC.

There is no evidence that the City treated LC with animus or ill-will or otherwise singled out LC. When dismissing LC's equal protection claim, the district court accepted as true that Councilmembers' disliked *LC's plan* (most of the residents in the City did) and one Councilmember's statement regarding the project's "problems and mediocrity", yet neither supported a finding that LC was treated differently from any other owner or developer. Decision on Reconsideration, R. 50 PageID #638.

LC's *plan* is the issue, not LC. Council specifically asked LC to submit a new application addressing the same concerns that have persisted since 2015, which again, LC purposefully ignored when preparing the Application. And by failing to appeal the district court's dismissal of LC's equal protection claim, LC essentially concedes that it was not singled out by the City.

**B.     The Court Should Affirm the Trial Court's Dismissal of LC's Due Process Claims.**

**1.     LC lacks a protected property interest.**

LC claims the district court ignored its "alleged due process claims based on [LC's] *existing* rights to possess, use, exclude, and dispose of the United Methodist property[,]" which it contends is reversible error. Br. of Appellant, p. 73 (emphasis in original). But that is wrong and this argument fails for at least two reasons.

First, LC forfeited this argument. It never alleged that its protected property interest arose from the existing zoning or that the City deprived it of its right to possess, use, exclude, or dispose of its property under that zoning. For its due process claims, it never alleged that the existing zoning was arbitrary or unconstitutional.[7] At best, LC alleged that it had "legitimate claims of entitlement and justifiable expectations in their property interests" because the "City's current zoning of [LC's] Property is not in accordance with the Property's Land Use Plan[.]" Compl., R. 1, PageID #29, 32, 34, 35. LC cannot make this argument for the first time on appeal for its due process claims.

Second, even assuming LC did not waive this argument, it fails substantively for several reasons. As the district court recognized, property rights are subject to

---

[7] LC only alleged that the existing zoning was arbitrary or unconstitutional in its Declaratory Judgment claim (Count VIII), which the court addressed when it ruled in the City's favor.

zoning regulations—mere ownership of property is not a protected property right under the Due Process Clause. Moreover, the City has never denied LC's "right to possess, to use, to exclude, and to sell." Nor did LC allege that. The only relevant allegation is that the City denied LC's rezoning request. Finally, if LC is now trying to argue that the existing zoning is arbitrary, unconstitutional, or too restrictive in the due process context (rather than the regulatory takings context), those claims fail for the same reasons addressed by the trial court in the Opinion and Order on summary judgment. Op. and Or., R. 89.

> **a.** **LC waived the argument that its protected property right arose from its right to possess, use, exclude, or dispose of its property under the existing zoning.**

This Court does "not consider new arguments presented for the first time on appeal." *United States v. Seventeen Firearms*, 170 F. App'x 418, 419 (6th Cir. 2006) (*citing McFarland v. Henderson,* 307 F.3d 402, 407 (6th Cir.2002) ("Issues not presented to the district court but raised for the first time on appeal are not properly before the court.")). The Court is "not compelled to hear, nor should [we] hear, an issue not presented to the district court." *Foster v. Barilow,* 6 F.3d 405, 408 (6th Cir. 1993).

LC never alleged or argued that its due process claims arose from mere ownership of property, available development under existing zoning, or alleged

arbitrary or unreasonable zoning. Each of its due process claims alleged the same

protected property interest:

> A "legitimate claims of entitlement and justifiable expectations in their property interests, for among other reasons:
>
>> a. The City's current zoning of Lifestyle's Property is not in accordance with the Property's Land Use Plan;
>>
>> b. The City, through its Charter and own admission, states that the Comprehensive Plan governs all development within the City and cabins the City's discretion as to its land use decisions;
>>
>> c. Lifestyle has the right to use the Property for a planned unit development;
>>
>> d. Lifestyle's Applications are in accordance with the City's Charter, Ordinance, and Comprehensive Plan, including the Property's Land Use Plan, such that the City did not have discretion to deny the Applications;
>>
>> e. Lifestyle undertook significant actions and made substantial investments in its Property such that the City's action against Lifestyle and the Property and the City's denial of Lifestyle's Applications – an arbitrary departure from the Property's Land Use Plan – caused substantial detriment to Lifestyle; and
>>
>> f. Lifestyle expended significant sums to design and plan the development plan."

