No. 25-3048

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

LIFESTYLE COMMUNITIES, LTD. *et al.*,
*Plaintiffs-Appellants*,

v.

THE CITY OF WORTHINGTON, OHIO,
*Defendant-Appellee*,
_____

On appeal from the United States District Court for the
Southern District of Ohio, Case No. 2:22-cv-01775

**REPLY BRIEF OF APPELLANTS LIFESTYLE COMMUNITIES, LTD.
AND WORTHINGTON CAMPUS, LLC**

Michael R. Gladman
Yvette McGee Brown
Dustin M. Koenig
Timothy D. Lanzendorfer
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215
(614) 469-3939

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................1

ARGUMENT.......................................................................................2

I.    Worthington misapplies both standards of review................................2

II.   Worthington's regulatory takings analysis mishandles the facts
      and misapplies the law ...............................................................7

      A.    Lifestyle Communities has property interests in the
            United Methodist property.............................................7

      B.    Lifestyle Communities had reasonable investment-backed
            expectations......................................................................11

      C.    Lifestyle Communities suffered a huge diminution in
            value ...............................................................................16

      D.    Worthington's actions have the character of a classic
            taking...............................................................................20

III.  Worthington cannot salvage the district court's improper
      dismissal of Lifestyle Communities' due process claims ...................26

IV.   Nor can Worthington salvage the district court's unreasoned
      declaratory judgment ruling ...................................................31

CONCLUSION ................................................................................32

CERTIFICATE OF COMPLIANCE ...................................................33

CERTIFICATE OF SERVICE ..........................................................34

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alexander Investments v. United States,*
    51 Fed. Cl. 102 (2001) .........................................................................8

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).....................................................................3, 20

*Andrews, Tr. of Gloria M. Andrews Tr. Dated Apr. 23, 1998 v. City*
    *of Mentor,*
    11 F.4th 462 (6th Cir. 2021).........................................................9, 14

*Appolo Fuels, Inc. v. United States,*
    381 F.3d 1338 (Fed. Cir. 2004).........................................................19

*Bannister v. Knox Cnty. Bd. of Educ.,*
    49 F.4th 1000 (6th Cir. 2022)............................................................29

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003) ..........................................................8

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.,*
    365 F.3d 435 (6th Cir. 2004).............................................................17

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*
    *for S. Cal.,*
    508 U.S. 602 (1993).........................................................................19

*Cotterman v. City of Cincinnati,*
    2023 WL 7132017 (6th Cir. Oct. 30, 2023)................................28, 29

*Doe v. Lee,*
137 F.4th 569 (6th Cir. 2025) .............................................................30

*Dolan v. City of Tigard,*
512 U.S. 374 (1994) ..........................................................................21

*DWG Corp. v. Granada Invs., Inc.,*
962 F.2d 1201 (6th Cir. 1992) ....................................................28, 31

*E. Enters. v. Apfel,*
524 U.S. 498 (1998) ..........................................................................26

*F.P. Dev., LLC v. Charter Township of Canton,*
456 F. Supp. 3d 879 (E.D. Mich. 2020) ..............................................9

*Hadacheck v. Sebastian,*
239 U.S. 394 (1915) ..........................................................................18

*Hall v. Meisner,*
51 F.4th 185 (6th Cir. 2022) .............................................................11

*Henry v. Jefferson Cnty. Comm'n,*
637 F.3d 269 (4th Cir. 2011) .............................................................19

*Iowa Coal Min. Co. v. Monroe County,*
257 F.3d 846 (8th Cir. 2001) .............................................................19

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
480 U.S. 470 (1987) ..........................................................................26

*Knight v. Metro. Gov't of Nashville & Davidson County,*
67 F.4th 816 (6th Cir. 2023) .............................................................21

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)................................................................17, 18, 21

*Loveladies Harbor, Inc. v. United States*,
    15 Cl. Ct. 381 (1988)......................................................................16

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)........................................................................8

*MHC Fin. Ltd. P'ship v. City of San Rafael*,
    714 F.3d 1118 (9th Cir. 2013)....................................................18, 19

*Murr v. Wisconsin*,
    582 U.S. 383 (2017)............................................................9, 10, 11, 20

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987)........................................................................21

*Oberer Land Developers Ltd. v. Sugarcreek Township*,
    2022 WL 1773722 (6th Cir. June 1, 2022) .......................................15

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)...................................................................9, 11, 16

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)........................................................................21

*Rudd v. City of Norton Shores*,
    977 F.3d 503 (6th Cir. 2020).........................................................6, 27

*Skinner v. Switzer*,
    562 U.S. 521 (2011)........................................................................27

*Store Safe Redlands Assocs. v. United States*,
35 Fed. Cl. 726 (1996) ...................................................................10

*Stryker Emp. Co. v. Abbas*,
60 F.4th 372 (6th Cir. 2023)............................................................28

