RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0027p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

LIFESTYLE COMMUNITIES, LTD.; WORTHINGTON CAMPUS, LLC,

    *Plaintiffs-Appellants*,

    *v.*

CITY OF WORTHINGTON, OHIO,

    *Defendant-Appellee.*

No. 25-3048

---

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:22-cv-01775—Sarah Daggett Morrison, District Judge.

Argued: December 10, 2025

Decided and Filed: January 27, 2026

Before: SILER, KETHLEDGE, and MATHIS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Dustin M. Koenig, JONES DAY, Columbus, Ohio, for Appellants. Yazan S. Ashrawi, FROST BROWN TODD, LLC, Columbus, Ohio, for Appellee. **ON BRIEF:** Dustin M. Koenig, Michael R. Gladman, Yvette McGee Brown, Timothy D. Lanzendorfer, JONES DAY, Columbus, Ohio, for Appellants. Yazan S. Ashrawi, Thaddeus M. Boggs, FROST BROWN TODD, LLC, Columbus, Ohio, Paul J. Schumacher, DICKIE, MCCAMEY & CHILCOTE, P.C., Cleveland, Ohio, Richard J. Silk, DICKIE, MCCAMEY & CHILCOTE, P.C., Columbus, Ohio, for Appellee.

---

**OPINION**

---

MATHIS, Circuit Judge. Lifestyle Communities, Ltd. and Worthington Campus LLC (collectively, "Lifestyle Communities") bought a parcel of real estate in the City of Worthington,

Ohio. It wanted to build a mix of residential and commercial spaces on the property. But before it could do so, Lifestyle Communities needed Worthington to approve its development plan and rezone the property. When the City did neither, Lifestyle Communities sued, bringing numerous federal and state constitutional claims and a state-law declaratory-judgment claim. The district court rejected every claim, some at the summary-judgment stage and others at the motion-to-dismiss stage. Lifestyle Communities now challenges the district court's grant of summary judgment to Worthington on its regulatory-takings and declaratory-judgment claims. It also argues that the district court erred in dismissing its due-process claims. We affirm.

## I.

### A.

This case centers on a vacant parcel of land (the "Property") in Worthington, Ohio. For decades, the United Methodist Children's Home ("UMCH") owned the Property, where it operated a youth home. But after the home shut down in 2010, UMCH looked to sell the Property. Given central Ohio's growth in recent years, it was desirable real estate. There was just one problem: nearly 75% of the Property carried a special S-1 zoning restriction that permitted only parks, hospitals, churches, parochial schools, and other public or institutional uses. *See* Worthington Codified Ordinances § 1147.01 (Am. Legal Publ'g 2024).

To make sense of this dispute, some background information on Worthington's specific rezoning procedures is helpful. When a Worthington property owner wants to build apartments or shops on land not zoned for such uses, the owner must submit a rezoning application. *Id.* § 1174.06. Worthington's Municipal Planning Commission ("MPC") reviews the application and then submits its recommendation to Worthington's legislative body, the City Council ("Council").[1] *Id.* §§ 1174.06(a), 1174.07(a). But the MPC does not make its recommendations in a vacuum. According to Worthington's Charter, the MPC must "articulate its basis . . . in writing" for any recommendation "by reference to" the City's Comprehensive Plan. *Id.* § 6.03.

---

[1]Because the Property sits in a designated architectural district, Worthington's zoning laws also require approval from its Architectural Review Board ("ARB"). Codified Ordinances §§ 1177.02–.05. Given that every MPC member also sits on the ARB, we attribute actions taken by the MPC and the ARB collectively to the MPC.

Sometimes referred to as a master plan, a comprehensive plan is a set of development objectives adopted by a municipal legislative body "to create a vision for the city and provide recommendations to guide public policy." D. 31 at p.12. It is a "land use policy document"—but, notably, it is not an ordinance. *See id.*

A simple majority of the Council may amend Worthington's Comprehensive Plan by adopting a resolution without notice or a waiting period. *See* Codified Ordinances § 2.16 (describing actions that the Council must take by ordinance and stating that all other actions may be taken by resolution or motion). Moreover, the authority to approve or deny applications lies with the Council alone, and the zoning ordinances do not require the Council to follow the Comprehensive Plan. *Id.* § 1174.08. Finally, even if the Council approves a rezoning plan, Worthington residents have 60 days to seek a referendum to potentially override the decision. *Id.* § 1.04. Needless to say, rezoning the Property would be no simple matter.