Compl., R. 1, PageID #29-37.

Responding to the City's Motion to Dismiss (Mot. to Dis., R. 20), LC

suggested that it had a protected property interest in only two ways: (1) putting the

property to use "which it cannot do under the current S-1 zoning and while being

subjected to the City's hostile zoning process and *de facto* moratorium; and (2) the

City's representations and actions created an understanding and obligation to rezone the Property pursuant to the Land Use Plan." Memo in Op., R. 22, PageID #403.

The trial court correctly recognized LC's claims, noting that its "Due Process claims are premised on the Comprehensive Plan, the Land Use Plan, and Resolution 04-2022." Order, R. 37, PageID #515. And even when LC sought reconsideration of the dismissal, it did not make the arguments it now raises. Instead, LC claimed only that the court overlooked "the City's unauthorized and improper enactment of Resolution 04-2022 without affording Lifestyle notice and the opportunity to be heard[.]" Motion for Recon., R. 45, PageID #598.

In short, the Court should not consider LC's new argument in support of its due process claims. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (explaining the well-settled rule that the "court will not consider arguments raised for the first time on appeal" in the absence of a plain miscarriage of justice).

> **b.** **Even assuming LC preserved this argument, or the Court considers it, it fails because the City's zoning is not unconstitutional and the City never acted adverse to existing zoning.**

LC's argument that it has a protected property interest in the Property itself is wrong on several levels. The right to use and develop property is not unfettered; it "is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions." *Palazzolo,* 533 U.S. at 627. Zoning

regulations have been upheld as valid restrictions on the use and enjoyment of private property for almost a century. *See Village of Euclid*, 272 U.S. at 379. LC's argument ignores this unquestioned, century-old precedent.

The Ohio Constitution reaffirms this principal, declaring property rights to be "subservient to the public welfare" (Ohio Const. art. 1, § 19), which includes the enforcement of zoning regulations. *See Jaylin Investments, Inc. v. Moreland Hills*, 839 N.E.2d 903, ¶ 10 (Ohio 2006). LC's suggestion that the current zoning is arbitrary, unreasonable, or unconstitutional because its desired use is not permitted is incorrect.

First, "[z]oning ordinances are presumed constitutional." *Goldberg Cos., Inc. v. Richmond Hts. City Council*, 690 N.E.2d 510, 511 (Ohio 1998). Second, LC bears the heavy burden to establish that the zoning for the property is "unconstitutional beyond fair debate[,]" (*Id.*), which it has not established. Third, the Ohio Supreme Court expressly held that the constitutionality of zoning regulation turns on whether they are *clearly* arbitrary and unreasonable, "not upon whether it has deprived landowner of all economically viable uses." *Id.* LC doesn't even come close to establishing its heavy burden to rebut the presumption of reasonable and constitutional zoning.

LC's citation to *City of Norwood v. Horney*, 853 N.E.2d 1115 (Ohio 2006) does not help either. *Norwood* made clear—citing *Euclid*—that "zoning regulations

. . . have been upheld as valid exercises of police powers *over due-process challenges*." *Norwood*, 853 N.E.2d at 1135, fn. 11 (emphasis added).

Along with LC's legal flaws, the undisputed material facts undermine its argument, too. The property is currently zoned S-1, C-2, C-3, and R-10, and permits multiple uses. The S-1 zoning district permits hospitals, colleges, churches, parochial schools, plant production, preschool, nursery school, and child daycare centers. Over twenty-five percent of the property is zoned C-2 (Community Shopping Center) and C-3 (Institutions and Office), which permit over fifteen additional nongovernmental uses. Again, the zoning has not changed—these zoning classifications and permitted uses are the same as they were when LC was performing due diligence on the property, when it negotiated the price for the property, and when it acquired the property.