*Tolan v. Cotton*,
572 U.S. 650 (2014)......................................................................6, 7

*Village of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926)........................................................................18

*Wensmann Realty, Inc. v. City of Eagan*,
734 N.W.2d 623................................................................................26

*Wray v. Mussig*,
1996 WL 586755 (Ohio Ct. App. Sept. 20, 1996) ..........................20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a)(2) .........................................................................27

Worthington City Charter § 2.05 ........................................................25

## INTRODUCTION

Worthington is eager to tell its own story. Time and time again, the City defends the district court's rulings by resorting to its own preferred factual slants and inferences. Because it can't refute the record evidence LC has marshaled, the City repeatedly asks this Court to simply disregard it—labeling it false, spin, and disingenuous. But facts are stubborn things, and the City cannot wish them away. Before a jury, Worthington's strategy may bear fruit. In this appeal, though, the City has it all wrong.

At this stage, Lifestyle Communities receives all reasonable factual inferences. For LC's takings and declaratory judgment claims, that means this Court views the summary judgment record in the light most favorable to Lifestyle Communities. So long as LC's claims find support in the record, Worthington's competing takes are irrelevant. And for LC's due process claims, which were dismissed at the pleadings stage, this Court must accept as true LC's factual allegations; the record subsequently developed on LC's *other* claims doesn't come into play at all. Once the Court applies these

correct standards—and sets aside Worthington's competing inferences—this case becomes a straightforward reversal.

Beyond fumbling both standards of review, Worthington gets the law wrong too. In hopes of avoiding the *Penn Central* test altogether, it proposes a novel, hyper-specific definition of property rights that would make a dead letter of the Fifth Amendment. But this is no surprise given that each *Penn Central* prong shows that, at minimum, there are genuine disputes of material fact that require a jury to decide. Lifestyle Communities also preserved and plausibly alleged due process claims based on its existing rights in the United Methodist property and its interest in rezoning based on the City's prior commitments. Finally, the district court erred in ignoring LC's substantive declaratory judgment claim. This Court should reverse.

## ARGUMENT

### I.    WORTHINGTON MISAPPLIES BOTH STANDARDS OF REVIEW.

Throughout its brief, Worthington improperly asks this Court to draw factual inferences in its favor. As to the takings and declaratory judgment claims, the City addresses only its own preferred narrative while deriding

LC's facts as "shocking[]," "spin," "conspiratorial theories," "patently false,"
"disingenuous," and a "novella." App. Br. 8, 18, 19, 26, 34. But Lifestyle
Communities has supported every factual statement with record evidence.
The City's strategy may be fair game at trial, where a jury can decide which
facts to credit. It has no place at summary judgment, however. *See Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

1.      For one example, consider the Midnight Resolution, Robinson's
literal "Plan B" that scrapped the detailed 2014 Plan in place of a one-and-a-
half-page statement. Meeting Min., R. 72-5, PageID #3670–76. The City
objects that the Midnight Resolution "*significantly and expressly contemplate[s]
mixed use residential and commercial development, not a public park.*"
App. Br. 38 (emphasis original). But the Midnight Resolution calls for "a
large contiguous greenspace, central to the property and inclusive of the
Tucker Creek" at the southern end of the property, with "select service-
oriented retail" along High Street "roughly in conformity with the existing
C-2 and C-3 zoned areas," and limited low-density housing on the edges.
Res., R. 72-5, PageID #3638. It's no great leap to call a "large contiguous

greenspace" a park. Lifestyle Communities supports its factual inferences with the language of the Midnight Resolution itself. Worthington does not.

**2.**    For another, take how the City bristles at the suggestion that it singled LC out for unfavorable treatment. *See* App. Br. 6 ("LC falsely asserts … that the City directed staff to ignore LC and treat it differently than other applicants for rezoning."). But these aren't LC's words, they come from the City's own officials. In a memo to the city council with "[r]esponses to questions posed by Council Member Robinson regarding status of UMCH Comprehensive Plan Update," city manager Matt Greeson wrote:

> I think it will be important for the Council to discuss, possibly at the retreat, what role it wants the staff to play. In addition to providing a technical review as I have described above, *staff often works to help steer developments* towards desirable community outcomes. … *Counsel has in recent years discouraged staff from proactively working with LC* (or Steiner); appetite for using alternative resolution processes has been limited.

Greeson Memo., R. 65-3, PageID #1973, 1975 (emphasis added).

In his email attempting to poison the City's municipal planning commission against LC's proposal before they'd even met to discuss it, Robinson himself recognized the commission's "standard practice of giving

applicants a chance to change course" but urged them not to "apply [that standard practice] to the proposal on hand from Lifestyle Communities." Robinson Email, R. 72-5, PageID #3686. The City's planning director admitted that the planning commission was "shocked" by Robinson's email because "they had not seen that direct approach to them before." Brown Dep., R. 69-1, PageID #2779. In the end, of course, the commission got over its shock and fell in line, recommending outright denial per Robinson's instructions in a departure from its standard practice of giving applicants a chance to change course. *See* Meeting Min., R. 60-5, PageID #901.