Reluctant to let the UMCH lot sit vacant, Worthington sought to amend its Comprehensive Plan to guide development of the Property. The City envisioned a mixed-use development, including commercial and residential zones, with a strip of greenspace along the southern boundary of the parcel. In 2014, the Council revised the Comprehensive Plan to include this development scheme.

## B.

Enter Lifestyle Communities, a real-estate developer. In June 2015, Lifestyle Communities—intrigued by the vision laid out in the Comprehensive Plan—presented a development proposal for the Property at an MPC public meeting. About 350 residents and City officials attended the meeting. The reaction was mixed—toward both Lifestyle Communities and the Comprehensive Plan in general. While some voiced approval, others raised concerns, including a lack of greenspace in the proposal, the potential for increased traffic in the area, and high residential density.

For the next two years, things were quiet. Then, in April 2017, Lifestyle Communities signed a contract with UMCH to purchase the Property for $6 million, with closing contingent on Worthington rezoning the land for Lifestyle Communities's mixed-use development plans.

After agreeing to waive the rezoning contingency, Lifestyle Communities paid $5.2 million for the Property—an $800,000 reduction from the original purchase price. The developer closed on the Property in January 2021.

A few months before closing, Lifestyle Communities submitted its application to the MPC to rezone the Property. The parties disagree on whether the application conformed with the Comprehensive Plan. But the record shows that, at the MPC's January 2021 meeting (six days before Lifestyle Communities and UMCH closed on the Property), Worthington residents and officials reiterated their concerns about the high-density buildings and the lack of greenspace in Lifestyle Communities's proposal. In fact, since its earlier proposal in 2015, Lifestyle Communities had *increased* the number of projected housing units from 571 to 730. Largely because of the negative feedback, and on Lifestyle Communities's request, the MPC tabled the application, and in September 2021, Lifestyle Communities submitted a revised proposal that reduced the number of units to 600. But the MPC still declined to recommend approval to the Council.

In December 2021, the Council denied Lifestyle Communities's application. By law, Lifestyle Communities had to wait until April 2022 to reapply—six months from the MPC's most recent review of the application. *See* Codified Ordinances § 1145.05. In the interim, the Council passed Resolution 04-2022, amending the Comprehensive Plan regarding the Property. Spearheaded by a new Council president—who did not share Lifestyle Communities's vision for the Property—the revised Comprehensive Plan placed greater emphasis on contiguous greenspace and reflected "a current understanding of public opinion, market conditions, and evolving societal and environmental values." R. 63-1, PageID 1473.

Rather than submit a new proposal, Lifestyle Communities sued Worthington under 42 U.S.C. § 1983 and the Ohio Constitution, asserting takings claims, due-process claims, equal-protection claims, free-speech claims, and retaliation claims. Lifestyle Communities also sought a declaratory judgment that the Property's current zoning restrictions were unconstitutional. The district court dismissed most of Lifestyle Communities's claims in resolving Worthington's motion to dismiss, leaving only Lifestyle Communities's regulatory-takings and declaratory-

judgment claims. Following discovery, the district court granted summary judgment to Worthington on those remaining claims.

Lifestyle Communities timely appealed. It now seeks to revive its regulatory-takings, declaratory-judgment, and due-process claims.

## II.

We review the grant of summary judgment de novo. *Puskas v. Delaware County*, 56 F.4th 1088, 1093 (6th Cir. 2023). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022).

### A.

We begin with the regulatory-takings claim. The Fifth Amendment's Takings Clause, applicable to the States through the Fourteenth Amendment, provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V; *Sheetz v. County of El Dorado*, 601 U.S. 267, 276 (2024). "The plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (citation modified). A primary objective of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

The Supreme Court has identified two types of takings. One is a physical taking. Physical takings happen "[w]hen the government physically acquires private property for a public use." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). This includes when the government undertakes any of the following actions—exercises its eminent-domain power to condemn property; physically appropriates property, by regulation or otherwise; "physically takes possession of property without acquiring title to it"; or "occupies property." *Id.* at 147–49.

The second type is a regulatory taking. Although the government can regulate how property owners use their property, "if regulation goes *too far* it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) (emphasis added). The regulatory-takings analysis "applies to use restrictions as varied as zoning ordinances, orders barring the mining of gold, and regulations prohibiting the sale of eagle feathers." *Cedar Point Nursery*, 594 U.S. at 148 (citation modified).