Finally, if LC is suggesting that the City deprived it of its right to possess, use, exclude, or sell the property under the existing zoning, that argument falls flat. The City has never denied any of these rights, LC has never attempted to assert them by petitioning the City under the current zoning, and LC has never alleged either occurred. LC maintains the same rights to possess, use, exclude, and sell as it did when it first acquired the property. Nothing has changed.

### 2.   LC does not have a protected property interest in a discretionary rezoning.

LC, which has developed hundreds of properties all over the country, fundamentally misunderstands, or purposefully misrepresents, the purpose and effect of an uncodified comprehensive plan. Its argument that it has a protected property interest under the 2014 Comp Plan fails. In Ohio, most comprehensive plans are long-ranging conceptual guidance documents that do not dictate zoning or guarantee rezoning. This Court has never held that a comprehensive plan—which is critically distinct from zoning laws—establishes a legitimate claim of entitlement to rezoning. It should not start here.

### a.   LC's understanding of the 2014 Comp Plan is misguided.

"A comprehensive plan represents a community's policy toward public and private development, *it is not, like a zoning regulation, a law*." *Southgate Corp.*, *supra*. at ¶ 13 (emphasis added). "In cases involving a comprehensive plan or a master plan that was not incorporated into a city's zoning code, courts have held that the city should not consider these general aspirations in evaluating whether a proposed use complies with the city's standards for permitted use." *Gross Builders v. City of Tallmadge*, 2005 WL 1966775, ¶ 45 (Ohio App. 2005). In fact, cities are prohibited from enforcing guiding principles and aspirations set forth in their comprehensive plan into zoning decisions if the plan is not explicitly adopted into

the zoning code. *Id.*, ¶ 44 (discussing the city's failure to incorporate the plan into its zoning code).

Like other cities, the City's 2014 Comp Plan is "a general recommended guide . . . for the future development of the City[.]" Worthington Ord. 1101.01(i). It serves as a "long-range development plan for the desirable use of land and development of thoroughfares and public facilities, as adopted by the Municipal Planning Commission." Worthington Ord. 1123.23. The Comp Plan is distinct from zoning ordinances or land use designations. While it provides some level of long-term conceptual guidance, landowners do not have an entitlement to its contents unless provisions in the comp plan are enacted in the City's zoning code. *See e.g.*, Worthington Ord. 149.02(b) ("The Division of Planning shall be under the supervision of the Director of Planning and Building. It shall perform the following duties: . . . (b) Manage the administration of the Worthington Comprehensive Plan, and recommend amendments to the codes and new or revised ordinances.")

Unlike zoning laws, the Comp Plan is not mandatory nor binding on zoning decisions. *See Southgate Corp.* Nor could it be—the Comp Plan does not prescribe specific land use or development regulations like a zoning code. And as the district court correctly determined, the Comp Plan does not limit the City's zoning discretion or otherwise bind the City. *See* Op. and Or. R. 37, PageID # 516-19. Of course, LC knows all of this.

### b.    LC is not entitled to rezoning under the 2014 Comp Plan.

As LC concedes, it does not have a protected property interest "when the state's decision to award or withhold the benefit is wholly discretionary." Br. of Appellant, p. 58 (citing *EJS Props., LLC v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012). LC nevertheless relies on *Braun*, *supra*, to suggest that its benefit or entitlement "can occur through a 'policy, law, or mutually explicit understanding[.]'" Br. of Appellant, p. 58 (citing *Braun*). But that is true only if the policy, law, or mutually explicit understanding "both *confers the benefit [ ] and limits the discretion of the City*[.]" *Braun*, 519 F.3d at 573 (emphasis added). Here, the 2014 Comp Plan does neither.

LC bases its argument on its conclusory allegations that the 2014 Comp Plan "was not merely an aspirational, forward-looking guide[,]" but that it "prescribed that the Property be used for a planned unit development and delineated concrete and objective criteria for development of the Property in that manner." Br. of Appellant, p. 59 (citing Compl. R. 1, PageID #30). LC also argues that it pled that the City "committed to [LC] that, if it would develop the Property in accordance with the [Plan], the City would provide the necessary approvals in accordance with the City's Charter." *Id.* (citing Compl. R. 1, PageID #12).  While acknowledging that Ohio prohibits contract zoning, LC nevertheless relies on allegations and

arguments that are based on general principles of contract law, not applicable zoning law.