**3.**     For a third example, consider the City's protests that Robinson's machinations had no influence on the City's decisions. App. Br. 12–13. As just shown, Robinson got the planning commission to depart from its own standard practices. Elsewhere, he badmouthed Lifestyle Communities to fellow councilmembers at a retreat before realizing an LC representative was present. Ballard Memo., R. 72-9, PageID #3795. And as city council president, he muscled the Midnight Resolution through on a 4–3 vote with no notice to the public or LC and over the strong objections of the minority and the

handful of citizens in attendance. Meeting Min., R. 72-5, PageID #3670–76. These are facts, established with record evidence. They are not an "unsupported conspiracy theory." App. Br. 12.

Worthington's confusion over who gets the benefit of the facts and inferences is nowhere more apparent than in its discussion of LC's due process claims. The City assures the Court that "the undisputed material facts undermine" these claims, which it argues "conspicuously lack[] any factual … support." *Id.* at 46, 51. But the district court dismissed the due process claims on the pleadings, so the only "facts" that matter are those alleged in LC's complaint. The record evidence subsequently developed in connection with LC's *other* claims simply does not matter. *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020).

Given Worthington's misapplication of both standards of review, this Court can disregard much of Worthington's brief as irrelevant. Indeed, this Court would only compound the district court's errors if it *relied* on Worthington's preferred factual inferences. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) ("By weighing the evidence and reaching factual inferences contrary

to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.").

## II.   WORTHINGTON'S REGULATORY TAKINGS ANALYSIS MISHANDLES THE FACTS AND MISAPPLIES THE LAW.

Worthington first tries to circumvent Lifestyle Communities' partial regulatory takings claim altogether by arguing that LC doesn't actually have protected property interests in the property that it indisputably owns. It then attacks LC's arguments under each of the three *Penn Central* factors. At every step, the City mishandles the facts and misapplies the law. This Court should reject these arguments and reverse the district court's grant of summary judgment to the City.

### A.   Lifestyle Communities has property interests in the United Methodist property.

Worthington starts by arguing that it actually didn't take anything at all because the zoning of the United Methodist property hasn't changed

since LC bought it.[1] LC saw this argument coming and so will only briefly expand on what the opening brief already covers. Apt. Br. 38–39, 43–46.

The City is right that courts "resort to 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (citation omitted) . But those "existing rules or understandings" refer to the historical conception of the "bundle of sticks" that includes the rights to possess, use, exclude, and dispose—not a municipality's current zoning laws at any given moment. *Lucas* tells us the key is whether the challenged action "proscribe[s] a productive use that was previously permissible under relevant property and nuisance principles." *Id.* at 1029–30.

---

[1] Notably, Worthington's lead case for this point, *Alexander Investments v. United States*, involved rights created by contract, not by ownership of real property. 51 Fed. Cl. 102, 106–08 (2001) (rejecting argument that contractual right to prepay government-insured mortgages created vested property rights protected under the Fifth Amendment). And even then, the Federal Circuit subsequently abrogated the case's holding. *Cienega Gardens v. United States*, 331 F.3d 1319, 1324 (Fed. Cir. 2003) ("Under constitutional, real estate, and contract law, we conclude a property right vested in the Owners that was temporarily taken.").

Thus, for example, a law that merely codifies existing nuisance law does not effect a taking because "[t]he use of these properties for what are now expressly prohibited purposes was *always* unlawful." *Id.* at 1030 (emphasis original). But when a regulation that restricts "economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate"—such as a zoning law limiting development that would otherwise be allowed if the zoning law didn't exist—a Fifth Amendment property interested has been implicated. *Id.*

This explains why property owners can and do challenge takings that predate their purchase. *See Murr v. Wisconsin*, 582 U.S. 383, 398 (2017); *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001); *see, e.g., F.P. Dev., LLC v. Charter Township of Canton*, 456 F. Supp. 3d 879, 889–91 (E.D. Mich. 2020), *aff'd on other grounds sub nom. F.P. Dev., LLC v. Charter Township of Canton*, 16 F.4th 198 (6th Cir. 2021). Indeed, "courts routinely consider takings claims … that arise from a local authority's denial of rezoning, variances, or land-use permits." *Andrews, Tr. of Gloria M. Andrews Tr. Dated Apr. 23, 1998 v. City of Mentor*, 11 F.4th 462, 469 (6th Cir. 2021).

No doubt, "[a] reasonable restriction that predates a landowner's acquisition" rightly factors into the court's analysis. *Murr*, 582 U.S. at 398. But in making this commonsense point, the Supreme Court has also acknowledged that landowners *can challenge* these "predat[ing]" restrictions. *Id.* And for "[*un*]reasonable restriction[s,]" a landowner may have a greater expectation that the restriction will not remain. *See id.* (emphasis added). Horner Rep., R. 73-1, PageID #3969 (S-1 zoning does "not provide for financially feasible or maximum productive uses.").