This case involves an alleged regulatory taking. For regulatory-takings claims, the Supreme Court has "generally eschewed any set formula for determining how far is too far." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (citation modified). Instead, the Court has preferred "to engage in essentially ad hoc, factual inquiries," *id.* (citation modified), that are "designed to allow careful examination and weighing of all the relevant circumstances," *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (citation modified).

That said, the Court has given us some guidance for deciding when government action "effects a regulatory taking." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). First, a regulatory taking occurs "where regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015. Second, if a regulation does not deprive a property owner of all economically beneficial use of the property, "a taking still may be found based on a complex of factors." *Murr*, 582 U.S. at 393 (citation modified). These factors include: (1) "[t]he economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). This guidance helps us "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

To begin, the parties dispute whether Lifestyle Communities possessed a "cognizable property interest" to support its takings claim. *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004). Lifestyle Communities asserts that, as the owner

of the Property, it holds "[t]he 'bundle of rights' which have been associated with property includ[ing] the rights to possess, to use, to exclude, to profit, and to dispose." *Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991). Worthington, on the other hand, argues that Lifestyle Communities had no property interest in the expectation of future rezoning, and so its takings claim must fail as a matter of law.

True, the right to freely develop the Property as it saw fit was not among the rights that Lifestyle Communities acquired when it purchased the Property. That said, "[a] valid takings claim will not evaporate just because a purchaser took title after" a land-use restriction "was enacted." *Murr*, 582 U.S. at 398. Also, we "routinely consider takings claims like [Lifestyle Communities's] that arise from a local authority's denial of rezoning, variances, or land-use permits." *Andrews v. City of Mentor*, 11 F.4th 462, 469 (6th Cir. 2021). We decline to resolve this "complicated" issue, which would require us delve into the "background principles of [Ohio] property and nuisance law," *id.* at 470–71, because, as we explain below, Lifestyles Communities has failed to show that Worthington committed a taking.

Assuming (without deciding) that Lifestyle Communities possessed a cognizable property interest, we now consider whether a regulatory taking has occurred. *Coal. for Gov't Procurement*, 365 F.3d at 481. Lifestyle Communities does not argue that Worthington has deprived it of all economical use of the Property. So we evaluate its claim using the *Penn Central* factors. Applying these factors, we conclude that the district court did not err in granting summary judgment to Worthington.[2]

### 1.

*Economic impact of the regulation.* Lifestyle Communities purchased the Property in 2020 for $5.2 million. Still, it contends that the Property would be worth $55.5 million if Worthington rezoned the land consistent with the 2014 Comprehensive Plan. But the Property would be worth only about $3.3 million, according to Lifestyle Communities, if Worthington

---

[2]Lifestyle Communities also brought a takings claim under the Ohio Constitution. Ohio Const. art. I, § 19. Because Ohio courts use the *Penn Central* factors when analyzing state-law takings claims, Lifestyle Communities's state takings claim fails for the same reasons as its federal takings claim. *State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1005–06 (Ohio 2002) (citing *Penn Cent.*, 438 U.S. at 124).

rezoned the land consistent with the 2022 amendment to the Comprehensive Plan—a 94% drop in economic value. If accurate, this loss of value is substantial. But even a significant loss of property value, absent more, will not suffice to prove a taking. *See Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) ("[D]iminution in the value of property, however serious, is insufficient to demonstrate a taking."). So we proceed to the other *Penn Central* factors.

**2.**

*Distinct investment-backed expectations*. Lifestyle Communities alleged that Worthington promised to "provide the necessary approvals" if Lifestyle Communities "develop[ed] the Property in accordance with the [Comprehensive Plan]." R. 1, PageID 12. But the record contradicts this allegation. The evidence instead shows that Lifestyle Communities purchased the Property with an awareness—maybe even an apprehension—that Worthington might not rezone the land.

Worthington never promised Lifestyle Communities that it would approve development consistent with the Comprehensive Plan. To the contrary, the Council issued a statement following Lifestyle Communities's initial 2015 presentation to let residents know that the Council "[h]as never supported nor does it support the plan presented by UMCH and [Lifestyle Communities]." R. 70-1, PageID 3262. And the Council pledged that it "[w]ill only support UMCH redevelopment that enhances the community and meets, in the broadest sense, the objectives of the Comprehensive Plan." *Id.* At best, the circumstances show that broad compliance with the Comprehensive Plan would be necessary, but not sufficient, to achieve rezoning approval. And even if the Council approved Lifestyle Communities's development, a referendum could still reverse that decision. Given this context, a reasonable investor would not expect that approval from Worthington and its residents was guaranteed.