These conclusory allegations and corresponding arguments ignore the law and factual reality. If the government "has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Irrespective of the unsupported allegations made about the Comp Plan, the City maintains complete discretion over zoning decisions.

Section 6.03 of the City's Charter requires the MPC to articulate its *recommendations* to Council by referencing the City's overall comprehensive planning goals. *But the MPC does not make zoning decisions*; the MPC only recommends actions to Council, and only Council can render zoning decisions. Worthington Charter, 6.03.

Council, on the other hand, is the City's legislative body and is the only City body authorized under the City's Charter to make zoning decisions after a recommendation from the MPC. Those decisions are discretionary. Worthington Ord. 1174.08(b)(2) ("After receiving from the [MPC] the recommendations for the proposed PUD and after holding the above public hearing . . . ***The City Council may***, **by a majority of all its members, adopt or reject the proposed Ordinance, with**

*or without change*); *see also* R.C. 713.10 ("the legislative authority of such municipal corporation *may* amend or change the ... [zoning] regulations of or within any district." (emphasis added))

The "word 'may' establishes 'sufficient discretion to undercut any argument that the language of the zoning regulations vested in [plaintiffs] an entitlement to the [re-zoning ordinance] once the [minimum requirements] were fulfilled.'" *EJS Properties,* 698 F.3d at 856 (citing *Triomphe Investors v. City of Northwood,* 49 F.3d 198, 203 (6th Cir. 1995)). So, LC "lacks a legitimate claim of entitlement or justifiable expectation if a municipality has discretion under its zoning code to deny the plaintiff's land-use application[.]" *Andreano v. City of Westlake*, 136 Fed.Appx. 865, 871 (6th Cir. 2005); *Silver v. Franklin Tp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992) (holding that landowner has no property right for his due process claim where the board had discretion to deny the zoning permit); *see also Triomphe Inv'rs*, 49 F.3d at 201 (holding that property owner did not possess a legitimate claim of entitlement where city council had discretion to issue special use permits).

LC's arguments tied to the 2014 Comp Plan are conspicuously lacking any factual or legal support to rebut well-established and long-standing precedent. Its arguments crumble in the face of that precedent and the fact that Zoning Ordinance

1174.08—the City's actual zoning law—gave Council full discretion to deny LC's rezoning request.

## C. The District Court Correctly Granted Summary Judgment on LC's Declaratory Judgment Claim.

The district court gave LC's declaratory judgment claim the attention it warranted. LC itself refers to the declaratory judgment claim as "corresponding" to the due process, equal protection, and regulatory takings claims. *See* Motion for Recon., R. 45, PageID #597. LC's own cursory pleading and argument of its declaratory judgment claim should not be rehabilitated on appeal.

In its principal brief, LC identifies its declaratory judgment claim as arising under R.C. 2721.03—although LC was never so definite about the basis of the claim in its district court filings. Ohio's statutory declaratory judgment action authorizes any person whose "rights, status, or other legal relations are affected by a . . . municipal ordinance . . . [to] have determined any question of construction or validity arising under the [ordinance]." R.C. 2721.03. Prerequisites to relief under Ohio's declaratory judgment statute are: (1) a real controversy between the parties, (2) justiciability, and (3) the necessity of speedy relief to preserve the parties' rights. *ProgressOhio.org, Inc. v. JobsOhio*, 13 N.E.3d 1101, 1107 (Ohio 2014). If a trial court's order "granting or denying substantive relief 'clearly and unambiguously resolve[s] the declaratory issue,' then the declaratory-judgment request is moot." *Fuller v. Quality Casing Co., Inc.*, --- N.E.3d ----, 2025-Ohio-361, ¶22 (1st Dist.

Ohio 2025) (quoting *Snider-Cannata Interests, LLC v. Ruper*, 190 Ohio App.3d 347, 941 N.E.2d 1242 (8th Dist. Ohio 2010)).