Worthington, by contrast, proposes a rule that would effectively codify unconstitutional takings so long as the affected property changes hands at least once. Taken to its logical conclusion, Worthington's rule would allow the State to "pass a law that stated that no one could build on their property. After all property had passed hands once, the right to build on one's property would be lost to everyone." *Store Safe Redlands Assocs. v. United States*, 35 Fed. Cl. 726, 735 (1996). The State's "unlawful regulation" would "become lawful through the passage of time and title[.]" Apt. Br. 43. "[T]he Takings Clause would be a dead letter" because the State "could simply

exclude from its definition of property any interest that the state wished to take." *Hall v. Meisner*, 51 F.4th 185, 190 (6th Cir. 2022). This is, of course, not how the Fifth and Fourteenth Amendments work.

Lifestyle Communities bought and now holds an interest in the United Methodist property. That interest allows LC to challenge unlawful takings of that property—including those that predated its purchase. *See Murr*, 582 U.S. at 398; *Palazzolo*, 533 U.S. at 627. The district court rightly looked past this argument when Worthington raised it below. *See* Op., R. 89, PageID #5643–50. This Court should too.

### B. Lifestyle Communities had reasonable investment-backed expectations.

**1.** Worthington assures us that no reasonable developer could possibly expect to rezone the property. For support, the City highlights only the evidence it favors, such as the property's existing zoning, select comments from LC's representatives, a survey predating the 2014 Plan, negative comments from some residents, and the hypothetical potential for a citizen referendum. App. Br. 21–29. In its zeal, Worthington trashes even

its own 2014 Plan, going so far as to suggest that it was *unreasonable* for a developer to rely on the City's Plan when buying the property. *Id.* at 24.

That last point may be the clearest example of the City misapplying the summary judgment standard in a brief full of them. This maximalist stance contradicts the Plan itself and the City's own pronouncements dating back two decades. 2014 Plan, R. 65-4, PageID #2020; 2005 Comprehensive Plan, at AP_000098. It probably comes as a surprise to Worthington's city council too. Brown Memo., R. 65-3, PageID #1888 (memo from city planning director noting 2014 Plan will "provid[e] a potential new developer some confidence that their proposal would fit with the community, city, and land owner desires for the site as they go through the development process"); Res., R. 73-5, PageID #4122 (council resolution adopting 2014 Plan because council "wishes to utilize this document as a guide for development, growth, and investment in the community"). Even Robinson admitted that the City had "explicitly state[d]" that the 2014 Plan "is, and ought to be, *the defining authority* regarding the future of the" property. Robinson Letter, R. 72-6,

PageID #3724 (emphasis added). Worthington's newfound contention otherwise is simply posturing.

In any event, the City's evidence is weaker than it lets on. For example, the City relies on a 2013 survey of residents conducted by an interest group dedicated to increasing parkland in Worthington. App. Br. 5–6, 26. Beyond its questionable origins, this survey predates the City's adoption of the 2014 Plan and has an unknown methodology. *See* Meeting Min., R. 60-1, PageID #707. The comments of a few dozen motivated citizens do not prove that any expectations LC had to develop the property were unreasonable as a matter of law. Any development plan faces its fair share of detractors. DeAscentis Dep., R. 78-1, PageID #4334. And there is competing evidence in the record showing community support for the proposed redevelopment. *See, e.g.,* Brownlee Dep., R. 61-1, PageID #987–88; Hart Dep., R. 70-1, PageID #3105; Meeting Min., R. 60-1, PageID #712–17. Worthington may disagree with LC's evidence, but it cannot wish that evidence away on summary judgment.

**2.** None of the cases Worthington cites dictates otherwise. The City initially relies on *Loreto Development Co. v. Village of Chardon*, an unpublished

case, to argue that a developer cannot have a reasonable expectation to develop if the land requires rezoning. 1998 WL 320981 (6th Cir. June 4, 1998) (per curiam). *Loreto* has little persuasive weight here, though. In that case, the court concluded that the developer lacked a reasonable expectation for a variance to build a 98,000-square-foot Wal-Mart in a rural village. *Id.* at *1, *4. But unlike Worthington and its 2014 Plan, the village in *Loreto* did nothing to invite reliance or create an expectancy that the developer could build its supercenter. *See id.* at *1, *4. And even if *Loreto* once stood for the general proposition that Worthington now claims—that discretionary rezoning denials can never give rise to a partial regulatory taking—this Court has since clarified otherwise. *Andrews*, 11 F.4th at 469 ("[C]ourts routinely consider takings claims … that arise from a local authority's denial of rezoning, variances, or land-use permits.").