But we do not need to guess at Lifestyle Communities's expectations. Before closing on the Property, Lifestyle Communities's then-general counsel Bo Brownlee told the Franklin County Auditor's Board of Revisions that "the city believes this will be a very difficult rezoning application to get approved." R. 60-2, PageID 774. Brownlee also testified that UMCH "just

didn't have the appetite for what was probably going to be a prolonged rezoning battle." *Id.* at 775.

Lifestyle Communities nevertheless insists there is a genuine dispute of material fact as to its investment-backed expectations. Why else, it argues, would it pay $5.2 million for the Property? But Lifestyle Communities misses the point. That it took various measures to gain Worthington's approval differs from whether it had a reasonable expectation that its rezoning application would be approved. And to establish "a reasonable investment-backed expectation," Lifestyle Communities needs to show "more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (citation modified).

Lifestyle Communities fails to meet this standard. For example, Lifestyle Communities argues that, notwithstanding Worthington's public representations, it reasonably relied on the development vision laid out in the 2014 Comprehensive Plan. But the Comprehensive Plan does not bind Worthington, nor does it speak for its residents on individual development projects. In municipalities across Ohio, a comprehensive plan "represents a community's policy toward public and private development." *Southgate Corp. v. Village of Granville*, No. 18-CA-108, 2019 WL 2366884, at *3 (Ohio Ct. App. June 3, 2019). It is "separate and distinct from a zoning ordinance." *Cent. Motors Corp. v. City of Pepper Pike*, 409 N.E.2d 258, 280 (Ohio Ct. App. 1979). To the extent the Comprehensive Plan has any legal effect, it applies only to the MPC—not the Council. And the MPC is required only to "articulate" the basis for its recommendations to the Council "by reference to" the Comprehensive Plan. Codified Ordinances § 6.03.

The Council is always free to depart from the MPC's recommendations. So even if Lifestyle Communities believed the Council would approve its application, this belief alone does not create an investment-backed expectation. Lifestyle Communities cannot establish a taking "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." *Penn Cent.*, 438 U.S. at 130.

### 3.

*Character of the government action*. The final *Penn Central* factor also weighs against Lifestyle Communities. In assessing the character of the government action, a taking is more

likely to occur "when the interference with property can be characterized as a physical invasion by government," *id.* at 124, or when the government action lacks a legitimate public purpose, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987). This factor also accounts for the "duration of the restriction"—the longer or more indefinite the restriction, the greater the likelihood that it is a taking. *Tahoe-Sierra Pres. Council*, 535 U.S. at 342.

First, Worthington's actions do not resemble a physical invasion. In fact, Worthington has barely changed the status quo at all. Lifestyle Communities has all the same property rights it did when it bought the Property; the only difference now is that the City lawfully amended a non-binding set of guidelines that functions largely as a reference aid for developers and the MPC.

Second, Worthington's actions—denying Lifestyle Communities's application, refusing to rezone, and amending the Comprehensive Plan—have legitimate public purposes. Among other reasons, residents opposed Lifestyle Communities's proposal due to its lack of greenspace and increased traffic to the area. Both are legitimate public purposes. *See Murr*, 582 U.S. at 405 (2017) (recognizing an "effort to preserve the river and surrounding land" as legitimate); *Loreto Dev. Co. v. Village of Chardon*, Nos. 97-3502/3636, 1998 WL 320981, at *5 (6th Cir. June 4, 1998) (per curiam) (recognizing traffic reduction as a "permissible motive[]"). And the text of Resolution 04-2022's amendment to the Comprehensive Plan specifically addresses these concerns, citing "traffic patterns, environmental impact, [and] scale and density of any residential housing" as relevant considerations. R. 63-1, PageID 1473. This suggests that the Council's stated legislative purposes were "genuine, substantial, and legitimate." *See Keystone*, 480 U.S. at 486.