To invalidate a zoning ordinance using declaratory judgment, a plaintiff must demonstrate its unconstitutionality "beyond fair debate" and that "the ordinance denies to [plaintiff] the economically viable use of their land without substantially advancing a legitimate government interest." *Karches v. City of Cincinnati*, 526 N.E.2d 1350, 1357 (Ohio 1988) (citing, *inter alia*, *Penn Central*). The "analysis focuses on the legislative judgment underlying the enactment, as it is applied to the particular property, not the municipality's failure to approve what the owner suggests may be a better use of the property." *Jaylin Investments, Inc. v. Moreland Hills*, 107 Ohio St.3d 339, 343, 839 N.E.2d 903 (Ohio 2006).

LC's claim is not all-square with Ohio cases. For example, in *Karches*, the plaintiffs' property had been rezoned to a more-restrictive designation *after* they purchased it. *Karches*, 526 N.E.2d at 1351-52. Here, LC still has exactly what it purchased—land on which the current zoning permits hospital, college, and daycare uses among others. These facts are undisputed. LC has never articulated an argument *why* the current zoning is unconstitutionally arbitrary, capricious, or unreasonable, as opposed to being incompatible with LC's business desires.

53

LC's other cases do not help it, either. In *Jaylin*, the plaintiff challenged zoning limiting single-family housing to 2-acre lots but wanted half-acre lots. He lost. *Jaylin*, 107 Ohio St.3d at 344.

In *C. Miller Chevrolet, Inc. v. City of Willoughby Hills*, 313 N.E.2d 400 (Ohio 1974)—an administrative appeal, not a declaratory judgment action—the appellant sought a "zoning variance" for a car dealership on residentially-zoned property. He lost. If anything, these cases show that Ohio's Supreme Court does not favor interfering with local zoning decisions on declaratory judgment.

LC itself stated its declaratory judgment claim is "corresponding" and "related" to its other substantive claims. Reply in Support Recon., R. 48, PageID #632. The cases LC relies on approximate (and themselves rely on) regulatory taking analysis—notably, as in *Karches*, proof that the ordinance denies economically viable use of the land without advancing a government interest.

It was reasonable for the district court to conclude that the declaratory judgment claim likewise fails, having already found that no regulatory taking occurred here. The court had no obligation to repeat itself in resolving the declaratory judgment claim.

**D.    LC Forfeited its Equal Protection and First Amendment Claims.**

Because LC elected not to appeal the trial court's decisions concerning its equal protection and First Amendment claims, LC waived and therefore forfeited those claims.

## CONCLUSION

The City of Worthington, Ohio respectfully requests that the trial court's decisions granting summary judgment to The City of Worthington, Ohio on Appellants' partial regulatory takings claim and dismissing Appellants' due process claims be affirmed and the instant Appeal be denied.

Dated:  July 10, 2025                    Respectfully submitted,

s/Richard J. Silk, Jr.

**PAUL J. SCHUMACHER (0014370)**
Dickie, McCamey & Chilcote, P.C.
600 Superior Avenue East
Fifth Third Center, Suite 2330
Cleveland, Ohio 44114
Tele: 216.685.1827 / Fax: 888.811.7144
pschumacher@dmclaw.com

**RICHARD J. SILK, JR. (0074111)**
Dickie, McCamey & Chilcote, P.C.
10 West Broad Street, Suite 1950
Columbus, Ohio 43215
Tele: 614.258.6000 / Fax: 888.811.7144
rsilk@dmclaw.com

**YAZAN S. ASHRAWI (0089565)**
**THADDEUS M. BOGGS (0089231)**
Frost Brown Todd, LLC
10 W. Broad Street, Suite 2300
Columbus, Ohio 43215
Tele: 614.464.1221 / Fax: 614.464.1737
Tboggs@fbtlaw.com
yashrawi@fbtlaw.com
***Attorneys for Defendant-Appellee***
***City of Worthington, Ohio***

## CERTIFICATE OF COMPLIANCE

Counsel for The City of Worthington, Ohio hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,900 words in Times New Roman font (14-point). The word processing software used to prepare this brief was Microsoft Office Word in the Enterprise version of Microsoft Office 365 Applications.