Worthington's citation to the Fourth Circuit's *Pulte Home Corp. v. Montgomery County* suffers similar defects. 909 F.3d 685 (4th Cir. 2018). In *Pulte*, the developer lacked reasonable expectations to erect "one thousand homes" because (1) the land lacked adequate water and sewer services and

because (2) the county's planning document cast doubt on the land's suitability for development given its "fragile … watershed." *Id.* at 696. The 2014 Plan, by contrast, invited the very mixed-use development application that Lifestyle Communities filed. In fact, Worthington has wanted to see the property developed into "a mixed use, planned development" with "higher density residential development" since at least 2005. 2005 Comprehensive Plan, at AP_000098.

So too with *Oberer Land Developers Ltd. v. Sugarcreek Township*. 2022 WL 1773722 (6th Cir. June 1, 2022). In *Oberer*, the proposed rezoning for a "98-lot development" directly *contradicted* the township's planning documents, which stated that the land "should 'continue to be for agricultural uses.'" *Id.* at *1–2. And unlike here, the *Oberer* plaintiffs lacked a cognizable interest because the would-be developer had not purchased the land and the current landowner had no plans to develop it himself. *Id.* at *5. Contrary to the City's strained reading, *Oberer* did not rely on the specter of a citizen referendum when resolving the partial regulatory takings claim. *See id.* at *5–6.

### C.   Lifestyle Communities suffered a huge diminution in value.

**1.**   Worthington next argues that LC did not suffer a sufficiently severe reduction in value for a partial regulatory taking. But the City's argument is hard to follow. In one breath, Worthington suggests that in order to satisfy this prong, a plaintiff must show that the government diminished value *and* "deprived [] 'all economically viable uses'" of the property. App. Br. 32. (quoting *Loveladies Harbor, Inc. v. United States*, 15 Cl. Ct. 381, 394–95 (1988)). But in the next, the City admits that a partial regulatory taking occurs where "a regulation places limitations on land that fall short of eliminating all economically beneficial use." *Id.* at 33 (quoting *Palazzolo*, 533 U.S. at 617). Both cannot be true—only the latter is.

Worthington's caselaw does not help clarify matters. Take the City's discussion of *Loveladies Harbor*. That decision is helpful insofar as it shows that a property owner can challenge government actions that maintain the regulatory status quo. *See* Apt. Br. 38–39. But *Loveladies Harbor* applies defunct caselaw to the diminution prong. The case predates the Supreme Court's later clarifications that partial regulatory takings *do not* require a

showing that the owner has been deprived of all economically viable uses. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 528–29 (2005). The City seems to be arguing that only a total regulatory taking—where no economic value and no viable uses remain—satisfies this prong of the *Penn Central* test. But that is not the law. *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 482–83 (6th Cir. 2004) (explaining that a "non-categorical" taking occurs "where property is deprived of some, but not all of its economic value").

This Court should reject the City's confused test. Diminution in value means what it says, making the question easy: Did the value go down, and if so, by how much? Viewed in the light most favorable to LC, the record evidence shows that Worthington's actions have devalued the United Methodist property anywhere from 88% to 94%. Apt. Br. 34. To be sure, this diminution cannot prove a partial regulatory takings claim *standing alone*. But in no world should it "weigh[] against" a partial regulatory taking, as the district court mistakenly held. Op., R. 89, PageID #5645.

**2.** Undeterred, the City responds that courts have upheld actions that diminished value by up to 92.5%. App. Br. 30–31. Worthington then points to cases where, it claims, courts found takings did not occur despite high diminutions in value. But multiple issues plague the City's analysis. To start, *Euclid* and *Hadacheck* are due process and equal protection cases, not partial regulatory takings cases. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926); *Hadacheck v. Sebastian*, 239 U.S. 394, 409–14 (1915); *see also Lingle*, 544 U.S. at 541 (calling *Euclid* a "substantive due process" case). Indeed, those cases predate *Penn Central* by over fifty years. And simply because a regulation survives one constitutional challenge does not make it immune from others. Thus, these cases say little about how to balance the three *Penn Central* factors.

Many of Worthington's other cases—all from outside this circuit—concerned instances where the court "concluded that the other two *Penn Central* factors had not been satisfied, meaning the diminution in value was the only leg the plaintiff had to stand on." Apt. Br. 37 (emphasis omitted). *See MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127–28 (9th Cir.

2013); *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011) ("[T]he other *Penn Central* factors make clear that Henry suffered no compensable taking."); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) ("[W]e conclude in light of the other two *Penn Central* factors that there has been no partial regulatory taking."). In other words, these cases simply follow the Supreme Court's uncontroversial statement that diminution in value cannot *by itself* establish a taking. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). As for *Iowa Coal*, that court did not apply the *Penn Central* test at all. *Iowa Coal Min. Co. v. Monroe County*, 257 F.3d 846, 853 (8th Cir. 2001).