Third, Worthington did not subject Lifestyle Communities to an unreasonable delay. After rejecting Lifestyle Communities's rezoning application, Worthington required the developer to wait six months from the MPC's most recent review of the application to reapply. *See* Codified Ordinances § 1145.05. There is no categorical rule as to when a delay becomes so "unreasonable" that it can be characterized as a taking. *See Tahoe-Sierra*, 535 U.S. at 341–42. What is more, Worthington codified its six-month waiting period years before Lifestyle

Communities's involvement with the Property, so the rule was neither unanticipated nor arbitrary as applied to Lifestyle Communities. We have described bureaucratic delays lasting well past six months as "incidents of ownership," not takings. *Richmond Rd. Partners, LLC v. City of Warrensville Heights*, No. 24-3502, 2025 WL 737342, at *3 (6th Cir. Mar. 7, 2025).

Lifestyle Communities contends that Worthington's conduct nevertheless embodies the character of a taking because it acts fundamentally as an attempt to seize private land and turn it into a public park. We disagree. Both the current S-1 zoning and the 2014 Comprehensive Plan contemplate substantial greenspace on the Property. *See* Codified Ordinances § 1141.02(b) (describing S-1 areas as "large public or semipublic land holdings . . . suitable for noncommercial recreation"); *see also id.* § 1147.01 (listing "parks" and "conservation . . . areas" as permitted uses under S-1 zoning). Thus, Lifestyle Communities had clear notice when it purchased the Property that Worthington possessed the authority and the intention to reserve some portion of the Property for parkland. The fact that Resolution 04-2022—which is not binding law—calls for more greenspace than Lifestyle Communities might prefer is a far cry from a "classic taking." *Lingle*, 544 U.S. at 539. Although Lifestyle Communities tells a tale of a supposed runaway councilmember covertly executing nefarious schemes, its story is more innuendo than substance—and, more importantly, its story does not show a taking.

\*   \*   \*

All in all, when viewing the evidence in Lifestyle Communities's favor, Worthington did not commit a taking. True, Lifestyle Communities may have suffered a loss in property value and had to endure a fairly typical bureaucratic waiting period. But as a matter of law, this is insufficient to establish a regulatory taking.

**B.**

We turn next to Lifestyle Communities's declaratory-judgment claim. Lifestyle Communities contends that the Property's S-1 zoning is unreasonable.

Under Ohio law, property owners may challenge existing zoning ordinances in a declaratory-judgment action. Ohio Rev. Code Ann. § 2721.03. To prevail, the property owner

must demonstrate the ordinance's unconstitutionality "beyond fair debate." *Goldberg Cos. v. Richmond Heights City Council*, 690 N.E.2d 510, 512 (Ohio 1998). This means that the ordinance must deny the owner "the economically viable use of their land without substantially advancing a legitimate government interest." *Karches v. City of Cincinnati*, 526 N.E.2d 1350, 1357 (Ohio 1988).

Under Ohio law, "[z]oning ordinances are presumed constitutional." *Goldberg*, 690 N.E.2d at 511. To rebut this presumption, Lifestyle Communities must show that the Property's current zoning is "clearly arbitrary and unreasonable," with no "substantial relation to the public health, safety, morals, or general welfare of the community." *Id.* at 515. Lifestyle Communities offers no authority indicating that the zoning at issue—which permits parks, hospitals, churches, and colleges, along with shops, offices, and other commercial uses on a substantial portion of the parcel—is unconstitutional "beyond fair debate." *See id.*

### III.

Finally, we address Lifestyle Communities's due-process claims, which the district court rejected at the motion-to-dismiss stage. We review the court's dismissal of these claims de novo. *Lindke v. Tomlinson*, 31 F.4th 487, 495 (6th Cir. 2022).

To survive a motion to dismiss, claimants must provide "a short and plain statement" in their complaint showing they are "entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this standard, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In this regard, a pleading that offers only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Fourteenth Amendment's Due Process Clause bars "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §

1. The Supreme Court has held that the Due Process Clause has procedural and substantive components. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 755–56 (2015).

Procedural due process requires the government to provide "fair procedure" before depriving a person of life, liberty, or property. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). To succeed on a procedural-due-process claim, a plaintiff must show: (1) "deprivation by state action of a protected interest in life, liberty, or property," and (2) "inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023).

Substantive due process "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon*, 494 U.S. at 125 (citation modified). To succeed on a substantive-due-process claim, a plaintiff must show: "(1) it has a constitutionally protected interest," and (2) the government "deprived it of that interest through arbitrary and capricious action." *Golf Vill. N., LLC v. City of Powell*, 42 F.4th 593, 601 (6th Cir. 2022) (citation modified).