*s/*Richard J. Silk, Jr.
*Attorney for Appellee-Defendant*
*The City of Worthington, Ohio*

Dated: July 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2025, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Sixth Circuit the foregoing Brief of Appellee the City of Worthington, Ohio and further certify that opposing counsel will be notified by the appellate CM/ECF system.

s/Richard J. Silk, Jr.
Richard J. Silk, Jr. (0074111)
*Attorney for Appellee-Defendant*
*City of Worthington, Ohio*

# ADDENDUM

Pursuant to Sixth Circuit Rule 30(g), the City of Worthington, Ohio designates the following documents from the lower court records as relevant to the instant appeal:

| Record Entry | Description | PageID# Range |
|---|---|---|
| 1 | Complaint | 1–44 |
| 20 | City's Motion to Dismiss | 114–159 |
| 22 | LC's Response in Opposition | 378–434 |
| 37 | Opinion and Order Re Motion to Dismiss | 507–532 |
| 43 | City's Answer to Complaint | 558–593 |
| 45 | LC's Motion for Reconsideration | 595-607 |
| 47 | City's Memorandum in Opposition | 611-622 |
| 48 | LC's Reply in Support | 623-633 |
| 50 | Opinion and Order Re LC's Motion for Reconsideration | 635–641 |
| 60 | Worthington's Motion for Summary Judgment | 659–701 |
| 60-1 | Municipal Planning Commission Meeting Minutes June 29, 2015 | 702–767 |
| 60-2 | Board of Revisions Hearing Transcript Oct. 19, 2020 | 768-783 |
| 60-4 | Municipal Planning Commission Meeting Minutes Jan. 14, 2021 | 788-845 |
| 60-5 | Municipal Planning Commission Meeting Minutes Oct. 14, 2021 | 846–903 |
| **Record Entry** | **Description** | **PageID# Range** |

| Record Entry | Description | PageID# Range |
|---|---|---|
| 60-6 | City Council Meeting Minutes Dec. 13, 2021 | 904-919 |
| 61-1 | Bo Brownlee Deposition & Exhibits | 922–1103 |
| 62-1 | David Robinson Deposition & Exhibits | 1106–1291 |
| 63-1 | Doug Smith Deposition & Exhibits | 1292-1490 |
| 64-1 | Jason Sudy Deposition & Exhibits | 1491-1629 |
| 65 | Lifestyle Communities' Motion for Summary Judgement | 1630–1679 |
| 66-1 | Katherine Brewer Deposition | 2058-2159 |
| 67-1 | Matthew Greeson Deposition | 2162-2448 |
| 68-1 | Pete Bucher Deposition | 2451-2552 |
| 69-1 | Lee Brown Deposition & Exhibits | 2555-3039 |
| 70-1 | Thomas Hart Deposition & Exhibits | 3042-3265 |
| 71-1 | Eric Gardner Deposition | 3268-3386 |
| 74-1 | Bo Brownlee Deposition Exhibit 2 (2015 Development Plan) | 4139-4157 |
| 74-2 | Thomas Hart Deposition Exhibit 12 (LC Nov. 5, 2019 Email) | 4158-9 |
| 78-1 | Michael DeAscentis Deposition | 4227-4460 |
| 79 | City's Memorandum in Opposition to LC's Motion for Summary Judgment | 4461-4482 |
| 79-1 | Lee Brown Affidavit | 4483-4487 |
| **Record Entry** | **Description** | **PageID# Range** |

| 80 | LC's Opposition to City's Motion for Summary Judgement | 4488–4547 |
|---|---|---|
| 83-1 | Deposition of James Horner | 4844-5004 |
| 87 | City's Reply Memorandum in Support of Motion for Summary Judgement | 5597–5608 |
| 88 | LC's Reply in Support of Motion for Summary Judgement | 5609–5620 |
| 89 | Opinion and Order Re Motions for Summary Judgment | 5621–5655 |
| 90 | Judgment | 5656 |
| 91 | LC's Notice of Appeal | 5657–5659 |