**3.**    Worthington also takes shots at LC's expert, Eric Gardner, and his assessment of the United Methodist property's value. App. Br. 36. The City makes this argument at the wrong time and in the wrong court. If it wanted to exclude his "absurd position," Worthington should have moved to limit or exclude his testimony under *Daubert* alongside its motion for summary judgment in the district court. It didn't. And if Worthington means to suggest that Gardner lacks credibility, the Court must disregard that

argument on summary judgment. *Anderson*, 477 U.S. at 255; *Wray v. Mussig*, 1996 WL 586755, at *6 (Ohio Ct. App. Sept. 20, 1996).

**D.    Worthington's actions have the character of a classic taking.**

The City concludes by arguing that its actions do not have the character of a classic taking for three reasons: first, the City's taking was motivated by good reasons; second, the City doesn't actually want a public park on LC's land; and third, the City claims it didn't single Lifestyle Communities out for unfair treatment. Each argument falls short.

**1.**    The City is wrong that its supposed good motivations somehow negate an unlawful taking. Worthington attests that it has not taken LC's land because it had a "legitimate public purpose." App. Br. 37 (quoting *Murr*, 582 U.S. at 405). In other words, because the City denied LC's application and adopted the Midnight Resolution for purported good reasons, LC cannot challenge the burdens those actions have placed on its property. The City's explanation is selective, though. It notably does not defend or even reference its breach of standard procedures, its muzzling of staff, its admitted secrecy, and the other machinations that led to this case.

True, courts have at times discussed the government's motivations alongside *Penn Central*'s third prong. *See Knight v. Metro. Gov't of Nashville & Davidson County*, 67 F.4th 816, 823 (6th Cir. 2023). However, modern takings jurisprudence primarily focuses on the distribution of *burdens* and not on the government's often-murky motivations. *Lingle*, 544 U.S. at 541–42; *see Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) ("public program adjusting the benefits and burdens of economic life").

In any event, there is at least a genuine issue of material fact whether Worthington had a legitimate public purpose. Perhaps public greenspace is a legitimate purpose in the abstract. But coercing a developer to establish a public park on private land is not. *Dolan v. City of Tigard*, 512 U.S. 374, 392–96 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–37 (1987). Here, Worthington set out to exact a park on private land that it cannot afford to buy for fair market value. *See* Robinson Email, R. 73-3, PageID #4083 (The United Methodist property "is the sole remaining opportunity for us to create a central public park in our beloved city"); Michael Email, R. 72-4, PageID #3604; Greeson Email, R. 65-3, PageID #1903. This is no conspiratorial

theory. LC has the smoking gun: City officials openly hoped that "*once* the City Council denie[d]" LC's rezoning application, Lifestyle Communities would "buckle and realize the only option remaining is to sell the land to the City." Ballard Memo., R. 72-9, PageID #3795 (emphasis added). Worthington can certainly dispute this evidence, but it can only do so before a jury.

**2.**    Worthington next contends that it has never wanted to see the United Methodist property used as a public park. This may be still more news to Worthington's city council. *See* Florey Memo., R. 72-5, PageID #3678–81; Greeson Email, R. 65-3, PageID #1903 (considering ways the City can "pursue green space" on the property); Meeting Min., R. 72-10, PageID #3817 (Councilman Myers referring to "desire for a park" as one of the only objections he'd heard to the 2014 Plan). Nonetheless, the City protests that the 2014 Plan has always called for public spaces on the United Methodist property and that the Midnight Resolution did nothing to change that.

Worthington, once more, fights the inferences. As LC has explained, the Midnight Resolution radically altered the City's expectations for the property. Apt. Br. 50. The 2014 Plan called for some public space, true. The

Plan also called for a "Neighborhood Core" with a "higher density neighborhood" at the heart of the property. 2014 Plan, R. 65-4, PageID #2024. But the City flipped the gameboard. It now wants "a large contiguous greenspace, central to the property" "[c]ompatible with current S-1 zoning." Res., R. 72-5, PageID #3638. What does "compatible with" S-1 zoning mean? Worthington's brief says the quiet part out loud: "noncommercial recreation [*including parks*.]" App. Br. 1 n.1 (brackets original, emphasis added); *see also* Horner Rep., R. 73-1, PageID #3969 (S-1 zoning does "not provide for financially feasible or maximum productive uses."). If more were somehow needed, LC invites the Court to compare the maps in its opening brief and evaluate their compatibility. *Compare* Apt. Br. 5, *with id.* at 8.

Worthington responds that it has never "instituted appropriation proceedings, or voted to acquire the Property." App. Br. 39. Yes, the City never took steps to formally acquire the property—because it cannot afford to pay fair market value to do so. Greeson Email, R. 65-3, PageID #1903. In fact, Worthington is litigating this case to *avoid* paying LC fair market value for public park space. No, Worthington wants its "large contiguous

greenspace" for free, or at least at a steep discount. Res., R. 72-5, PageID #3638; *see* Greeson Email, R. 65-3, PageID #1903; Ballard Memo., R. 72-9, PageID #3795 (Lifestyle Communities "will buckle and realize the only option remaining is to sell the land to the City").