Both types of due-process claims require the plaintiff to have "a constitutionally protected interest." *Id.* at 598. Protected property interests are defined by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Lifestyle Communities's complaint asserted several due-process violations, some styled as procedural challenges and others as substantive.[3] On appeal, Lifestyle Communities argues that it sufficiently alleged: (1) a due-process claim based on Worthington's failure to rezone the

---

[3]The complaint asserts five due-process claims, respectively labeled: "procedural due process," "substantive due process," "spot zoning," "void for vagueness," and "due process taking." But we focus primarily on the first two claims. Although Ohio courts recognize spot-zoning claims, Lifestyle Communities alleged no facts from which we could infer that Worthington singled out the Property "for discriminatory or different treatment from that accorded surrounding land which is similar in character." *Willott v. Village of Beachwood*, 197 N.E.2d 201, 203 (Ohio 1964). Next, Lifestyle Communities may not premise its void-for-vagueness challenge on Resolution 04-2022 because the resolution is not binding law. The void-for-vagueness doctrine exists to "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). Resolution 04-2022 neither forbids nor requires anything of Lifestyle Communities. Finally, we have rejected Lifestyle Communities's claim that Worthington's conduct amounts to a taking under the Takings Clause, and that outcome would not change under the Due Process Clause. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215–16 (6th Cir. 1992) (distinguishing the two types of takings claims more by the remedy sought than by the alleged conduct).

Property in accordance with the 2014 Comprehensive Plan, and (2) a due-process violation based on the restrictions to its use of the Property under the current zoning. We address each argument in turn.

### A.

Property owners generally do not have a property interest in the expectation of rezoning. *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856 (6th Cir. 2012). This is because "a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Still, an exception applies when a "policy, law, or mutually explicit understanding . . . both confers the benefit[] and limits the discretion of the City to rescind the benefit." *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 573 (6th Cir. 2008) (quotation omitted).

Lifestyle Communities contends that it had a mutually explicit understanding with Worthington that the Council would approve its development proposal if it was consistent with the Comprehensive Plan. But such an arrangement would be improper under Ohio law. *See Gillespie v. Stow*, 584 N.E.2d 1280, 1285 (Ohio Ct. App. 1989). Ohio municipalities cannot bargain away their legislative power by promising to rezone land if some condition is met—a practice known as "contract zoning." *Id.*; *see also Hausmann & Johnson, Inc. v. Berea Bd. of Bldg. Code Appeals*, 320 N.E.2d 685, 690 (Ohio Ct. App. 1974). Such an arrangement could not create a property interest on which Lifestyle Communities can base a due-process claim because it leaves "the discretion of the City to rescind the benefit" intact. *See Braun*, 519 F.3d at 573.

In response, Lifestyle Communities argues that there is no contract zoning because there is no contract—it offered no consideration to Worthington in exchange for rezoning. But Ohio courts interpret "contract zoning" to encompass a wide range of prohibited conduct—beyond the obvious corruption of offering bags of cash to influence zoning policy—including when a city conditions rezoning on an applicant's conduct. *See Hausmann & Johnson*, 320 N.E.2d at 689 (invalidating a city ordinance requiring rezoning applicants to use the property for its desired purpose within one year, or else the land would revert to its original zoning).

Without a valid mutual understanding, Worthington had unfettered discretion to deny Lifestyle Communities's rezoning application, negating any purported property interest. *See EJS Props.*, 698 F.3d at 856. The district court thus did not err in concluding that Lifestyle Communities failed to allege a cognizable property interest in a discretionary zoning decision.

### B.

Lifestyle Communities argues that Worthington's current zoning scheme violates its right to use its property as it sees fit. This type of claim sounds in substantive due process.

Even absent a property interest in future zoning, a property owner may still challenge a denied rezoning proposal as a due-process violation under limited circumstances. Property owners "have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 853 (6th Cir. 2010) (quotation omitted). "A local zoning ordinance survives a substantive due process challenge if there exists a rational relationship between the terms of the ordinance and a legitimate governmental purpose." *Id.* (citation modified).

The complaint fails to plausibly allege that the current S-1 zoning for the Property bears "no rational relationship to any public purpose." *Warren v. City of Athens*, 411 F.3d 697, 705 (6th Cir. 2005). Instead, Lifestyle Communities points to a purported conspiracy against it, spearheaded by a councilmember and a cadre of not-in-my-backyard activists. These allegations do nothing to state a substantive-due-process claim.

### IV.

For the reasons above, we **AFFIRM** the district court's judgment.