Worthington also says that LC cannot impute City Council President Robinson's views onto the City. But Robinson's influence was pervasive. He lobbied councilmembers to deny LC's application, even before LC had submitted one. Robinson Email, R. 72-10, PageID #3820; Ballard Memo., R. 72-9, PageID #3795. He pressured the municipal planning commission to recommend denial of LC's application—departing from, in his own words, the "sensibility and fairness of the [commission's] standard practices." Robinson Email, R. 72-5, PageID #3686. He orchestrated the 2014 Plan's abrupt replacement in an "anti-democratic" midnight proceeding. Meeting Min., R. 72-5, PageID #3656–76. He bullied councilmembers into an effective "gag order" to stop LC from protecting its rights. *Id.*, PageID #3664. Robinson is no bit player. Indeed, Worthington city council appoints the mayor,

meaning as city council president, Robinson was the City's highest elected officeholder at that time. Worthington City Charter § 2.05.

*Nekrilov v. City of Jersey City* changes nothing. 45 F.4th 662 (3d Cir. 2022). There, the court held that the subjective motivations of the mayor and one councilmember did not impute onto the city more generally because "the complaint does not attribute bad faith motives to [other city] council members." *Id.* at 677. In other words, the plaintiffs in *Nekrilov* suffered a pleading defect, not a legal defect. Here there is no such factual defect; to the contrary, the record shows the pervasiveness of Robinson's influence.

**3.**    Finally, Worthington protests that it did not "treat[]" Lifestyle Communities "differently from any other owner or developer." App. Br. 40. As already explained, the record shows otherwise. The City's brief does too:

> After LC filed the Application, City staff members made LC aware of the need to discuss the development plan primarily in the public forum because the Property was a singularly unique property historically, geographically, and emotionally for the residents, and should not be treated as a routine rezoning application.

*Id.* at 8.

In addition, Worthington is mistaken that the district court's equal protection analysis precludes this point. *Id.* at 40. Even absent an equal protection claim, government action can have the character of a taking where the government singles the property owner out for disparate treatment. *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality op.); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987); *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 640 & 641 n.14 (Minn. 2007) ("Any unfairly unequal distribution of the regulatory burden may be considered in appropriate cases under the character factor of the *Penn Central* approach and then balanced along with the other relevant factors.").

Worthington does not acknowledge—let alone rebut—LC's caselaw. In fact, Worthington's argument contains no legal support or citations at all and should be rejected. This Court should reverse.

## III. WORTHINGTON CANNOT SALVAGE THE DISTRICT COURT'S IMPROPER DISMISSAL OF LIFESTYLE COMMUNITIES' DUE PROCESS CLAIMS.

The district court dismissed Lifestyle Communities' due process claims on the pleadings. When reviewing then, this Court must accept LC's factual allegations as true and ask whether they plausibly allege a due

process claim. *Rudd*, 977 F.3d at 511–12. As already discussed, Worthington pays lip service to this standard, then immediately abandons it. *See supra* Part I. But Worthington compounds its factual errors with legal errors.

To start, Worthington argues that LC forfeited or waived its property interest tied to its existing rights in the property. App. Br. 41. For support, the City chiefly points to the complaint, along with brief references to LC's response in opposition to Worthington's motion to dismiss and LC's motion for reconsideration.

The City's argument misunderstands forfeiture. LC need not allege *any* legal theories in its complaint. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."). Rather, LC needed to plead "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Lifestyle Communities' complaint contained sufficient factual allegations supporting its existing-rights due process theory. *See* Compl., R. 1, PageID #1, 6.

Moreover, LC preserved an existing-rights argument in its briefing below. "To preserve an issue for appellate review, a litigant must 'state the issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue' and provide 'some minimal level of argumentation in support of it' before the district court." *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 383 (6th Cir. 2023) (citation omitted). LC did so, dedicating three pages of its response to the motion to dismiss under the heading: "Lifestyle has a protected property interest in putting its Property to use, which Lifestyle cannot do under the Property's existing zoning." Resp., R. 22, PageID #403–06. Worthington cites no authority suggesting a party must move for reconsideration to preserve an issue for appeal. No such requirement exists.

The City also side-steps the district court's failure to address LC's arguments. The district court's "muteness" is grounds for reversal alone, as it "prohibits [the reviewing court] from examining the soundness" of its decision. *DWG Corp. v. Granada Invs., Inc.*, 962 F.2d 1201, 1202 (6th Cir. 1992); *see also Cotterman v. City of Cincinnati*, 2023 WL 7132017, at *7 (6th Cir. Oct. 30, 2023) (reversing and remanding where the district "court's opinion did

not discuss" claims its judgment indicated were dismissed with prejudice, such that "the district court gave us nothing to review").

Perhaps recognizing this, Worthington tries to downplay LC's claim. In the City's view, Lifestyle Communities' claim is so weak that it warranted nothing more than summary rejection. But the district court resolved only the narrow question of whether LC *had a property interest*, and Worthington forfeited any challenge to the other prongs of LC's various due process claims. *See* Mot., R. 20, PageID #128–39. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022). LC has repeatedly identified this forfeiture. *See* Apt. Br. 55–56; Resp., R. 22, PageID #401.

Ignoring its forfeiture, the City responds that LC's existing-rights due process theory fails because "the City's zoning is not unconstitutional and the City never acted adverse to existing zoning." App. Br. 44. Worthington continues that "the zoning has not changed." *Id.* at 46. Again, these arguments are forfeited. *See Bannister*, 49 F.4th at 1011–12. They go to whether the City *deprived* a property interest, not whether LC *has* a property

interest. And Worthington fails to argue that LC lacks a due process property interest in the United Methodist property itself.

Regardless, this Court should "decline to address" the merits of LC's existing-rights due process theory and remand, "since the district court hasn't passed on it." *Doe v. Lee*, 137 F.4th 569, 579 n.2 (6th Cir. 2025). "After all, [this is] 'a court of review, not of first view.'" *Id.* (quoting *Byrd v. Haas*, 17 F.4th 692, 700 (6th Cir. 2021)).

Worthington errs regarding LC's property interest in rezoning as well. As the City apparently concedes, LC can obtain a property interest in rezoning "through a 'policy, law, or mutually explicit understanding[.]'" App. Br. 49 (citation omitted). Lifestyle Communities' complaint alleges that the City created that mutually explicit understanding. Compl., R. 1, PageID #10, 12, 30. The City labels these allegations "conclusory" and ignorant of "factual reality." App. Br. 50. But in this appeal, those factual arguments fail. This Court should reverse.

**IV.**    **NOR CAN WORTHINGTON SALVAGE THE DISTRICT COURT'S UNREASONED DECLARATORY JUDGMENT RULING.**

Finally, Worthington seeks to fill in the district court's nonexistent analysis for LC's declaratory judgment claim. According to the City, "[t]he district court gave LC's declaratory judgment claim the attention it warranted" when it dismissed the claim in one sentence without reasoning. App. Br. 52. Worthington provides no legal support for this proposition. As discussed, trial courts must articulate the reasoning behind their decisions in order to permit appellate review. *See DWG Corp.*, 962 F.2d at 1202.

Worthington also appears to contend that LC did not properly preserve this claim. Not so. LC defended its declaratory judgment claim at summary judgment—and even pointed out how the City misunderstood its claim in the same way the district court ultimately did. Mot., R. 65, PageID #1675; Resp., R. 80, PageID #4545–46; Reply, R. 88, PageID #5618. Lifestyle Communities preserved its declaratory judgment claim, and the district court should have denied the City summary judgment for all the reasons outlined in LC's opening brief. *See* Apt. Br. 61–63.

## CONCLUSION

The district court erred in granting summary judgment to the City on Lifestyle Communities' partial regulatory takings and declaratory judgment claims. It also erred in granting the City's motion to dismiss as to LC's due process claims. This Court should reverse.


Dated: July 31, 2025                        Respectfully submitted,

                                            */s/ Michael R. Gladman*

                                            Michael R. Gladman
                                            Yvette McGee Brown
                                            Dustin M. Koenig
                                            Timothy D. Lanzendorfer
                                            JONES DAY
                                            325 John H. McConnell Boulevard
                                            Suite 600
                                            Columbus, OH 43215
                                            (614) 469-3939
                                            mrgladman@jonesday.com
                                            ymcgeebrown@jonesday.com
                                            dkoenig@jonesday.com
                                            tlanzendorfer@jonesday.com

                                            *Counsel for Appellants*
                                            *Lifestyle Communities, Ltd. and*
                                            *Worthington Campus, LLC*

## CERTIFICATE OF COMPLIANCE

Counsel for Lifestyle Communities, Ltd. and Worthington Campus, LLC hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The foregoing brief contains 5,968 words in Palatino Linotype (14-point) proportional type. The word processing software used to prepare this brief was Microsoft Office Word for Microsoft 365.

*/s/ Michael R. Gladman*
Michael R. Gladman

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*

Dated: July 31, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2025, I electronically filed with the Clerk's Office of the United States Court of Appeals for the Sixth Circuit the foregoing Reply Brief of Appellants Lifestyle Communities, Ltd. and Worthington Campus, LLC, and further certify that opposing counsel will be notified by the appellate CM/ECF system.

/s/ Michael R. Gladman
Michael R. Gladman

*Counsel for Appellants*
*Lifestyle Communities, Ltd. and*
*Worthington Campus, LLC*